# Exhibit 1

F I L E D

FEB 23 2021

Clerk of the Court
Superior Court of CA County of Santa Clara
BY M.Bueno DEPUTY
(M.Bueno)

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

IN RE THE MARRIAGE OF

PATRICE W. DARISME

               Petitioner,

and

PRINCESCA N. ENE,

               Respondent.

Case No. 2015-6-FL014081

STATEMENT OF DECISION RE PROPERTY DIVISION, REIMBURSEMENT AND BREACH OF FIDUCIARY DUTY

Trial Dates: February 11 through December 16, 2020 (various)
Date Submitted: December 16, 2020
Proposed Statement of Decision: January 20, 2021
Hearing re Attorneys' Fees: March 3, 2021
Dept.: 10 (Hayashi)

     On February 11, February 13, February 14, February 20, February 21, March 2, March 4, October 26, October 27, October 28, November 18, December 10 and December 16, 2020, the Parties brought on for trial the issues of (1) Division of Property and Reimbursements; (2) Petitioner PATRICE DARISME 's ("Petitioner" or "Husband" or "Mr. Darisme") Request for Findings and Orders based upon Respondent PRINCESCA ENE's ("Respondent" or "Wife" or "Ms. Ene") Breach of Fiduciary Duties under the Family Code; (3) the Parties' respective Requests for Orders re Contempt;[1] and (4)

---

[1] Petitioner's two March 27, 2019 Requests for Order re Contempt; Respondent's May 31, 2019 Request for Order re Contempt.

1

1 Husband's Request for Temporary Restraining Order (filed October 20, 2020). Petitioner appeared with
2 and through his counsel Walter Pierce Hammon, Cory Hammon and John D. Pernick; Respondent
3 appeared with and through her counsel Shannon Stein and Pamela Schuur.

4 The matter was originally scheduled to commence trial on February 10, 2020, at which time the
5 trial court was concluding a civil jury trial in another matter. The jury in that case did not return a
6 verdict on the second phase of that trial until the afternoon of February 14. In the meantime, following
7 hearing on *in limine* motions and opening statements, testimony in this case commenced on February 11,
8 with Petitioner calling Respondent as an adverse witness.[2] Court was in recess for the Lincoln's
9 Birthday holiday on February 12. On the afternoon of February 13, following discussion between Court
10 and counsel about potential collateral consequences that may result from Respondent's testimony,
11 Respondent's counsel requested a break in the proceedings so that she could consult with criminal law
12 counsel, which counsel Dan Barton, appeared in limited scope with and for Ms. Ene on October 27,
13 2020 only.
14
15 On February 14, 20, 21, March 2 and March 4, 2020, the Court heard testimony from the Parties'
16 respective accounting experts Jeffrey Stegner (for Respondent re: business valuation); James Butera
17 (Joint Neutral Accounting Expert); and Sally White (for Petitioner). In addition, the Court addressed the
18 request of Respondent for an early distribution of funds from a community property investment account.
19 At the close of testimony on March 4, 2020, the Parties were to resume testimony on March 17, 2020.
20 On the afternoon of March 13, 2020, the Court received notice that due to the Covid-19 emergency
21 "shelter in place" orders, further trial proceedings would be continued until sometime after May 4, 2020.
22 Due to various extensions in those orders and the limited resources available to the Court because of the
23 State's reduction of trial court funding, trial in this matter could only resume on October 26, 2020.[3]
24
25
26 ─────────────────
27 [2] The substance of any witness' testimony will be discussed below in connection with the Court's findings. With the
exception of a portion of the testimony of Sally White given on March 4, 2020, a court reporter was present during all
witness testimony in this matter.
28 [3] Between March 13, 2020 and October 26, 2020, the Court held at least three informal telephonic status conferences and
remote hearings with counsel to address continued trial dates, Respondent's request for early disbursement of funds from a
community account; and requests by witnesses and Parties to appear remotely.

2

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 3 of
37

On October 26, 2020, the Parties stipulated to withdraw their respective Requests for Order re Contempt with prejudice. Accordingly, the Court will not make any rulings with respect thereto.

On October 26, 2020, the Court heard testimony of Wilson Eng[4] (appearing remotely via MS Teams) and Nina Thompson, a former employee of Nano Alloys, Inc. On October 27, 2020, Ms. Ene (appearing remotely via MS Teams) resumed testifying and on the advice of her counsel Dan Barton (specially appearing remotely via MS Teams) asserted her Fifth Amendment right not to answer any of the questions that she was asked by Petitioner's counsel. On October 27 and 28, 2020, the Court heard the testimony of Petitioner. In addition, the Court received the deposition testimony of Laura Vaughn, representative of Cardinal Health and an out-of-state resident, in lieu of her live testimony. Thereafter, Ms. White and Katie Simms (Respondent's expert re: property division and reimbursements), who had been meeting and conferring in an attempt to resolve the division of bank accounts and reimbursements were to testify, which testimony was set for November 18, 2020.

On October 28, 2020, counsel for Petitioner brought to the Court's attention the fact that Petitioner had filed a request in the family law division for temporary restraining order and order to show cause to prevent Respondent from withdrawing or using any funds held in the names of or purportedly on behalf of certain entities in which the community had an interest, including Nano Alloys, Inc. The Court granted the temporary restraining order, and advanced hearing on the preliminary injunction from November 19, 2020 in the family law department to November 18, 2020, further

---

[4] It has been stipulated that for purposes of this proceeding Wilson Eng is a shareholder of Nano Alloys, Inc. who currently holds a 50 percent interest in the company. As discussed in the text below, when and how he obtained that interest is disputed. The Court does not find Mr. Eng to be a neutral witness; he is adverse to Petitioner. Both Nano Alloys, Inc. and Mr. Eng are represented by the Law Offices of Nicholas Heimlich and Pamela Schuur (counsel for Respondent in this action) in a related civil action adverse to Petitioner, Nano Alloys, Inc. v Patrice Darisme, and Mr. Darisme's cross-complaint filed therein (18CV321769). The Court notes that in February 2020, Mr. Heimlich appeared on behalf of Mr. Eng with regard to Mr. Eng's appearance as a witness in this case pursuant to subpoena. In March 2020, Mr. Heimlich wrote to the court to state that he is not "corporate counsel" for Nano Alloys, Inc., and therefore although made aware by Ms. Schuur of the Court's instruction that the Parties contact and cooperate with Nano Alloys, Inc.'s corporate counsel with regard to the access of their community property share of funds held by that corporation, he could not cooperate with the Court's instruction and stated that the corporation was not going to make funds available to any of the shareholders. In December 2020, the Court learned that Mr. Heimlich was being paid by the corporation Nano Alloys, Inc., at the direction of Respondent to represent Mr. Eng and the corporation adverse to Petitioner – who is a putative shareholder in the corporation.

3

ordered that neither Party should transfer, sell or attempt to transfer or sell their ownership interest in the identified entities, and ordered that hearing be set for November 18, 2020, on the joinder of Nano Alloys, Inc. in the family case.[5] As Wilson Eng and Nano Alloys, Inc. thereafter filed a CCP §170.6 challenge, the issue of joinder was reassigned to the Family Law Division for determination. Accordingly, the Court makes no orders herein with regard to the corporation, but addresses only the rights and liabilities as and between Husband and Wife with regard to the community property interest in the corporation, and Wife's actions that have had or may have an impact on the community property interest in the corporation.

On November 18, 2020, the Court granted Petitioner's motion to strike the testimony of Respondent's accounting expert Jeffrey Stegner to the extent that it included: (1) statements made to him by Respondent of matters as to which she refused to answer questions; (2) assumptions made by him based upon statements or information provided by Respondent as to which she had refused to answer questions; or (3) findings and opinions expressed by him in reliance on statements made by Respondent or assumptions of fact based thereon. The Court continued further testimony to December 10, 2020, and reissued the temporary restraining order.

On December 10, 2020, the Court heard testimony of Katie Simms and further testimony of Sally White. The Court also heard argument in support of Respondent's request to modify the Temporary Restraining Order so that she could pay necessary ongoing expenses to preserve the value of Nano Alloys, Inc. The Court reissued the Temporary Restraining Order, and ordered that the Parties

---

[5] Prior to February 2020, Petitioner had sought joinder of Nano Alloys, Inc. into this family law action. Respondent had sought to stay this trial under after adjudication of the civil action of Nano Alloys, Inc. v. Patrice Darisme and Mr. Darisme's cross-complaint filed therein (18CV321769). The all-purpose Family Law Judge assigned to this case denied both requests for order. On October 28, 2020, the Court stated that based on the evidence it appeared to the Court that prior to separation 100% of the stock of Nano Alloys, Inc. was a community property asset, that Wife had purported to transfer 50% of the stock to Wilson Eng in violation of her fiduciary duties to her spouse; that Wife had acted with malice, oppression and fraud in her exercise of management and control over Nano Alloys, Inc. and its assets, to the detriment of Husband; that after separation she had transferred, withdrawn and converted cash assets of Nano Alloys, Inc.; that as of October 28, 2020, she continued to be the sole officer of the corporation, and had sole control over the bank accounts containing approximately $6 million; and that therefore the temporary restraining order should issue as requested against Wife, and the corporation should be joined so that the Court could effectively enforce its orders.

4

return on December 16, 2020 to discuss a briefing schedule for attorneys' fees and whether further modification of the Temporary Restraining Order should be ordered.

On December 16, 2020, the Parties confirmed that the matter was submitted on all issues except attorneys' fees. The Court stated its tentative ruling that Petitioner is entitled to recover attorneys' fees from Respondent under Family Code §1101(g) and under Family Code §271. The Court set a briefing schedule for attorneys' fees and hearing for March 3, 2021. The Court continued further hearing on the preliminary injunction to March 3, 2021, and modified the Temporary Restraining Order to allow Respondent to pay delinquent and ongoing corporate operational expenses for Nano Alloys, Inc., such as corporate filing fees, taxes, data storage fees, and equipment storage fees that fell below a monthly cap, and were concurrently disclosed to Petitioner, as well as to pay a significant arbitration award entered against the corporation in favor of its former counsel who had initiated the civil action (18CV321769) against Petitioner. The Court denied Respondent's request to authorize her to use corporate funds, in which Petitioner had an interest, in order to continue to pursue litigation against Petitioner. The Court authorized the payment of the arbitration award to former counsel solely to avoid incurring interest and costs of collection, and thereby further reduce the value of the community interest in the corporation. This authorization does not alter the Court's finding that Respondent's use of corporate funds to pursue claims against Petitioner for withdrawing corporate funds while not repaying the corporation for her withdrawal of corporate funds, is evidence of oppression (misuse of Respondent's position as an officer of the corporation to disadvantage Petitioner).

Both Parties requested a written Statement of Decision. On January 20, 2021, the Court filed and served its Tentative Decision and Proposed Statement of Decision (the "PSOD"). On February 4, 2021, Petitioner filed and served his Response to the PSOD ("Petitioner's Response") and Respondent filed and served her Objections to Tentative Decision and Statement of Decision ("Respondent's Objections"). This Statement of Decision incorporates the Court's rulings with regard to the Parties' objections, and requests for correction or clarification, as well as additional corrections or clarifications made by the Court.

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 6 of 37

1    Petitioner's Response.

2        Request A: Both Parties identified a 2004 Toyota Sequoia as a community asset in their trial

3    briefs. See also Respondent's Schedule of Assets and Debts. The Court did not address that asset in the

4    PSOD, and will do so herein.

5        Request B that Petitioner be awarded 100% ownership of the Canadian corporation in this

6    Statement of Decision is granted as described below. On October 26, 2020 (Transcript pages 60:24-

7    63:6) the Parties stipulated that the Parties own as community property an eight unit apartment complex

8    held by them through the Canadian corporation, and stipulated to the value of the real property. The

9    Parties also made clear that their stipulation went only as to the value of the real property not to the

10   corporate interest, and that there are as yet unresolved claims with regard to an accounting for the bank

11   account balance as of date of separation, and the receipt of rents and expenditures made since date of

12   separation the bank accounts. Accordingly, a transfer of ownership of the Canadian corporation to

13   either spouse, without reservation of rights with regard to an accounting for post-separation income and

14   expenses, would not be proper.

15        Request C to correct the value of the household furniture to a total value of $10,000; Request D

16   seeking clarification of the dates on which Plaintiff's obligation to make Fair Rental Payments; Request

17   E to make clear that transfers of cash or assets (including the buyouts of either Parties' interests in the

18   Family Residence or stock of Nano Alloys) are incident to a divorce and not intended to be taxable; and

19   Request F to correct typographical errors, are granted, except with regard to page 28, line 6, which

20   dollar amount is being modified pursuant to other orders made herein.

21        Respondent's Objections.

22        In a statement of decision, the court need not specify the particular evidence considered by the

23   trial court is reaching its decision or make findings on every evidentiary point. *IRMO Williamson*

24   (2014) 226 Cal.App.4th 1303, 1318-19; *Richardson v. Franc* (2015) 233 Cal.App.4th 744, 753 n.2. The

25   main purpose of an objection to a proposed statement of decision is not to reargue the merits. *Heaps v.*

26   *Heaps* (2004) 124 Cal.App.4th 286, 292; *Yield Dynamics, Inc. v. TEA Sys. Corp.* (2007) 154

6

Cal.App.4th 547, 560. For these reasons, except as specified below, the Court overrules all of Respondent's "Objections" as either requests that the Court consider a particular piece of evidence and disregard other findings and evidence, and/or re-arguments of the merits of the case. In particular, the arguments with regard to the valuation date for purposes of the award of damages, whether or not an award of damages for breach of fiduciary duty was duplicative with assigning a value to the remaining community interest in the stock of Nano Alloys, Inc., were presented orally and in writing repeatedly and exhaustively over the past year.

Further, despite Respondent's refusal to answer questions about her transfer of stock to Mr. Eng, Respondent asks the Court to give greater weight to the stock certificates and minutes that she purportedly prepared in 2014 (which could not be corroborated by Wilson Eng) as compared to the sworn testimony of Petitioner. The Court has already rejected these arguments by Petitioner, and finds no greater merit in them now.

The Court finds that Respondent's reliance on *IRMO Schleich* (2017) 8 Cal.App.4th 267, 284 is unavailing and based on a misstatement of the Court's careful explanation of the basis of its calculation of 1101(g) damages for the transfer of 50% of the community property interest of Nano Alloys to Mr. Eng; 1101(h) damages measured by the difference between the value of the community property interest in the other 50% and the current pre-tax value (which specifically avoids duplication of the damages awarded and the value of the corporation as of the date of trial); and the buyout amount (25% of the Court's valuation as of date of trial).

The Court's statements about Mr. Eng, his representation in this case and in the related civil action by the same counsel who are representing Respondent in this case, and the actions of Mr. Eng and his counsel in this case are not *dicta*. The Court finds that Mr. Eng was not a neutral witness in this case and is biased as against Mr. Darisme. Mr. Eng's lack of neutrality and bias were considered by the Court in weighing the credibility of Mr. Eng's testimony and in concluding that it would be unjust and inequitable to divide the stock ownership of Nano Alloys "in kind", and therefore place Mr. Darisme's interest in Nano Alloys at the mercy of Mr. Eng and Ms. Ene.

7

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 8 of 37

The Court does not find that any misstatements of the evidence go to "key" issues or are in anyway material to the Court's findings and orders. Nonetheless, for purposes of clarity:

- the Court sustains Petitioner's objections to the characterization in Footnote 5, that both Parties sought joinder of Nano Alloys to the family law case. Petitioner sought joinder; Respondent sought to have the family law case stayed pending the resolution of the civil action;

- The Court will state in Paragraph 3 that it finds that from 2012, Wife was the principal owner/operator of the business;

- The Court will clarify the timing of the Parties' investments in Paragraph 5(d);

- The Court will clarify the evidence with regard to the Court's findings in Paragraph 8(b)

The Court sustains Respondent's objection to that portion of paragraph 15 ordering that Petitioner is awarded the operating account for the Canadian property, but will award 100% ownership of the stock of the corporation holding the Canadian Property to Petitioner, subject to the obligation to account for all income and expenses of the corporation and to reimburse to Respondent 50% of the post-separation profits and cost of capital expenditures.

The Court sustains Respondent's objection to paragraph 2 of the Orders with regard to the date on which custody and control of the Family Residence will transfer to Petitioner. The Court had set the date of June 30, 2021 in the belief that such date would provide sufficient time for the Parties to resolve or set for hearing the issue of child support, temporary spousal support and support arrears, so that Respondent (the custodial parent) would have the benefit of child support in order to obtain replacement housing. However, given the evident inability of the Parties to resolve issues by agreement, and the limited number of hearing dates caused by Covid-19 and staffing shortages resulting in delays in obtaining hearing dates, the Court will modify the Statement of Decision to provide that the effective date of the transfer of the Family Residence to Petitioner shall be the later of June 30, 2021 or thirty days after the effective date of any order for child support.

The Court sustains Respondent's objection to paragraph 9 of the Orders, as it exceeds the scope of the Findings and Orders necessary to effect a division of the property.

8

Case: 21-50901     Doc# 48-1     Filed 09/27/21     Entered 09/27/21 18:07:01     Page 9 of 37

This Statement of Decision does not address the request for attorneys' fees or the preliminary injunction, both of which are scheduled for hearing on March 3, 2021.

**HAVING HEARD, READ AND CONSIDERED THE TESTIMONY OF THE WITNESSES, THE EVIDENCE AND ARGUMENT (BOTH ORAL AND WRITTEN) AND REVIEWED THE PRIOR ORDERS AS CONTAINED IN THE FILES AND RECORDS OF THE COURT, AND HAVING CONSIDERED AND SUSTAINED CERTAIN REQUESTS AND OBJECTIONS AS STATED ABOVE, AND FINDING GOOD CAUSE THEREFORE, THE COURT FINDS AND ORDERS:**

1. It is not disputed that the Parties married on September 2, 2000, and that there are two children of the marriage: Gabrielle (DOB: 2/25/2002) and Tyler (DOB: 5/9/2005).[6] It is stipulated that the Parties' Date of Separation is January 1, 2015.

*Petitioner's Breach of Fiduciary Duty Claims re Community Property Interest in Nano Alloys dba NiTi Tubes.*

2. In or around November 2004, the Parties formed a business venture, known as NiTi Tubes, LLC, for the purpose of manufacturing and supplying tubing used in the medical device industry. The venture was formed between Wife, who was then employed full time at Memry Corporation and a co-worker from a prior employment, Wilson Eng. As both Wife and Mr. Eng had other employment, the nominal owners and managing partners of the LLC were Husband and Mr. Eng's spouse, Linh Chang (also referred to as "Ling Chang" and "Lin Cheng"). While the exact amount of capital contributed is disputed, it appears that each couple (Parties in this action on the one hand, and Wilson Eng and his spouse, on the other), contributed at least $100,000 as an initial investment. *See* Resp. Exh. A. There is no evidence that Ms. Chang had any participation in the business. Mr. Eng provided facilities and

---

[6] Issues of custody, visitation, child support, temporary and long-term spousal support, and support arrears (if any) were not assigned to this department for trial.

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 10 of 37

operational services in the early years of the business, but it does not appear that he was ever engaged as a full-time management employee of the business.

3. It is not disputed that by 2012, Wife had become the principal owner/operator of the business. It is also not disputed that Husband established bank accounts for the business enterprise, and that Wife used Husband's personal American Express account to pay business expenses.

4. In late 2012, approximately eight years after the venture started, Parties in this action decided to incorporate. It was stipulated by the Parties on February 11, 2020, that on or about January 1, 2013, NiTi Tubes, LLC incorporated as NiTi Tubes, Inc. which corporation changed its name to Nano Alloys, Inc. dba NiTi Tubes. All 700,000 shares of stock were held in Respondent's name, and consistent with having only one shareholder, there was no Board of Directors. *See* Petitioner's Exh. 12.

5. The Court finds that at the time of incorporation, 100% of the stock of Nano Alloys, Inc. dba NiTi Tubes was a community property asset.

    a. On or about June 14, 2014, Respondent sent an e-mail to her mother-in-law M. Beaudray (Exh. 121) admitting that the company has $3,000,000 in the bank that Petitioner/Husband owns 50% of the Company, inferring that they jointly owned 100% of the company. Respondent's denials of this e-mail were not credible.

    b. Even after separation, Respondent asserted that she was the 100% owner of Nano Alloys, Inc. In her testimony on February 11, 2020, Plaintiff admitted that she claimed sole ownership of Nano Alloys, Inc. in the police report she filed on or about September 22, 2015. *See also* Exh. 53. Further, Schedule G of the corporate tax return for tax year 2014 (filed after separation in 2015), Exhibit RR identifies Wife as the 100% shareholder.

    c. Although Wilson Eng claims that he believes that he and his wife were and continue to be 50% owners in Nano Alloys, Inc., no evidence of that ownership interest in the corporation existed until

10

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 11 of 37

Ms. Ene unilaterally created stock certificates to give him such an interest. Mr. Eng did not participate in the decision to incorporate in late 2012, was not aware of the incorporation or share ownership, and was not employed full-time with the business. In his declaration filed in the Court on January 4, 2019, Mr. Eng declared (at paragraph 4): "*We* formed Nano Alloys in January 2013 to replace Ni-Ti Tubes, LLC." (emphasis added). This is not a true statement. At trial, Mr. Eng admitted that he never saw the stock certificates giving him any interest in the company until his deposition in 2019, and was not aware that the original stock certificates gave Wife 100% ownership interest.

    d. Husband testified that he understood that after the initial formation of the LLC and before the incorporation, eight years later, he and Wife contributed all of the additional capital in the business and provided all of the management services that had led to the growth of the company, such that Mr. Eng did not have an ownership interest. He does not have any evidence, however, that Mr. Eng had been "bought out" of the business venture before its incorporation.

    6. The Court finds that Respondent/Wife breached her fiduciary duties to Petitioner by transferring or purporting to transfer 50% of the stock of Nano Alloys, Inc. dba NiTi Tubes to Wilson Eng.

    a. Family Code §§ 721 and 1100 and the case law thereunder make clear that a spouse who disposes of community property without prior consent or written authorization of the other spouse has breached the fiduciary duties owed by one spouse to the other, which duties persist until the final division of property.

    b. It is not disputed that at some time Wife prepared documents for Nano Alloys dated in late 2014 (shortly before the Date of Separation) that purported to "cancel" the stock certificate issuing her 700,000 shares, and issuing her mother, D. Busieres and Mr. Eng, 200,000 shares each and granting herself 400,000 shares (Pet. Exh. 33-34) Petitioner testified that she executed these transactions in or

11

Case: 21-50901   Doc# 48-1   Filed: 09/27/21   Entered: 09/27/21 18:07:01   Page 12
of 37

around October 2014, and granted the stock to Ms. Busieres and Mr. Eng "in consideration for their services." This testimony is not credible. There is no evidence that the stock grant was reported as taxable income to either Ms. Busieres or Mr. Eng in 2014. Mr. Eng testified that he never saw that stock certificate until it was shown to him at his deposition. Further, as noted above in 2015 Ms. Ene was still claiming that she is the 100% owner of NiTi Tubes and the 2015 taxes were filed on the basis of her 100% ownership. The Court finds no credible evidence supporting Respondent's argument that the Court's award of damages under Family Code §1101(g) (discussed in paragraph 6 below) should be based as to 200,000 shares on a 2014 date of transfer.

     c.     By documents created by Wife dated December 8, 2017, D. Busieres "returned" her shares, and stock certificates were issued giving Respondent/Wife and Mr. Eng, each 350,000 shares of Nano Alloys, Inc., for no apparent consideration paid to anyone for these transactions. (Exh. 131). Again, Mr. Eng testified that he did not see the stock certificate until his deposition. There is no evidence that he was aware of the transaction in December 2017. The Court makes no determination in this proceeding as to <u>when</u> Mr. Eng actually obtained an ownership interest in Nano Alloys, Inc., whether he was entitled to receive an ownership interest, the percentage of the ownership interest to which he was entitled, or whether he has aided or abetted Respondent in connection with her conduct towards Petitioner. The Court accepts the stipulation of the Parties that Mr. Eng currently holds 50% of the shares of Nano Alloys, Inc.

     d.     Husband credibly testified that the transactions resulting in Mr. Eng's ownership of 50 percent of the stock of Nano Alloys, Inc. were without his prior knowledge or consent. There is no evidence that he gave prior written consent. For purposes of this proceeding, it is not disputed that Respondent/Wife effectively transferred one-half of the stock of Nano Alloys, Inc. a community asset, to Wilson Eng. Although Husband argues that this "transfer" was done as part of a fraudulent

12

Case: 21-50901    Doc# 48-1    Filed 09/27/21    Entered: 09/27/21 18:07:01    Page 13 of 37

conspiracy, there is not clear and convincing evidence of fraud in connection with the transfers to Mr. Eng.

7.      Accordingly, pursuant to Family Code §1101(g), the Court awards to Petitioner the amount of **$2,402,645.70** (25% of the business value as of December 31, 2017) plus attorneys' fees and court costs in connection with providing the breach of fiduciary duty for the transfer to Wilson Eng of 50% of the ownership of Nano Alloys, Inc.[7]

a.      Family Code §1101(g) provides that the remedies for breach of fiduciary duty by a spouse are "an amount equal to 50 percent of any asset . . . transferred in breach of the fiduciary duty plus attorney's fees and court costs." Here, the "asset transferred" is 50% ownership interest in Nano Alloys, Inc., one half of which would be 25% of the value of the asset.

b.      Family Code §1101(g) further provides that "[t]he value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the disposition of the asset, or the date of the award by the Court." As discussed above, there is no credible evidence of when Ms. Ene actually "granted" 200,000 shares of the stock of Nano Alloys, Inc. to Mr. Eng in 2014. By the documents she created dated December 8, 2017, Respondent/Wife had caused Mr. Eng to be granted 350,000 shares of Nano Alloys, Inc., for no apparent consideration (Exh. 131). Thereafter, she and Mr. Eng have contended in litigation that he is a 50% owner. On October 27, 2020, Ms. Ene refused to answer further questions with regard to the granting of stock to Mr. Eng. Considering all the evidence, the Court finds that the date of disposition is December 2017, and that the value of the asset as of that date. is the value of Nano Alloys measured as a going business as of December 2017, as stated in the opinion and report of James Butera, CPA assuming the business has goodwill value and there is not a

---

[7] On December 16, 2020, the Court set a briefing schedule and hearing on March 3, 2021 for determination of those fees.

13

customer liability for returned merchandise, which Mr. Butera finds to be $9,610,583. (See Pet. Exh. 214 and Resp. Exh. PP).

     i.     Petitioner argues that the Court should adopt the valuation of $10,917,000 based on the report of Sally White. The Court notes that despite the difference in valuation date (12/31/2016 used by Ms. White, v. 12/31/2017 used by Mr. Butera); and the somewhat different manner in which they made various adjustments, both reached very close conclusions with regard to the tangible assets value ($7,709,178 per Ms. White v. $7,898,162). As testified to by Mr. Butera and apparent from Resp. Exh. PP which he prepared, the difference between their two calculations was the result of the multiplier for the capitalization rates which they used in order to calculate the goodwill of the business (5.46 per Ms. White v. 3.88 per Mr. Butera). Given that in 2017 Nano Alloys, Inc. was wholly-owned and managed by Respondent as the key person, and sole director; that corporate and financial transactions were inadequately documented, and that the corporation relied on Petitioner's corporate credit card (rather than establishing a corporate line of credit) and that both Petitioner and Respondent withdrew and used corporate funds for personal expenses, the Court finds that the more conservative multiplier of 3.88 better takes into consideration the risks that might hinder the stability of the company's revenue stream and its potential for future growth in the eyes of a potential purchaser or investor.

     ii.     Mr. Stegner testified that Nano Alloys, Inc. had $7.6 million in cash as of December 31, 2015 based on review of its tax returns, which had dropped to $7.3 million as of December 31, 2016 per Ms. White. These numbers further support the calculations of tangible assets made by Mr. Butera and Ms. White, as shown above, and without considering the good-will attached to a going business, show that a valuation as of the date of breach of fiduciary duty will be higher than the valuation as of today's date of award.

Case: 21-50901    Doc# 48-1    Filed STATEMENT OF DECISION 09/27/21 18:07:01    Page 15 of 37

iii.     Respondent contends that although the company had cash of approximately $7,337,000 and total assets exceeding $8,000,000, as of December 31, 2016 (see Exh. TT), those assets were subject to client warranty and claims exceeding $6.1 million. Respondent's contentions are not supported by the evidence; and Respondent has refused to testify with regard to the specifics of the underlying transactions. Mr. Stegner's testimony and opinion as to the valuation of the business of Nano Alloys, Inc. based on Respondent's statements to him that such liability exists has been stricken, because of Respondent's refusal to testify with regard to any facts supporting that contention. The testimony of Nina Thompson made clear that there was more than one set of financial records maintained by Nano Alloys, Inc/NiTi Tubes. The testimony of Sally White made clear that return material authorizations purportedly issued by Nano Alloys were patently falsified. The deposition testimony of Laura Vaughn (Pet. Exh. 268) entirely undermines the purported claims of product returns or customer liabilities. The testimony of Sally White, James Butera, Ms. Thompson and Ms. Vaughn, made clear that there is no factual basis for the purported "liabilities."

iv.     It is not disputed that Respondent ceased operating Nano Alloys, Inc. dba NiTi Tubes in early 2018. All of the accounts receivable have been liquidated, and any remaining product inventory has minimal value. There is relatively little value in any equipment or raw materials that have been stored. The primary remaining assets appear to be approximately $6 million in cash that Respondent transferred from accounts in the name of Nano Alloys, into bank accounts in the names of other fictitious entities ("NiTi Tub" or "Cardinal Cordis Health") under her control (as described below). It appears that Nano Alloys and its shareholders did not pay taxes on that money. Thus, using a value of the asset as of today (the date of award) would clearly not yield "the highest value" as required under §1101(g).

15

8. The Court finds that Petitioner has met his burden of showing by clear and convincing evidence that Respondent engaged in "malice, oppression and fraud", in order to reduce the value of Nano Alloys, Inc. from its value as an ongoing business ($9,610,583) as established by Mr. Butera to $6,000,000, the reported cash in the bank at the commencement of trial. Pursuant to Family Code §1101(h), Petitioner is hereby awarded damages in the amount of **$1,805,291.50.**, the amount by which the remaining 50% community property interest (after the transfer to Mr. Eng) was damaged as a result of Respondent's course of conduct described below.

a. Through a series of transactions, Respondent transferred over $6 million in cash from the accounts of Nano Alloys, Inc. to accounts in her name, or in the name of entities wholly owned by her, falsely claiming that the funds belonged to a fictitious entity, in order to intentionally reduce the value of Nano Alloys, Inc. and the community property interest therein;

i. Prior to separation, Nano Alloys, Inc. held funds in bank accounts at Bank of America and Chase. As discussed above at the end of December 2015, Nano Alloys purportedly had $7.6 million cash on hand, primarily held in Chase bank accounts (#2380, 2661, 2963, and 0167) and over which Respondent exercised sole control.

ii. On June 30, 2016, Respondent opened JP Morgan Chase account #1692 in her individual name (See Exhs 80, 80a opening balance of $100);

iii. On February 21, 2017, Respondent transferred $3 million from Chase #2661, a bank account in the name of Nano Alloys, dba NiTi Tubes, to JP Morgan Chase account #1692 in her individual name; and transferred $950,000 from account #1692 to JP Morgan Stanley ("JPMS") brokerage account ending 0412 another account in her name (Exh. 88). Thereafter, she executed additional transactions that moved the $3 million which she had removed from Nano Alloys' accounts to JPMS accounts -87223, 87234 and 87229 bearing the name of the

Case: 21-50901     Doc# 48-1     Filed: 09/27/21     Entered: 09/27/21 18:07:01     Page 17

Princesca Ene Revocable Trust and bearing Ms. Ene's social security number (Exhs. 89, 90, 91, 92, 95, 96, and 97). In documents that she provided under penalty of perjury in the Family Law action (Exh. 148), she admitted that account 87234 was in her name, but failed to disclose that it held $400,000 in 2017. In her testimony in February 2020, she denied that she executed these transactions. The Court finds those denials not credible in view of the weight of the documentary evidence and the testimony of Nina Thompson.

      iv.      In March 2017, Respondent transferred an additional $1,350,000 from Nano Alloys account #1692 to JPMS account 0412 (Exh. 94),

      v.      On or about September 1, 2017, Petitioner's counsel served subpoena's for the production of bank records on Bank of America and JP Morgan Chase, notice of which would have been received by Respondent's counsel at or about the same time (Exh. 117). Promptly thereafter, on or about September 6, 2017, Respondent/Wife opened JPMS accounts in the name of Nano Alloys, dba NiTi Tubes (JPMS ## 831-17409, -17410, and 17411) with zero balances, and by September 19, 2017, Respondent had transferred over $3,160,000 back from the JPMS accounts (#87229, 87233, and 87234) that she had opened in the name of her personal trust into accounts in the name of the corporation that are entirely in her control (JPMS ## 831017409, 17410 and 17411). (Exh. 108, 109, 110, 111 112 and 113), and also avoided immediate discovery of the removal of $3 million from the corporation. After this flurry of transactions, on September 22, 2017, Respondent's then-attorneys moved to quash the subpoenas to BofA and JP Chase, obviously seeking to delay or avoid discovery of this attempted removal of $3 million from the corporation. Wilson Eng (the 50% co-owner of the business) testified that he had no knowledge of any of these transactions, had no knowledge that the company had over $7 million in cash, and authorized none of these transactions.

17

vi.  On December 1, 2017, Respondent formed an entity, Cardinal Cordis Health, LLC, purportedly a venture authorized by Cardinal Health, Inc. through its agent Cynthia Chan[8], and Respondent, of which she claims to be an 80% controlling owner (Exh. 129). On December 11, 2017 Respondent opened a Bank of America account (#2264) in the name of NiTi Tub, a Wyoming LLC (Exh. 132, 178 and 192), for which Respondent is the sole signatory, the address for which is her residence address, and into which she deposited funds which appear to have originated from Nano Alloys, Inc. Thereafter, between December 6, 2017 and March 31, 2018, Respondent transferred into the Cardinal Cordis Health account over $6 million from Nano Alloys accounts (including the over $3 million that she had moved from corporate accounts into her personal trust accounts, and then back into the JPMS accounts she created in September 2017 after the subpoenas were served. (Exhs. 130 [$2,231,000 in December 2017; $3,764,000 on February 28, 2018] and 136, 155, 156, 165, 168, 169).

vii.  On or about March 8, 2018, Respondent opened another bank account at Chase Bank in the name of Cardinal Cordis Health (Exhs. 161, 161(a)), identifying herself as the sole owner and President (Exh. 165). On March 9, 2018, Respondent transferred over $3 million from the Cardinal Cordis Health Account at Wells Fargo Bank (described above) to the Cardinal Cordis Health Account at Chase Bank that she had opened the day before (Exhs. 168-169).

viii.  Early in the trial, Respondent contended that the $6 million in funds were transferred by agreement between Nano Alloys and its customer Cordis Corporation, to establish a reserve fund from which customer liability claims could be satisfied (See, e.g. Day 2 of the

---

[8] On the afternoon of February 13, 2020, when confronted with a Nano Alloys American Express charge made by Cynthia Chan (Exh. 135), Ms. Ene testified that there was a Cynthia Chan employed by Nano Alloys from 2011 until about 2013, and that the company had used a credit card with her name on it even after she left the company; Ms. Ene stated that the Cynthia Chan who appears on corporate documents for Cardinal Cordis Health, was actually the Quality Assurance Director for Cordis who had married and moved to Mexico in 2016 or 2017. The Court does not find Ms. Ene's testimony to be credible.

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 19

transcript, page 232 and Exh. 212). In October 2020, Respondent refused to answer any questions about Cynthia Chan or any transactions that resulted in the transfer of $6 million from Nano Alloys bank accounts into bank accounts in the name of Cardinal Cordis Health or NiTi Tub. The Court finds these transactions to be fraudulent. As made clear from the deposition testimony of Laura Vaughn (Exh. 268) authorized agent of Cardinal Health, the entity that controls Cordis Corporation -- there is no record of a Cynthia Chan being employed by Cardinal Health, Inc. or Cordis Corporation,[9] there was no agreement with Respondent to create Cardinal Cordis Health, or to open bank accounts in the name of such entity. Husband testified that Cynthia Chan was a pseudonym used by Respondent herself during the operation of Nano Alloys, Inc., in order to create the impression that Nano Alloys had a larger infrastructure than it in fact had. There is no evidence that Cordis Corporation or Cardinal Health have asserted against Nano Alloys, Inc. or NiTi Tubes any product liability claims.

ix.      Respondent's contention that the funds either: 1) do not belong to Nano Alloys; or 2) are subject to unliquidated unasserted liabilities for product returns or product liability claims are not supported by any credible evidence.

x.      In March 2018, in opposition to Petitioner's prior request to freeze Nano Alloys, Inc.'s bank accounts, Respondent filed a declaration attaching a memorandum purportedly written by Nina Thompson and bearing the date of March 2018, which Respondent then claimed was actually written in March 2017 and legitimized the March 2017 transfer of funds. (Exh. 167). Nina Thompson testified that she had already left the company before March 2017, and

---

[9] Respondent contends that the subsequent acquisition by Johnson & Johnson of this business line makes Ms. Vaughn's testimony irrelevant. Having reviewed Ms. Vaughn's deposition and considered the evidence as a whole, the Court overrules the objection. Further the fact that Petitioner did not rule out whether Johnson & Johnson in 2019 shows outstanding claims on its books, separate from the records of the subsidiary entity with which Nano Alloys, Inc. in fact did business in 2017 is immaterial to the Court's evaluation of Respondent's conduct.

19
STATEMENT OF DECISION

that any memoranda purportedly authored by her in March 2017 or at any time thereafter are false.

b. Respondent now does not dispute that the funds held in any bank accounts in the name of Cardinal Cordis Health, NiTi Tubes, or NiTi Tub, are the property of Nano Alloys, Inc. The Court finds, however, that viewing the evidence as a whole, the creation of bank accounts in the name of Cardinal Cordis Health, and the removal of the funds from Nano Alloys, Inc. into those accounts was fraudulent and done intentionally to attempt to conceal the true value of the community interest in that corporation. The removal of these funds coincided with Respondent's unilateral decision to shut-down the business operations, thereby destroying the goodwill that had been built up in the business. The last product shipped in the first quarter of 2018.

c. The Court finds clear and convincing evidence that Respondent misused her position of authority to access and use funds of Nano Alloys, Inc. for her own personal benefit, thereby reducing the community property interest in the corporation.

i. On or about December 12, 2013, Ms. Ene purchased a 2013 Tesla Model S, paying $97,813 cash from corporate funds of Nano Alloys (Exh. 277). Both Parties have attempted to claim that the Tesla is a community asset. The Court finds that it is a corporate asset, and that the community has a potential liability back to the corporation for its purchase. The Court assigns this liability to Ms. Ene as her sole and separate obligation.

ii. On or about December 22, 2013, Ms. Ene transferred $98,000 from Nano Alloys, Inc dba NiTi Tubes to Bank of America Account 6739 in the name of herself and her mother D. Bussieres (Schedules 24 and 25 to Exh. 229). From that account, she thereafter transferred funds from and to BofA Account 8002, also held in the name of herself and her mother. This $98,000 payment purports to be in addition to $7,318.00 in expense reimbursements purportedly paid to

Ms. Bussieres at various times between April and December 2013. (Exh. AAA). The reimbursements include payment for employee meals, cleaning (e.g. "Simple Green"), office and floor supplies, and other items which were more likely purchased by Ms. Ene than an independent consultant. During the course of trial, Ms. Ene produced a NiTi Tubes "Find Report" dated 12/22/13 (Exh. AAA) which purports to support the contention that the $98,000 was paid for "professional services" rendered by Ms. Bussieres between 2009 and 2013. No invoices or Form1099's to Ms. Bussieres were produced. Ms. Bussieres did not testify at trial. Respondent refused to answer questions about the payments to her mother. The Court does not find credible the claim that Nano Alloys' payment of $98,000 into a joint account of Ms. Ene and Ms. Bussieres was for professional services to the corporation;

iii.      In December 2017, Respondent opened BofA account 2264 for NiTi Tub, a Wyoming LLC and contended it was an account belonging to NiTi Tubes (Exh. 132, 178, 192) and in August 2018 withdrew cash from that account.

iv.      In December 2019, February 2020, March 2020, April 2020, and May 2020, Respondent transferred funds totaling of or about $504,000 from Nano Alloys accounts to the NiTi Tub, LLC account which Respondent had established with Bank of America (See Exhs. 132, 248, 249, 250, 251, 252, 253, 254, 255 and 256) which account is under Respondent's control. At or about the same time, Respondent transferred funds to her personal bank accounts, and bank accounts held jointly by Respondent and her Mother, paid her attorneys and paid personal credit card bills (see Exh. 248, 253, 254, 255, and 256).

v.      In 2017, Ms. Ene increased her salary from Nano Alloys, from $65,000/year paid in 2016 to $108,000, which action is inconsistent with any theory that the business was failing in 2017, and the fact that it ceased operations at the end of 2017.



vi.     It is not disputed that after separation, Ms. Ene continued to use Mr. Darisme's personal Amex credit card to charge Nano Alloys business expenses ($24,778.70 in April 2015 and $27,316.57 in June 2015). It is further not disputed, that in or about April 2015, the Parties agreed, and it was ordered that the Parties would each receive $100,000 from the Fisher Investment Account" as an advance on community property distributions. (Exh. XX). In testimony given on March 4, 2020, it was conceded that after separation Petitioner accessed the Nano Alloys bank accounts and transferred $286,481 to himself to pay off the outstanding balance on his Amex credit card created by Ms. Ene's use of that account for Nano Alloys, and to distribute $100,000 to himself and $100,000 to Ms. Ene. (Exh. Q and R). Nonetheless in September 2015, Ms. Ene used her position of management and control of Nano Alloys, to file a police report accusing Mr. Darisme of stealing over $200,000 in Nano Alloys funds, and thereafter directed the use of over $120,000 of corporate funds to pursue claims against Petitioner for his removal of funds from the Nano Alloys, Inc. bank accounts while not making any effort to account for the greater cash amounts that she had removed.

vii.    After having removed its cash assets, Respondent provided knowingly false information to the accounting professionals and in early 2018 purportedly ceased operations of Nano Alloys, Inc., thereby destroying any business goodwill and reducing the value of the community property interest in the corporation from $4,805,291.50 to $3,000,000 or less.

**Division of Assets, Liabilities and Reimbursements**

9.  The Court finds for purposes of the family law action, that the community owns at least 50% of the shares of Nano Alloys, Inc. and thus Petitioner is entitled to own at least 25% of the shares of Nano Alloys, Inc. Respondent's request that the Court divide this asset "in kind" would be unjust, unreasonable and inequitable under the circumstances of this case, as it would place Petitioner in the

22

position of a minority shareholder in a corporation whose assets are under the sole control of Respondent, with the majority of the stock held by Respondent and Wilson Eng, a party who has shown himself adverse to the interests of Petitioner. Accordingly, the Court orders that Respondent be awarded the entirety of the community property interest in Nano Alloys, Inc., NiTi Tubes, NiTi Tub, LLC and Cardinal Cordis Health, subject to the requirement that she pay to Petitioner the sum of **$863,519** and that she defend, indemnify and hold harmless Petitioner from and against all claims asserted or unasserted, which have or may be asserted against him based on any alleged ownership of an interest in Nano Alloys, Inc or NiTi Tubes or any predecessor entity, or any claims based on the removal of any funds from the accounts of Nano Alloys, Inc., any claims against Ms. Ene for her conduct, or transactions, including any negligence, and including any removal by Petitioner of any amount of money from Nano Alloys, Inc. bank accounts, including the amount of $286,481, which amount is deemed by the Court to be an advance distribution to Petitioner of a portion of his community property interest in Nano Alloys, Inc. and NiTi Tubes.

10. Petitioner's request for an alternate date of valuation for of his share of Nano Alloys, Inc. was previously denied by the Court. *See* 11/12/2019 Findings and Order After Hearing. Family Code §2552(b) allows for an exception to use of a valuation date closest to trial to "remedy inequities" that might otherwise result from a trial date valuation. Petitioner argues that a trial date valuation would result in Petitioner's 25% interest in Nano Alloys, Inc. being undervalued. Given the findings in paragraph 8 above which result in providing Petitioner with full remedies for the decrease of value in the entire community property interest in Nano Alloys (i.e. 50% of the company's value as of December 31, 2017 offset by the cash remaining on hand as of the date of trial), the Court finds that for purposes of division the community property interest in Nano Alloys, Inc. should be valued as of the date of trial, and is $2.25 million ($6 million cash held in various bank accounts, reduced by 30% to account for the



estimated Federal and State tax and other outstanding liabilities to third parties, and divided by 2).

Petitioner's share thereof is $1,125,000, which is reduced by the $286,481 that he removed in 2015 from Nano Alloys, Inc. bank accounts.

11. The Court orders that Respondent reimburse Petitioner **$100,000** for the portion of the $286,481 that he withdrew from Nano Alloys, Inc. and deposited to Respondent's account as described above and in Exhibit XX.

12. It is stipulated that the Parties purchased during marriage residential real property located on Ormsby Drive in Sunnyvale (the "Family Residence") that has a current value of $2,250,000, which is encumbered by a loan in the principal amount of $303,391, leaving equity of $1,946,609. Each Party's interest would be valued at **$973,304.50**.

13. Pursuant to the April 30, 2015 Stipulation and Order (Exh. XX), from and after May 1, 2015, Wife had sole control and use of the Family Residence, which she and the children have occupied ever since. It is not disputed that from May 1, 2015, she paid the mortgage, property tax and insurance, as well as the costs for the gardener and pool service (Exh. CCC). The Court orders that Respondent be credited with one-half of the mortgage, property tax, insurance payments and major repairs that she made to preserve the community interest in the Family Residence in the amount of **$112,865.27** (*Epstein* reimbursement[10]) The Court will not order reimbursement for occupancy expenses such as utilities, gardening services, or swimming pool maintenance.

14. The Parties have stipulated to the Fair Rental Value of the Family Residence based on the appraisal report of Michael Frangadakis: $5,400/month for 5/1/2015 through 12/31/2017; $5,500 for 1/1/2018 through 12/31/2019; and $5,800/month for 1/1/2020 through 11/30/2020 (Exh. 275; Exh.

---

[10] *IRMO Epstein* (1979) 24 Cal.3d 81 (spouse entitled to be reimbursed for post-separation payments of community debts that are made from separate property).

24

Case: 21-50901     Doc# 48-1     Filed: 09/27/21     Entered: 09/27/21 18:07:01     Page 25 of 37

CCC).  Petitioner asks that Respondent be charged with that amount pursuant to *IRMO Watts*.[11]

Respondent urges that the Court deny any *Watts* reimbursement under the facts of this case, as Respondent had primary care of the children since separation, sole responsibility for financial and physical maintenance of the Family Residence, and received no support from Petitioner at any time since May 1, 2015.  The Court considers those facts, and also considers that Respondent simultaneously had sole access to the revenues of Nano Alloys, Inc. and that her mortgage, property tax and insurance appear to be about one-half of the Fair Rental Value of the Property.  Both Parents share the responsibility for providing shelter for their children while they are minors.  Accordingly, the Court orders that Respondent reimburse Petitioner for 30% of the Fair Rental Value of the Family Residence from 5/1/2015 through 12/31/2019 and 40% of the Fair Rental Value for the Family Residence from 1/1/2020 through 11/30/2020, which is calculated as **$116,960**.  This Order is not intended to be determinative of any issues related to any claim for support or *Trainotti* credits that may be asserted in connection therewith.

15. Canadian Property.  The Parties stipulated that they own as community property an 8-unit apartment complex located in Quebec Canada.  Title to the apartment building is held by a Canadian corporation, 6059431 Canada Inc., the stock of which is owned in equal shares by Husband and Wife.  It appears that the Canadian corporation retains a third-party property manager who is responsible for leasing activity, any capital expenditures, and who maintains a Canadian bank account into which rents are deposited and from which expenses are paid.  Presumably a portion of the bank account may consist of tenant deposits, which are potentially subject to return to the tenants upon vacating the property, or reserves for the payment of taxes.

---

[11]  *IRMO Watts* (1985) 171 Cal.App.3d 366 (An order that one spouse reimburse the community for one-half of the fair rental value of his/her sole occupancy of community-owned real property is based on the equitable powers of the Court).

25

Petitioner contends that the real property and the Canadian bank account are the only assets of the Canadian corporation, and that all income received from the real property has been used solely to pay expenses associated therewith, and that there have been no post-separation capital improvements. Respondent contends that since separation, Petitioner has not been provided with an accounting of all income and expenses of the Canadian corporation, including any payments made to Petitioner from that corporation, and that the property manager has not cooperated with regard to the provision of leasing records and bank statements. At the commencement of trial, the Parties stipulated that they would obtain an appraisal of the real property, including an evaluation of the leases and occupancy. There were significant delays in obtaining that appraisal, due in part to the "shelter at home" orders due to Covid.

On October 27, 2020, the Parties stipulated that based on appraisal, the community property interest is valued as of the date of trial at $508,875 and that both Parties shall be assigned one-half of that amount. It was also stated that amount represented the value of the real property only and did not resolve the accounting for post-separation income, expenses or distributions, or the division of the Canadian bank account (which at one point reportedly had a balance of $10,000 (U.S. or Canadian is unknown), which accounting was not completed by the Parties' respective accounting professionals as of the date this matter was submitted. The Court will order that one-half of the real property value **($254,437.50)** is credited to each Party. The Court will further reserve jurisdiction to modify the Judgment to credit Respondent with one-half of the value of adjusted value of any cash assets of the corporation taking into account any bank account balances, distributions, reserves, advances or distributions being held in that corporation. Effective upon the entry of such modified judgment, Petitioner shall be granted 100% of the right, title and interest in the Canadian corporation, 6059431 Canada Inc. and shall thereafter hold harmless, indemnify and defend Respondent from any subsequent

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 27
of 37

claim, cause of action or liability, asserted or unasserted, including any claim based on negligence,

arising or accruing after that date from ownership, operation or management of the Canadian property.

16. Husband's Requests for Reimbursements for Post-Separation Payments. As summarized in Exh.

274 (page 2, schedules 1 and 2) and the testimony of Sally White and Respondent on December 10,

2020, the Court finds that after separation Husband paid $36,417.69 in community property expenses

from separate property bank accounts, consisting of carrying costs and maintenance for the Family

Residence (which he was not occupying) from Date of Separation through April 30, 2015, and tax

liabilities as well as interest and penalties which appear to the Court to be the fault (at least in significant

part) of Respondent's unilateral decision to file taxes separately and lack of cooperation in the filing of

2013 and 2014 tax returns, or timely transmitting documents from governmental agencies that were

mailed to the Family Residence. Husband is entitled to a credit for one-half of those amounts,

**$18,208.85.**

17. Joint Accounts of Wife and her Mother are not Community Property of this Marriage. It appears

that there are two bank accounts, Bank of America #6739 and 8002, opened during marriage in the name

of Wife and her Mother, D. Bussieres (Exh. 274), the balances in which total approximately $108,000.

As discussed above in paragraph 8.c.ii, the Court has found that in December 2013,  Respondent

transferred at least $98,000 in funds from Nano Alloys to those accounts (Exh. 229, schedules 24 and

25).  There is no evidence provided to the Court that Wife is the owner of any funds contained in these

accounts.  Wife's counsel argues that the Court must treat these funds as property of Wife's mother, and

exclude them from any orders made in this proceeding.  The Court does not have credible evidence that

the payment was made for professional services provided by Ms. Bussieres to Nano Alloys, Inc.

Nonetheless, Husband's request to divide those accounts as community property of the Parties is denied.

Any claim for the conversion of those funds from Nano Alloys, Inc. or NiTi Tubes belongs to the

27

corporation. The damages caused to Petitioner's community property interest in the corporation through this conduct has already been addressed in the remedies awarded under Family Code section 1101(h) above.

18. As summarized in Exh. ZZ, page 2, the Court finds that after separation Wife paid $6,132.06 for a community tax liability and to pay off pre-separation credit card balances. However, $2,931 of that amount was paid from the account that Wife holds jointly with her Mother (BofA #6739), and consistent with paragraph 17 above, any right to reimbursement from the community belongs to Ms. Bussieres, as she is being treated for purposes of this matter as the owner of those funds. The Court therefore finds that Wife's right to reimbursement is limited to the amount paid from her personal account #7077, in the amount of $3,201, and orders that she be reimbursed one-half of that amount, **$1,600.50** by Husband.

19. The Court finds that after separation on or about June 9, 2016, Husband deposited to his separate bank account (-0444) $5,000, which was a deposit paid to Tesla before marriage, and refunded after marriage (Exh. 274, page 3, line 232). One half of that amount is $2,500. In addition, the Court finds that after separation, Husband deposited into his separate bank account -checks that were written to him by third-parties for what appears to be community claims, e.g. refunds or insurance claim payments (Exh. YY) totaling $2,708.77. (Exh. YY). The Court does not include post-separation checks for refund/rebate for post-separation emergency road service in late 2015 or thereafter. Husband is ordered to reimburse Wife one-half of these amounts: **$3,854.39**.

20. It is not disputed that as the date of separation the American Express Card in Mr. Darisme's name had a cash rewards balance of $8,034. (Exh. ZZ) Wife shall be credited with one half of that amount, **$4,017**.

21. Division of Bank Accounts. As summarized in Exh. 274, and confirmed by the expert accountants for the respective Parties Sally White and Katie Simms during their testimony on December



28

10, 2020, the Parties have stipulated to the division of checking, savings and brokerage accounts which have a total value of $1,606,463, of which $531,844 is community property. Dividing the community portion equally, and taking into consideration agreed upon separate property amounts in the accounts, agreed-upon reimbursements and post-separation transfers from one spouse to the other, $825,143 is to be awarded to Husband as his sole and separate property, and $781,320 is awarded to Wife as her sole and separate property.

In addition to the amounts stated in Exh. 274, Respondent's expert identified that as of the Date of Separation there was a balance remaining in BofA Account #9770 of $1,395 which is a community property asset. This amount was transferred to BofA Account -0745, from which Husband paid community expenses for which he is being reimbursed. Thus, Husband's award should be reduced by $697.50 and Wife's award increased by a like amount. Husband is credited with **$824,445.50** (of which $265,922 is a division of community property); Wife is credited with **$782,017.50** (of which $265,922 is a division of community property).

22. <u>Division of Retirement Accounts</u>. On March 6, 2020, the Parties stipulated to a division of their retirement accounts (3/6/2020 Stipulation and Order re Division of Retirement Accounts, hereinafter "3/6/2020 Order")). Pursuant to that stipulation as of February 2020, the Parties held a total of $1,193,638 in various retirement accounts, of which $920,331 is community property. $750,095 of the community property funds are held in retirement accounts in Husband's name, one-half of which $375,047.50 would be subject to transfer to Wife's retirement account under a QDRO. In addition, Wife holds an eTrade account x5634 valued at $20,187, of which $2,493 is community, and the balance of $17,695 is separate. Wife's Medtronic 401(k)/ESOP plan holds $69,716 all of which is community property and her Memry/SAES plan holds $98,027, all of which is community property. Wife would be entitled to receive a QDRO distribution of $375,047.50 (1/2 of the community property share of the

retirement accounts held in Husband's name). Based on the 3/6/2020 Order, it appears that Husband would be entitled to **$715,777.50** and Wife would be entitled to a QDRO distribution of **$477,860.50** (adjusted for earnings and losses).

23. <u>Cars</u>. The Court finds that the Tesla automobile is not community property. It was acquired by Wife using Nano Alloys, Inc. funds, and may be subject to claims of ownership by the corporation. It is ordered that Wife defend, indemnify and hold harmless Husband against any and all claims arising from her purchase of the Tesla automobile or its use, including any claims for reimbursement by the corporation.

It is not disputed that Husband has had in his possession a 2004 Toyota Sequoia SR5 Sport Utility vehicle that is community property. The Court will take judicial notice of the current Kelly Blue Book valuation for that vehicle (mid-point of the private party range) which is $5,055 (assuming good condition and 160,000 miles (i.e. 10,000 miles/year). The 2004 Toyota Sequoia is awarded to Husband and one half of its current value, $2,527.5 is credited to Respondent

24. There is in the Family Residence household furnishings and fixtures. The Court heard evidence that the estimated value thereof ranges from $5,000 to $15,000. If the Parties cannot come to an agreement with regard to the division of the household furnishings and fixtures, the Court will order that each of the children (minor or adult) shall be allowed to retain any clothing, toys, computers, telephones, desks, bedding and bedroom furniture used primary by that child as her/his personal property. The Parties shall then go to binding arbitration with Family Court Services as to the division of all other community property furnishings and fixtures.

25. The Table below summarizes the liabilities owed by Respondent/Wife to Petitioner/Husband, and the credits to each Party from the division of the Parties assets.

| Description | Amount Owed to Husband from Wife | Amount Owed to Wife from Husband |
|---|---|---|
| | | |
| **Issues re Nano Alloys** | | |
| Damages under 1101(g) (¶¶ 5-7) | $2,402,645.70 | |
| Damages under 1101(h) (¶8) | $1,805,291.50 | |
| Buy-out of Husband's Interest in Nano Alloys, Inc.; Wife keeps interest in Nano Alloys and defends, indemnifies and holds harmless Husband (¶9-10) | $863,519. | |
| Reimbursement to Husband for $100,000 of the $286,481 removed by Husband from Nano Alloys in September 2015, and deposited in Wife's account. (¶11) | $100,000 | |
| **Sub-total – Amounts Due to Husband from Wife re Nano Alloys:** | **$5,171,456.20** | |
| | | |
| **Property Division and Reimbursements re Family Residence** | **Amount Credited to Husband** | **Amount Credited to Wife** |
| Interest in Ormsby Residential Real Property (stipulated value $2,250,000 – loan of $303,391 = community interest of $1,946,609) per 10/27/2020 (¶12) | $973,304.50 | $973,304.50 |
| Reimbursement to Wife (5/1/2015 to 11/30/2020) Resp. Exh CCC; Exh. 275 (*Epstein*) (¶13) | | $112,865.27 |
| Reimbursement to Husband for Fair Rental Value (5/1/2015 to 11/30/2020) adjusted by 20% per minor child Exh. 275; Resp Exh CCC (*Watts*) (¶14) | $116,960. | |

31

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 32 of 37

| | | |
|---|---|---|
| **Other Property Division and Related Reimbursements** | | |
| Interests in Canadian Property (per 10/27/2020 stip, equity is $678,500 Canadian, or $508,875 USD) (¶15) | $254.437.50 | $254,437.50 |
| Ordered Reimbursement to Husband for ½ post-separation payment of community expenses (Exh. 274) (¶16) | $18,208.85 | |
| Ordered Reimbursement to Wife for ½ post-separation payment of expenses (Exh. ZZ) (¶18) | | $1,600.50 |
| Ordered Reimbursement to Wife for one-half of of Tesla refund of ($5,000) and post-separation community checks deposited to Husband's account (¶19) | | $3,854.39 |
| Ordered Reimbursement to Wife for one-half of AmEx cash rewards balance (¶20) | | $4,017. |
| Adjusted Stipulated Division of Bank Accounts (Exh. 274;, Exh. ZZ) (includes separate property shares of each spouse) (¶21) | $824,445.50 | $782,017.50 |
| Division of Retirement Accounts Buy-out of Wife's share of community property interest of all retirement accounts in Husband's name (3/6/2020 Stipulation and Order) (¶22) to be adjusted based on earnings/losses since Feb. 2020 | $715,777.50 | $477,860.50 |
| 2004 Toyota Sequoia awarded to Husband, credit to Wife (¶23) | | $2,527.50 |

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 33 of 37

| Sub-total of Property division and reimbursements | $2,903,133.85 | $2,612,484.66 |
|---|---|---|

As discussed above, the foregoing numbers are subject to adjustment based on the increase/decrease in the value of the non-real property assets of the Canadian corporation and the value of the retirement accounts. However, it is clear that the amount owed by Wife to Husband as it relates to Nano Alloys, Inc. of $5,171,456.20 (taking into account the damages awarded breach of her fiduciary duties and the buy-out of his interest in the corporation), significantly exceeds the amounts credited to her for division of the other community assets.

Based on the foregoing, IT IS HEREBY ORDERED THAT JUDGMENT ON RESERVED ISSUES OF BREACH OF FIDUCIARY DUTY AND DIVISION OF PROPERTY BE ENTERED, which provides:

1. Wife shall buy-out Husband's 25% interest in Nano Alloys, Inc. for the sum of $863,519, which amount shall be an offset against the division of community property assets as between the Parties. Wife shall defend, indemnify and hold harmless Husband against all claims and cause of action that have arisen, asserted or unasserted, against him based on ownership of Nano Alloys, transactions by either spouse purportedly on behalf of that company or related to that company, removal by either Party of any funds from Nano Alloys, including without limitation Husband's removal of any funds from the bank accounts of Nano Alloys, Inc. in the amount of or about $286,481.

2. Husband shall be awarded as his sole and separate property the Family Residence on Ormsby Drive and all furniture and fixtures contained therein. Title and possession shall be transferred to Husband on the _later_ of June 30, 2021 or thirty-days following the effective date of an order for child support, and from December 1, 2020 until such date of transfer, Wife shall be

33



Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 34 of 37

responsible for paying the mortgage, property tax and insurance, maintaining the property in good condition and paying to Husband the amount of $1,933 per month (the difference between the current fair rental value and the current mortgage plus impounds per Exh. CCC).

3. Effective as of the date of the modified Judgment which includes the accounting for all non-real property assets of the Canadian corporation, Husband shall be awarded as his sole and separate property all right, title and interest in the Canadian corporation, 6059431 Canada, Inc., including the Canadian property and the operating bank accounts associated therewith.

4. Husband shall be awarded as his sole and separate property all bank accounts, retirement accounts and investment accounts in his name, or in the name of both Husband and Wife, effective as of December 31, 2020, and is responsible for providing account statements as of that date to Sally White and Katie Sims, so that the professionals can calculate the exact amount of the credits that Wife will be given for the award of her community property interest in those accounts. The Parties are ordered to meet and confer to determine if ownership of the retirement accounts in Wife's name can be transferred to Husband under the terms of the applicable plans, and if so, how they should be valued, or if it will be necessary to prepare QDRO orders, in which case the maximum portion of those plans shall be assigned to Husband in order to satisfy Wife's liabilities as ordered hereby.

5. All reimbursements owing from Husband to Wife for Epstein amounts (paragraph 13), division of the Canadian corporation and Canadian real property (paragraph 15), and division of other assets or accounts (paragraphs 18, 19, 20, 21, and 22) are hereby ordered to be offset against the monies otherwise owing to Wife this Judgment.

6. The transfers of assets between the Parties as ordered hereby are intended to be incident to the divorce and not a taxable event pursuant to IRC section 1041.



34

Case: 21-50901    Doc# 48-1    Filed: 09/27/21    Entered: 09/27/21 18:07:01    Page 35

7. Issues of attorneys' fees and costs are reserved, and set for hearing on March 3, 2021.

8. After application of the foregoing credits and offsets, all remaining amounts owed shall be entered as a monetary Judgment owing from Wife to Husband, with all unpaid amounts bearing interest at the rate of 10% per annum starting April 1, 2021. The Court reserves jurisdiction to amend the Judgment to add an award of attorneys' fees.

9. Counsel for Petitioner shall prepare the Judgment consistent with the foregoing.

IT IS SO ORDERED.

Dated: February 19, 2021

Roberta S. Hayashi
Judge of the Superior Court

35