Mark S. Bostick (Bar No. 111241)
Lisa Lenherr (Bar No. 258091)
**FENNEMORE WENDEL**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: mbostick@fennemorelaw.com
Email: tgreen@fennemorelaw.com
Email: llenherr@fennemorelaw.com

Attorneys for Gina R. Klump, Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>PRINCESCA N. ENE,<br><br>Debtor. | Case No. 21-50901-MEH<br><br>Chapter 7<br><br>**MOTION TO SUBSTANTIVELY CONSOLIDATE NON-DEBTOR ENTITIES**<br>**1) NANO ALLOYS, INC. a California Corporation dba NiTi Tubes fka NiTi Tubes, Inc.;**<br>**2) CARDINAL CORDIS HEALTH, a Wyoming Corporation; AND**<br>**3) NiTi TUBE, LLC, a Wyoming limited liability company**<br><br>Date: January 19, 2023<br>Time: 1:30 p.m.<br>Place: In Person or Via Zoom<br>Courtroom 11<br>280 South First Street<br>San Jose, CA<br>Judge: Hon. M. Elaine Hammond |

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 1 of 24

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ..... 1
II. STATEMENT OF FACTS ..... 2
A. State Court Findings ..... 2
1. Entity Formation and Ownership (Debtor owned the Entities) ..... 2
2. Findings Re Entity/Debtor Activity (Debtor controlled the Entities and treated them as her own piggy bank) ..... 4
3. Liabilities (no product liability claims are asserted against the Entities) ..... 6
4. Fraudulent Transfers ..... 6
5. Wilson Eng Purported Ownership via Fraudulent Transfer ..... 6
B. Additional Facts ..... 8
III. JURISDICTION ..... 9
IV. ARGUMENT ..... 9
A. Bankruptcy Court has Authority To Order Substantive Consolidation of Non-Debtors ..... 9
B. Substantive Consolidation of the Entities is Just and Proper ..... 10
1. Single Economic Entity ..... 10
a. Nano ..... 11
b. CCH ..... 13
c. NiTi Tube, LLC, a Wyoming Limited Liability Company ..... 14
2. Affairs are so Entangled that Consolidation Will Benefit All Creditors ..... 15
a. Entanglement ..... 15
b. Benefit to Creditors ..... 16
C. Nunc Pro Tunc ..... 17
D. Wilson Eng ..... 17
V. NOTICE ..... 18
VI. REQUEST TO SET CLAIMS BAR DATE AND PROCEDURES ..... 18
VII. CONCLUSION ..... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Compton (In re Bonham)*, 229 F.3d 750 (9th Cir. 2000) ........ 9, 10, 11, 14, 15, 16, 17

*Clark's Crystal Springs Ranch, LLC v. Gugino (In re Clark)*, 548 B.R. 246 (9th Cir. B.A.P. 2016) *aff'd* 692 Fed. Appx. 946 (2017) ........ 9, 10

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) ........ 2

*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising* (2000) 85 Cal. App. 4th 1168 ........ 2

*Lance v. Dennis*, 546 U.S. 459 (2006) ........ 2

*Leslie v. Mihranian (In re Mihranian)*, 937 F.3d 1214 (9th Cir. 2019) ........ 18

*Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez)*, 367 B.R. 99 (B.A.P. 9th Cir. 2007) ........ 2

*Migra v. Warren City Sch. Dist. Bd. Of Educ.*, 465 U.S. 75 (1984) ........ 2

*In re Price*, 2014 Bankr. LEXIS 4599 (Bankr. N.D. Cal. Nov. 4, 2014) ........ 2

*Williams v. Swenson (In re Williams),* 280 B.R. 857 (B.A.P. 9th Cir. 2002) ........ 2

*Wood v. Herson* (1974) 39 Cal. App. 3d 737 ........ 2

**Statutes**

11 U.S.C. § 105 ........ 9

11 U.S.C. § 502 ........ 19

11 U.S.C. § 541(a)(1) ........ 2

28 U.S.C. § 157(b)(2)(A) ........ 9

28 U.S.C. § 1334 ........ 9

28 U.S.C. § 1408 ........ 9

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 3 of 24

28 U.S.C. § 1409(a) .......... 9

28 U.S.C. § 1738 .......... 2

**Other Authorities**

Federal Rules of Bankruptcy Procedure Rule 9024 .......... 19

Federal Rules of Civil Procedure Rule 60(b) .......... 19

Gina R. Klump, ("Applicant"), chapter 7 trustee of the above-captioned estate of Princesca N. Ene ("**Debtor**"), hereby moves for substantive consolidation of non-Debtor entities Nano Alloys, Inc. a California Corporation dba NiTi Tubes fka NiTi Tubes, Inc.; Cardinal Cordis Health, a Wyoming Corporation; and NiTi Tube, LLC, a Wyoming limited liability company (collectively the "**Entities**"), as follows:

## I. PRELIMINARY STATEMENT

Debtor's primary assets consist of her interests in various defunct Entities which, as of early 2022, held approximately $7 million. Debtor's primary creditor is Patrice Darisme, her ex-spouse, who asserts a claim in excess of $5 million—a sum awarded in large part due to findings by the State Court in the marital dissolution proceeding that Debtor's attempts to dissipate community marital assets was undertaken with "malice, oppression and fraud" and related findings that the transfer of funds between various non-Debtor Entities was fraudulent.

Based on State Court findings of fact and the records obtained in this case, the non-Debtor Entities that Trustee seeks to substantively consolidate have either never operated or ceased operation in 2018. Since at least 2018, the Entities merely served as Debtor's personal piggybank with her withdrawing and using significant funds for personal use without regard to tax consequences. Debtor's misuse of funds resulted in an injunction issued by the State Court—an injunction that Debtor has continually violated on numerous occasions.

Debtor's conduct early in this case resulted in appointment of a Chapter 11 Trustee, and ultimately conversion of this case. Post-Petition, Debtor's failure to provide accurate and true information continues and has been compounded by shifting testimony and numerous and significant omissions in her Statement of Financial Affairs—including transfers of cash and shares valued at $605,531.88 to her mother less than five (5) months prior to the Petition Date.

In the Ninth Circuit, substantive consolidation of non-debtor entities is a powerful and exacting tool to ensure that Debtor's cannot conceal or dissipate assets using corporate shields. In this case, this tool is necessary to recover funds and pay creditors in a fair and equitable way.

## II. STATEMENT OF FACTS

### A. State Court Findings

On February 23, 2021, after a thirteen (13) day trial, the Superior Court of California, County of Santa Clara (the "**State Court**"), entered its Statement of Decision re Property Division, Reimbursement and Breach of Fiduciary Duty (the "**Statement of Decision**").[1] (Request for Judicial Notice "**RJN**" No. 1, Ex. A). In the Statement of Decision, the State Court made the following factual findings:

#### 1. Entity Formation and Ownership (Debtor owned the Entities)

1. Nano Alloys, Inc. dba NiTi Tubes. NiTi Tubes, LLC, a California limited liability company ("**NiTi CA**") was formed in 2004; the nominal owners and managing partners were Mr.

---

[1] Pre-Petition, on or about May 19, 2021, Debtor filed an appeal of the State Court judgment award related to breach of fiduciary duty, attorney fees, and sanctions (the "**Appeal**") in the California Court of Appeal, 6th Appellate District, as Case No. H049168. The Motion for Order Approving Compromise with Patrice Darisme, filed concurrently herewith, provides for the dismissal of the Appeal. "A federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered." *In re Price,* 2014 Bankr. LEXIS 4599 (Bankr. N.D. Cal. Nov. 4, 2014) (*citing Migra v. Warren City Sch. Dist. Bd. Of Educ.,* 465 U.S. 75 (1984) and 28 U.S.C. § 1738)). "[I]n California the rule is that the finality required to invoke the preclusive bar of res judicata is not achieved until an appeal from the trial court judgment has been exhausted or the time to appeal has expired." *Franklin & Franklin v. 7-Eleven Owners for Fair Franchising,* (2000) 85 Cal. App. 4th 1168, 1174. The appeal is property of the estate. 11 U.S.C. § 541(a)(1). A technically pending appeal should not prevent application of res judicata if doing so would promote injustice. *Wood v. Herson*, (1974) 39 Cal. App. 3d 737, 747-48. Moreover, re-litigation of the factual findings at the behest of an objection from Debtor would be a violation of the Rooker-Feldman Doctrine because it would effectively be the "state-court loser[] complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005); *see also Williams v. Swenson (In re Williams),* 280 B.R. 857 (B.A.P. 9th Cir. 2002) ("the United States Supreme Court is the only federal court that may review an issue previously determined by a state court in an action between the same parties." "Rooker-Feldman doctrine applies even if the state court judgment is not final"); *but, see, Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez)*, 367 B.R. 99 (B.A.P. 9th Cir. 2007) (stating *Williams* was overruled by *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280 (2005) and *Lance v. Dennis*, 546 U.S. 459 (2006) (both cases provide that the Rooker-Feldman Doctrine is not intended to "override or supplant preclusion doctrine").

Darsime and Linh Chang (Wilson Eng's spouse).[2]

2. "Mr. Eng provided facilities and operational services in the early years of the business, but it does not appear that he was ever engaged as a full-time management employee of the business." (Statement of Decision pp. 9-10, ¶ 2.)

3. By 2012, Debtor was the principal owner/operator of NiTi CA.[3]

4. "On or about January 1, 2013, NiTi CA incorporated as NiTi Tubes, Inc. which corporation changed its name to Nano Alloys, Inc. dba NiTi Tubes [("**Nano**")]. All 700,000 shares of stock were held in [Debtor's] name, and consistent with having only one shareholder, there was no Board of Directors." (Statement of Decision p. 10, ¶ 4.)

5. "The Court finds that at the time of incorporation, 100% of the stock of [Nano] was a community property asset." (Statement of Decision p. 10, ¶ 5.)

6. "The last product shipped in the first quarter of 2018." (Statement of Decision p. 20, ¶ 8(b).) "[Debtor] ceased operating [Nano] in early 2018. All the accounts receivable have been liquidated, and any remaining product inventory has minimal value. There is relatively little value in any equipment or raw materials that have been stored." (Statement of Decision p. 15, ¶ 7(b)(iv).)

7. <u>Cardinal Cordis Health, a Wyoming Corporation</u>. "On December 1, 2017, [Debtor] formed an entity, Cardinal Cordis Health, LLC [("**CCH**")]. . . ."[4] (Statement of Decision p. 18, ¶ 8(a)(vi).)

---

[2] "In or around November 2004, [Debtor and Mr. Darisme] formed a business venture, known as NiTi Tubes, LLC, for the purpose of manufacturing and supplying tubing used in the medical device industry. The venture was formed between [Debtor] . . . and a co-worker . . . Wilson Eng. As both [Debtor] and Mr. Eng had other employment, the nominal owners and managing partners of the LLC were [Mr. Darsime] and Mr. Eng's spouse, Linh Chang . . . ." (Statement of Decision p. 9, ¶ 2.) "[E]ach couple . . . contributed at least $100,000 as an initial investment . . . There is no evidence that Ms. Chang had any participation in the business. (Statement of Decision pp. 9-10, ¶ 2.)

[3] "It is not disputed that by 2012, [Debtor] had become the principal owner/operator of the business." (Statement of Decision p. 10, ¶ 3.)

[4] CCH is actually a Corporation. (Wade Decl. ¶ 3, n.1 (2004 Production; State of Wyoming Office of the Secretary of State re CCH incorporation). For a discussion of the ownership of CCH, *see infra* § IV(B)(1)(b).

8. NiTi Tub, LLC, a Wyoming limited liability company ("**NiTi WY**"). "On December 11, 2017 [Debtor] opened a Bank of America account (#2264) in the name of NiTi Tub, a Wyoming LLC . . . for which [Debtor] is the sole signatory, the address for which is her residence address, and into which she deposited funds which appear to have originated from Nano Alloys, Inc." (Statement of Decision, p. 18, ¶ 8(a)(vi).) The State Court found that Debtor "contended it was an account belonging to [NiTi CA] . . . and in August 2018 withdrew cash from that account." (Statement of Decision, p. 21, ¶ 8(c)(iii).) "In December 2019, February 2020, March 2020, April 2020, and May 2020, [Debtor] transferred funds totaling on or about $504,000 from Nano Alloys accounts to the NiTi WY account which [Debtor] had established with Bank of America . . . which account is under [Debtor's] control." (Statement of Decision, p. 21, ¶ 8(c)(iv).) Debtor has not listed NiTi WY on her Schedules. (*See* Docket No. 141, filed June 23, 2022.) Debtor testified at the Meeting of Creditors that NiTi WY is a subsidiary of Nano. (Klump Decl. ¶ 5, n. 5.)[5]

**2. Findings Re Entity/Debtor Activity (Debtor controlled the Entities and treated them as her own piggy bank)**

9. In 2017, Debtor was the sole director of Nano Alloys, Inc., and she failed to follow corporate formalities and otherwise mismanaged the entity by using corporate funds for personal expenses.[6]

10. Debtor maintained more than one set of financial records for Nano, falsified financial records, and fabricated unsubstantiated liability claims.[7]

---

[5] All references to the Declaration of Gina R. Klump shall be referred to as (Klump Decl. ¶ __.)

[6] "[I]n 2017 Nano Alloys, Inc. was wholly-owned and managed by [Debtor] as the key person, and sole director; that corporate and financial transactions were inadequately documented, and that the corporation relied on [Debtor's] corporate credit card (rather than establishing a corporate line of creditor) and that both [Mr. Darsime] and [Debtor] withdrew and used corporate funds for personal expenses . . . ." (Statement of Decision p. 14, ¶ 7(b)(i).)

[7] Debtor purportedly asserts that Nano's "assets were subject to client warranty and claims exceeding $6.1 million. [Debtor's] contentions are not supported by the evidence; and [Debtor] has refused to testify with regard to the specifics of the underlying transactions . . . testimony and opinions as to the valuation of the business of Nano Alloys, Inc., based on [Debtor's] statements . . . that such liability exists has been stricken, because of [Debtor's] refusal to testify with regard to any facts supporting that contention . . . [T]estimony . . . made clear that there was more than one

11. "[Debtor] engaged in 'malice, oppression and fraud', in order to reduce the value of Nano Alloys, Inc. from its value as an ongoing business . . . ." (Statement of Decision p. 16, ¶ 8.)

12. "Through a series of transactions, [Debtor] transferred over $6 million in case from the accounts of Nano Alloys, Inc. to accounts in her name, or in the name of entities wholly owned by her, falsely claiming that the funds belonged to a fictitious entity, in order to intentionally reduce the value of Nano Alloys, Inc. and the community property interest there." (Statement of Decision p. 16, ¶ 8(a).) These transfers are detailed in paragraphs 8(a)(i)-(x) of the Statement of Decision.

13. The State Court found the "transactions that resulted in the transfer of $6 million from Nano Alloys bank accounts into bank accounts in the name of Cardinal Cordis Health or [NiTi WY] . . . to be fraudulent." (Statement of Decision p. 19, ¶ 8(a)(viii).)

14. "[T]he creation of bank accounts in the name of Cardinal Cordis Health, and the removal of the funds from Nano Alloys, Inc. into those accounts was fraudulent and done intentionally to attempt to conceal the true value of the community interest in that corporation." (Statement of Decision p. 20, ¶ 8(b).)

15. The State Court found "clear and convincing evidence that [Debtor] misused her position of authority to access and use the funds of Nano Alloys, Inc. for her own personal benefit, thereby reducing the community property interest in the corporation." (Statement of Decision p. 20, ¶ 8(c).) Examples: use of Nano Alloys corporate funds to purchase a 2013 Tesla Model S (Statement of Decision p. 20, ¶ 8(c)(i)); transfer of $98,000 from Nano Alloys to personal bank account jointly owned by Debtor's mother (Statement of Decision p. 21, ¶ 8(c)(ii)); transfer of $504,000 from Nano Alloys account to an account under Debtor's control, then further transfers to Debtor's personal bank accounts, and bank accounts held jointly by Debtor and her mother and then used to pay attorneys and personal credit card bills (Statement of Decision p. 21,

---

set of financial records maintained by Nano Alloys, Inc./NiTi Tubes . . . [T]estimony . . . made clear that return material authorizations purportedly issued by Nano Alloys were patently falsified . . . [T]estimony . . . entirely undermines the purported claims of product returns or customer liabilities . . . [T]here is no factual basis for the purported 'liabilities.'" (Statement of Decision p. 15, ¶ 7(b)(iii).)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 9 of 24

¶ 8(c)(iv)); "In 2017, [Debtor] increased salary from Nano Alloys, from $65,000/year paid in 2016, to $108,000, which action is inconsistent with any theory that the business was failing in 2017, and the fact that it ceased operations at the end of 2017." (Statement of Decision p. 21, ¶ 8(c)(v).)

16. "After having removed its cash assets, Respondent provided knowingly false information to the accounting professionals . . . ." (Statement of Decision p. 22, ¶ 8(c)(vii).)

**3. Liabilities (no product liability claims are asserted against the Entities)**

17. "There is no evidence that Cordis Corporation or Cardinal Health have asserted against Nano Alloys, Inc. or NiTi Tubes any product liability claims." (Statement of Decision p. 19, ¶ 8(a)(viii).) Debtor's contention that the funds "are subject to unliquidated unasserted liabilities for product returns or product liability claims are not supported by any credible evidence." (Statement of Decision p. 19, ¶ 8(a)(ix).)

**4. Fraudulent Transfers**

18. "[I]n December 2013, [Debtor] transferred at least $98,000 in funds from Nano Alloys to [2 bank accounts in the name of Debtor and her mother] . . . The Court does not have credible evidence that the payment was made for professional services provided by Ms. Bussieres to Nano Alloys, Inc. . . . Any claim for the conversion of those funds from Nano Alloys, Inc. or NiTi Tubes belongs to the corporation." (Statement of Decision pp. 27-28, ¶ 17.)

**5. Wilson Eng Purported Ownership via Fraudulent Transfer**

19. "Although Wilson Eng claims that he believes that he and his wife were and continue to be 50% owners in Nano Alloys, Inc., no evidence of that ownership interest in the corporation existed until Ms. Ene unilaterally created stock certificates to give him such an interest. Mr. Eng did not participate in the decision to incorporate in late 2012, was not aware of the incorporation or share ownership, and was not employed full-time with the business . . . At trial, Mr. Eng admitted that he never saw the stock certificates giving him any interest in the company until his deposition in 2019, and was not aware that the original stock certificates gave [Debtor] 100% ownership interest." (Statement of Decision pp. 10-11, ¶ 5(c).)

20. "The Court finds that [Debtor] breached her fiduciary duties to [Mr. Darisme] by

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 10 of 24

transferring of purporting to transfer 50% of the stock of Nano Alloys, Inc. dba TiTi Tubes to Wilson Eng." (Statement of Decision p. 11, ¶ 6.)

21. "It is not disputed that at some time [Debtor] prepared documents for Nano Alloys dated in late 2014 (shortly before the Date of Separation) that purported to 'cancel' the stock certificate issuing her 700,000 shares, and issuing her mother, D. Busieres and Mr. Eng, 200,000 shares each and granting herself 400,000 shares . . . [Debtor] testified that she executed these transactions in or around October 2014, and granted the stock to Ms. Busieres and Mr. Eng 'in consideration for their services.' This testimony is not credible. There is no evidence that the stock grant was reported as taxable income to either Ms. Busieres or Mr. Eng in 2014. Mr. Eng testified that he never saw the stock certificate until it was shown to him at his deposition. Further . . . the 2015 taxes were filed on the basis of her 100% ownership." (Statement of Decision pp. 11-12, ¶ 6(b).)

22. "By documents created by [Debtor] dated December 8, 2017, D. Busieres 'returned' her shares, and stock certificates were issued giving [Debtor] and Mr. Eng, each 350,000 shares of Nano Alloys, Inc., for no apparent consideration paid to anyone for these transactions. Again, Mr. Eng testified that he did not see the stock certificate until his deposition. There was no evidence that he was aware of the transaction in 2017. The Court makes no determination in this proceeding as to <u>when</u> Mr. Eng actually obtained an ownership interest in Nano Alloys, Inc., whether he was entitled to receive an ownership interest, the percentage of the ownership interest to which he was entitled, or whether he has aided or abetted [Debtor] in connection with her conduct towards Mr. Darsime. The Court accepts the stipulation of [Debtor and Mr. Darsime] that Mr. Eng currently holds 50% of the shares of Nano Alloys, Inc." (Statement of Decision p. 12, ¶ 6(c).)

23. "Although [Mr. Darsime] argues that [the share transfer to Mr. Eng] was done as part of a fraudulent conspiracy, there is not clear and convincing evidence of fraud in connection with the transfers to Mr. Eng." (Statement of Decision pp. 12-13, ¶ 6(d).)

24. "[T]here is no credible evidence of when [Debtor] actually 'granted' 200,000 shares of the stock of Nano Alloys, Inc. to Mr. Eng in 2014. By the documents she created dated

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 11 of 24

December 8, 2017, [Debtor] had caused Mr. Eng to be granted 350,000 shares of Nano Alloys, Inc., for no apparent consideration . . . Thereafter, [Debtor] and Mr. Eng have contended in litigation that he is a 50% owner. On October 27, 2020, [Debtor] refused to answer further questions with regard to the granting of stock to Mr. Eng. Considering all the evidence, *the Court finds that the date of disposition is December 2017* . . . ." (Statement of Decision p. 13, ¶ 7(b) (*emphasis added*).)

**B. Additional Facts**

25. Following entry of the Statement of Decision, the Entities were awarded to Debtor in the Amended Judgment after Trial. (RJN No. 2 Ex. B, § III(A).)

26. In response to the misuse of corporate funds, the State Court issued a Modified Preliminary Injunction (the "**Injunction**") effective from April 21, 2021, which restricted and/or prohibited use of funds held in bank accounts owned by the Entities. (RJN No 3, Ex. C.)

27. Debtor filed her chapter 11 Voluntary Petition on July 2, 2021.

28. On March 28, 2022, this Court entered its Order Converting Case to Chapter 7. (Docket No. 102.) On March 28, 2022, Trustee was appointed as the Chapter 7 Trustee. (Docket No. 103.)

29. The claims bar deadline in the Bankruptcy Case for non-governmental units was June 6, 2022, and the claim bar deadline for governmental units is 180 days after the date relief was entered. (Docket No. 104, filed March 28, 2022.)

30. On October 13, 2021, Patrice Darisme filed an amended claim in the amount of $5,400,903.86 as Claim No. 3-2 (the "**Darisme Claim**").

31. On January 19, 2022, Wells Fargo Bank, N.A. ("**WFB**"), filed Complaint for Interpleader asking to interplead $3,101,517.76 with the Bankruptcy Court (the "**WFB AP**"). (AP No. 22-05004.) The funds are held in a CCH account and, because WFB believes the funds to be disputed (due to the Injunction), WFB no longer wants to hold the funds. (AP Docket No. 1, filed Jan. 19, 2022.)

32. Entities' primary assets are its brokerage and bank accounts; as of early 2022, 2022, the Entities assets were valued at approximately $7,000,000.00 (the "**Entities' Assets**"). (Wade Decl. ¶ 4.)[8]

33. Trustee has reached a settlement with Mr. Darisme with regard to numerous issues, including the Appeal and the Darisme Claim, as reflected by the Motion for Order Approving Compromise with Patrice Darisme, filed concurrently herewith.

## III. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409(a).

## IV. ARGUMENT

### A. Bankruptcy Court has Authority To Order Substantive Consolidation of Non-Debtors

"Substantive consolidation is an uncodified, equitable doctrine allowing the bankruptcy court, for purposes of the bankruptcy, to 'combine the assets and liabilities of separate and distinct—but related—legal entities into a single pool and treat them as though they belong to a single entity.'" *Clark's Crystal Springs Ranch, LLC v. Gugino (In re Clark)*, 548 B.R. 246, 252-253 (9th Cir. B.A.P. 2016) *aff'd* 692 Fed. Appx. 946 (2017) (*quoting Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 763-765 (9th Cir. 2000)." In the Ninth Circuit, substantive consolidation of non-debtor entities is permissible pursuant to 11 U.S.C. § 105 which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see, e.g., Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 763-765 (9th Cir. 2000) (substantively consolidating two non-debtor corporations, *nunc pro tunc* to date of the involuntary chapter 7 petition). "The primary purpose of substantive consolidation is to ensure the equitable treatment of all creditors." *Bonham*, 229 F.2d at 764, 765 (quotation omitted) (finding "sole aim" of substantive consolidation to be "fairness to all creditors"). "[T]he law of substantive consolidation is federal bankruptcy law and is not dependent

---

[8] All references to the Declaration of Austin Wade shall be referred to as (Wade Decl. ¶ __, Ex. __.)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 13 of 24

upon state law concepts." *Clark*, 548 B.R. at 252. Substantive consolidation may be sought via "contested matter upon motion by the involved parties . . . or via an adversary proceeding or other procedural device, as long as there is notice and an opportunity to be heard." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, n. 9, (9th Cir. 2000). "[T]he bankruptcy court has the power, in appropriate circumstances, to order less than complete substantive consolidation, or to place conditions on the substantive consolidation, including the preservation of avoidance claims by the formerly separate estates." *Bonham*, 229 F.3d at 769 (citations omitted).

**B. Substantive Consolidation of the Entities is Just and Proper**

"[I]n ordering substantive consolidation, courts must (1) consider whether there is a disregard of corporate formalities and commingling of assets by various entities; and (2) balance the benefits that substantive consolidation would bring against the harms that it would cause." *Bonham*, 229 F.2d at 765 (*citations omitted)*. The Ninth Circuit in *Bonham*, adopted the following test which requires consideration of two factors: "(1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors." *Bonham*, 299 F.2d at 766 (*citation omitted)*. "The presence of either factor is a sufficient basis to order substantive consolidation." *Id.*; *see also Clark's Crystal Springs Ranch, LLC, v. Gugino (In re Clark)*, 692 Fed. Appx. 946 (9th Cir. 2017) (finding that when first prong is met, no need to consider "whether substantive consolidation benefited all creditors"). In this case, both factors are met.

**1. Single Economic Entity**

The first *Bonham*, factor looks at "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit." *Bonham*, 299 F.2d at 766. Courts have found that substantive consolidation under this factor is satisfied with a finding of a "unity of interest" and "no clear demarcation between Debtor's affairs and those of the [non-debtor entity]." *Clark*, 548 B.R. at 251. In *Clark*, the bankruptcy court found this factor was satisfied when, *inter alia*, "Debtor drew at his unfettered pleasure from the LLC," and failed to maintain appropriate record keeping of the transactions, resulting in a finding that "there was an

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 14 of 24

exploitation of, and a disregard for the economic and legal separateness of, the LLC and the Trust." *Id.* at 251, 256 ("For example, the LLC paid Debtor's student loan payments, credit card bills, child support payments, house payments for his children, mortgage payments for rental property owned by Debtor, and personal expenses for Debtor's then-girlfriend"). Not all, but many creditors of the LLC were also creditors of Debtor. *Id.* at 256. Once a close interrelationship between debtor and the non-debtor entities are shown, "there is a presumption that creditors did not rely on their separate credit . . . [and] [t]he burden of proof shifts to the parties opposing substantive consolidation to show otherwise." *Id.* At 257 (*citing Bonham)*.

**a. Nano**

In this case, prior to ceasing operation in 2018, the State Court found that "in 2017 Nano Alloys, Inc. was wholly-owned and managed by [Debtor] as the key person, and sole director; that corporate and financial transactions were inadequately documented, and that the corporation relied on [Debtor's] corporate credit card (rather than establishing a corporate line of credit) and that both [Mr. Darsime] and [Debtor] withdrew and used corporate funds for personal expenses . . . ." (Statement of Decision p. 14, ¶ 7(b)(i).) The State Court went on to find that "[t]hrough a series of transactions, [Debtor] transferred over $6 million in cash from the accounts of Nano Alloys, Inc. to accounts in her name, or in the name of entities wholly owned by her, falsely claiming that the funds belonged to a fictitious entity, in order to intentionally reduce the value of Nano Alloys, Inc. and the community property interest there." (Statement of Decision p. 16, ¶ 8(a).) These transfers are detailed in paragraphs 8(a)(i)-(x) of the Statement of Decision.[9] In addition to finding the transactions to be fraudulent (*see* n. 9), the State Court found "clear and convincing evidence that [Debtor] misused her position of authority to access and use the funds of Nano Alloys, Inc. for her

[9] The State Court found these transactions to be fraudulent. (Statement of Decision p. 19, ¶ 8(a)(viii) ("transactions that resulted in the transfer of $6 million from Nano Alloys bank accounts into bank accounts in the name of Cardinal Cordis Health or NiTi Tub [sic] . . . to be fraudulent.").) The State Court found these transactions were done "intentionally to conceal the true value of the community interest in that corporation." (Statement of Decision p. 20, ¶ 8(b) ("[T]he creation of bank accounts in the name of Cardinal Cordis Health, and the removal of the funds from Nano Alloys, Inc. into those accounts was fraudulent and done intentionally to attempt to conceal the true value of the community interest in that corporation.").)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 15 of 24

own personal benefit, thereby reducing the community property interest in the corporation." (Statement of Decision p. 20, ¶ 8(c).) Examples: use of Nano Alloys corporate funds to purchase a 2013 Tesla Model S (Statement of Decision p. 20, ¶ 8(c)(i)); transfer of $98,000 from Nano Alloys to personal bank account jointly owned by Debtor's mother (Statement of Decision p. 21, ¶ 8(c)(ii)); transfer of $504,000 from Nano Alloys account to an account under Debtor's control, then further transfers to Debtor's personal bank accounts, and bank accounts held jointly by Debtor and her mother and then used to pay attorneys and personal credit card bills (Statement of Decision p. 21, ¶ 8(c)(iv)); "In 2017, [Debtor] increased salary from Nano Alloys, from $65,000/year paid in 2016, to $108,000, which action is inconsistent with any theory that the business was failing in 2017, and the fact that it ceased operations at the end of 2017" (Statement of Decision p. 21, ¶ 8(c)(v).)

In 2018, Nano ceased to operate. (Statement of Decision p. 15, ¶ 7(b)(iv).) In 2021, the State Court found that "[a]ll the accounts receivable have been liquidated, and any remaining product inventory has minimal value. There is relatively little value in any equipment or raw materials that have been stored." (Statement of Decision p. 15, ¶ 7(b)(iv).) Debtor's continued misuse of corporate funds by both Debtor and Mr. Darisme caused the State Court to issue the Injunction, effective from April 21, 2021, which restricted and/or prohibited use of Nano funds. (RJN No. 3, Ex. C.) As of November 30, 2021, Nano's accounts held approximately $40,000.00, with the bulk of Nano's purported cash having been purportedly transferred by Debtor to CCH in 2018. (*See* Docket No. 97, filed March 10, 2022; *see also* Statement of Decision, p. 18, ¶ 8(a)(vi) (State Court findings re: fund transfers).)

In addition, not only has Debtor treated Nano as her personal piggybank, but Debtor is also jointly liable for Nano's obligation owed to BraunHagey & Borden LLP in the amount of $303,112.84. With regard to other creditors, Nano's primary liability appears to be tax liability, as the State Court found that "[i]t appears that Nano Alloys and its shareholders did not pay taxes on [the funds that were transferred to CCH]." (Statement of Decision p. 15, ¶ 7(b)(iv).) A summary of known creditors can be found attached to the Declaration of Austin Wade as **Exhibit A** (the "**Entities' Liabilities**"). (Wade Decl. ¶ 5, Ex. A.)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 16 of 24

### b. CCH

Debtor asserts in her Schedules that CCH is a wholly owned subsidiary of Nano.[10] (Docket No. 141, p. 4, filed June 22, 2022 (Schedules).) The ownership of CCH is unclear,[11] but there is no evidence that CCH has ever been an operating company and the over $7,000,000.00[12] that CCH holds in its accounts was found by the State Court to be transfers[13] from Nano.[14] (Statement of

---

[10] Debtor asserts in her Schedules that CCH is a wholly owned subsidiary of Nano, (Docket No. 141, p. 4, filed June 22, 2022 (Schedules)), and testified at the August 27, 2021, Meeting of Creditors that "[CCH] belongs to Nano Alloys" and "[CCH] is a subsidiary of Nano Alloys." (Klump Decl. ¶ 4, n. 2.) When asked at that same August 27, 2021, Meeting of Creditors whether CCH was operational, Debtor responded: "[CCH] is a holding front it's under Nano Alloys." (Klump Decl. ¶ 4, n. 2.) Almost a year later at the May 31, 2022, Meeting of Creditors, Debtor reiterated her testimony that "[CCH] is a subsidiary of Nano Alloys. It was just put in place to hold the six million dollars . . . [and] the bank accounts where the money is right now is [sic] listed in Nano Alloy's tax returns." (Klump Decl. ¶ 4, n. 2.) As late as September 7, 2022, Debtor testified that if CCH had creditors, they would be the same as Nano's creditors (due to the fact CCH was a subsidiary). (Klump Decl. ¶ 4, n. 2.) However, at the November 3, 2022, continued meeting of creditors, Debtor for the very first time testified that she was mistaken and in fact CCH is <u>not</u> a wholly owned subsidiary of Nano but rather is its own standalone corporation. (Klump Decl. ¶ 4, n. 2.) This brazen reversal of testimony is wholly without merit as it contradicts numerous statements and testimony that has been given by Debtor over many, many years.

[11] "On December 1, 2017, [Debtor] formed an entity, [CCH,] purportedly a venture authorized by Cardinal Health, Inc. through its agent Cynthia Chan, and [Debtor] of which she claims to be an 80% controlling owner." (Statement of Decision p. 18, ¶ 8(a)(vi).) However, the State Court found Debtor's testimony regarding Cynthia Chan not credible. (Statement of Decision p. 18, n. 8) ("As made clear from the deposition testimony of Laura Vaughn [] Authorized agent of Cardinal Health, the entity that controls Cordis Corporation—there is no record of a Cynthia Chan being employed by Cardinal Health, Inc. or Cordis Corporation, there was no agreement with [Debtor] to create Cardinal Cordis Health, or to open bank accounts in the name of such entity. Husband testified that Cynthia Chan was a pseudonym used by [Debtor] herself during the operation of Nano Alloys, Inc., in order to create the impression that Nano Alloys had a larger infrastructure than it in fact had." (Statement of Decision, p. 19, ¶ 8(a)(viii)).) State Court found that Debtor opened a CCH bank account at Chase "identifying herself as the sole owner and President [of CCH]." (Statement of Decision, p. 18, ¶ 8(a)(vii).) Debtor also opened a CCH bank account at WFB, identifying herself as sole owner. (AP Docket No. 1, ¶ 1, filed Jan. 19, 2022) (On January 19, 2022, WFB filed Complaint for Interpleader, asking to interplead $3,101,517.76 with the Bankruptcy Court. (AP No. 22-05004).) CCH produced documents in response to Trustee's Rule 2004 subpoena, but none of the documents definitively revealed the underlying ownership. (Klump Decl. Klump ¶ 4.)

[12] (Docket No. 97, filed March 10, 2022.) The funds in these accounts is subject to the Injunction. (RJN No. 3, Ex. 3.)

[13] The State Court found these transactions to be fraudulent. (Statement of Decision, p. 19, ¶ 8(a)(viii).)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 17 of 24

Decision, p. 18, ¶¶ 8(a)(vi), (vii).) Other than Nano's claims to the funds held by CCH and WFB's claim for attorneys' fees as part of the WFB AP, CCH appears to have no creditors; Debtor has testified that CCH has no creditors (other than taxes or governmental fees) or, if it does, they are the same creditors/debts as Nano. (Klump Decl. ¶ 4, nn. 3-4.) The transactions related to CCH were found to be fraudulent by the State Court. (*See* Statement of Decision, p. 19, ¶ 8(a)(viii).) The lack of creditors and purported origin of the CCH funds weighs heavily in favor of a finding in favor of substantive consolidation under the first *Bonham* factor.

**c. NiTi Tube, LLC, a Wyoming Limited Liability Company**

Debtor has not listed NiTi WY on her Schedules. (*See* Docket No. 141, filed June 23, 2022.) The ownership of NiTi WY is unclear, but the State Court found that "[o]n December 11, 2017 [Debtor] opened a Bank of America account (#2264) in the name of [NiTi WY] . . . for which [Debtor] is the sole signatory, the address for which is her residence address, and into which she deposited funds which appear to have originated from Nano Alloys, Inc."[15] (Statement of Decision, p. 18, ¶ 8(a)(vi).) Debtor testified at the Meeting of Creditors that NiTi WY is a subsidiary of Nano. (Klump Decl. ¶ 5, n. 5.)

NiTi WY appears to have never been an operating company, and the funds[16] that NiTi WY held in its accounts are transfers from Nano.[17] Other than Nano's claims to the funds held in NiTi WY's accounts, NiTi WY appears to have no creditors; Debtor testified at the meeting of creditors

[14] State Court found with regard to the source of the funds, the State Court found as follows: "between December 6, 2017 and March 31, 2018, [Debtor] transferred into [CCH] account over $6 million from [Nano] accounts (including the over $3 million that she had moved from corporate accounts into her personal trust accounts, and then back into the JPMS accounts she created in September 2017 after the subpoenas were served." "On March 9, 2018, [Debtor] transferred over $3 million from the [CCH] Account at [WFB] . . . to the [CCH] Account at Chase Bank that she had opened the day before."

[15] The Statement of Decision recounted that Debtor "contended it was an account belonging to [NiTi CA]." (Statement of Decision, p. 21, ¶ 8(c)(iii).)

[16] The funds in these accounts is subject to the Injunction.

[17] The State Court Decision found that "[i]n December 2019, February 2020, March 2020, April 2020, and May 2020, [Debtor] transferred funds totaling on or about $504,000 from Nano Alloys accounts to the NiTi WY account which [Debtor] had established with Bank of America . . . which account is under [Debtor's] control." (Statement of Decision, p. 21, ¶ 8(c)(iv).) As of November 30, 2021, the NiTi WY BOA accounts held approximately $229,000.00. (Docket No. 97, filed March 10, 2022.)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 18 of 24

that NiTi WY has no creditors or, if it does, they are the same creditors/debts as Nano. (Klump Decl. ¶ 5, n. 6.) The transactions related to NiTi WY were found to be fraudulent by the State Court. (*See* Statement of Decision, p. 19, ¶ 8(a)(viii).)

Post-Petition, and in violation of the Injunction, Debtor withdrew $152,162.19 from the NiTi WY BOA accounts x2264 and x6092. (Wade Decl. ¶ 7, Ex. B; Darisme Decl. ¶ 7[18] (Debtor did not comply with requirements of Injunction.) According to April and May 2022, statements for the NiTi WY BOA accounts x2264 and x6092, most of the monies went to Discover Bank, Coinbase, Barnard College, CitiBank CC, Debtor's daughter, and numerous personal expenditures. (Wade Decl. ¶ 7, Ex. B.)

The lack of creditors, purported origin of the NiTi WY funds, and continued misuse of funds in violation of the injunction, weighs heavily in favor of a finding in favor of substantive consolidation under the first Bonham factor.

**2. Affairs are so Entangled that Consolidation Will Benefit All Creditors**

The second *Bonham* factor is also satisfied in this case. "Consolidation under the second factor, entanglement of the debtor's affairs, is justified only where the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible." *Bonham*, 229 F.3d at 766 (citations omitted).

**a. Entanglement**

In this case, the ownership structure of the entities is convoluted and could potentially require litigation to determine whether the assets are wholly owned subsidiaries, or entities legally controlled by Debtor. (*See supra* §§ II(A), IV(B).) In addition, the Entities' accounting records are problematic through 2017, and non-existent past 2018. (Wade Decl. ¶ 6.) Indeed, it appears that the Entities served no business purpose after 2018,[19] and their accounts were primarily used as

---

[18] All references to the Declaration of Patrice Darisme shall be referred to as (Darisme Decl. ¶ __.)

[19] "The last product shipped in the first quarter of 2018." (Statement of Decision p. 20, ¶ 8(b).) "[Debtor] ceased operating [Nano] in early 2018. All the accounts receivable have been liquidated, and any remaining product inventory has minimal value. There is relatively little value in any equipment or raw materials that have been stored." (Statement of Decision p. 15, ¶ 7(b)(iv).)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 19 of 24

Debtor's personal piggybank. (*See, supra* § II(A), IV(B)); Wade Decl. ¶ 6.) Moreover, prior testimony suggests that Nano maintained "more than one set of financial records," (State of Decision p. 15, ¶ 7(b)(iii)), and the State Court found that Debtor provided false information to accounting professionals. (Statement of Decision p. 22, ¶ 8(c)(vii) (the State Court also found that "[a]fter having removed its cash assets, [Debtor] provided knowingly false information to the accounting professionals . . . .").) Trustee's accountant has determined that it will be extremely difficult to recreate the accounting records. (Wade Decl. ¶ 6.)

The Statement of Decision makes a clear case that Debtor abused corporate formalities, used corporate funds for personal use, used Nano and the related entities to further devalue community assets with "malice, oppression and fraud"—acts that the State Court believed justified a levy of $1.8M in damages against Debtor. (Statement of Decision p. 16, ¶ 18.) In satisfaction of the second factor, it would be difficult to unwind the various levels of entanglement. (Dec. Wade ¶ 6.)

**b. Benefit to Creditors**

Although Nano does have creditors (*see* Wade Decl. ¶ 5, Ex, A),[20] The Entities' primary assets appear to be the funds held in the CCH accounts. (Wade Decl. ¶ 4.) Accordingly, creditors would have to pursue fraudulent transfer actions in order to realize payment on their claims. Substantive consolidation of the entities will benefit Nano creditors by eliminating this hurdle. In addition, all creditors will benefit by substantive consolidation because it will enable Trustee to safeguard cash currently held in numerous banks and afford her authority to pursue potential avoidance actions. *See Bonham*, 229 F.3d at 765 (citations omitted) (preservation of avoidance actions is often grounds for substantive consolidation).

In furtherance of Trustee's efforts, and to ensure that Nano creditors are not harmed by the substantive consolidation, in connection with a settlement with Mr. Darisme, he has agreed to consensually subordinate his claim to all creditors (except for possible subordinated tax penalties).

[20] Debtor has asserted there is medical devise liability claims against Nano; however, the State Court found this assertion not credible. (Statement of Decision, p. 18, ¶ 8(a)(viii) ("There is no evidence that Cordis Corporation or Cardinal Health have asserted against Nano Alloys, Inc. or NiTi Tubes any product liability claims").)

(*See* Motion for Order Approving Compromise with Patrice Darisme, filed concurrently herewith.) Trustee's accountant has reviewed the Entities' Assets and the projected Entities' Liabilities and believes that subordination of the Darisme Claim will allow for full payment of the Entities' Liabilities (except for possible subordinated tax penalties). (Wade Decl. ¶ 8.)

With regard to CCH and NiTi WY, there is no evidence that either has ever been an operating company and, other than Nano's claims to the funds and WFB's claim for attorneys' fees and costs[21] as part of the WFB AP against CCH, they have no creditors or, if they do, they are the same creditors/debts as Nano (or taxes or governmental fees). (Klump Decl. ¶ 4, nn. 3-4.) Again, all creditors will benefit by substantive consolidation because it will enable Trustee to safeguard cash asserts currently held in numerous banks and afford her authority to pursue potential avoidance actions. *See Bonham*, 229 F.3d at 765 (citations omitted) (preservation of avoidance actions is often grounds for substantive consolidation).

**C. Nunc Pro Tunc**

"[B]ankruptcy courts have sanctioned the substantive consolidation of two or more entities nunc pro tunc in order to allow a trustee or creditors to attack fraudulent transfers or avoidable preferences made by the debtor or consolidated entities as of the date of filing of the initial bankruptcy petition." *Bonham*, 229 F.3d at 765 (citations omitted). In this case, Nano and its entities appear to have made numerous transfers without business justification to Debtor's mother and other creditors (*see, e.g., supra* § IV(B)(1)), and substantive consolidation *nunc pro tunc* will permit recovery of these transfers.

**D. Wilson Eng**

Trustee disputes the ownership interest in Nano asserted by Mr. Eng as recoverable as a fraudulent transfer. Indeed, the State Court found that Mr. Eng received Nano stock certificates "for no apparent consideration," and did not make a determination as to whether he was entitled to

[21] Provided the Motion is approved, it is requested that $10,000.00 be withheld from any turnover of funds to cover the fees and costs incurred as part of the WFB AP against CCH.

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 21 of 24

an ownership interest, or what percentage such an ownership would be.[22] (Statement of Decision p. 12, ¶ 6(c).) Both Mr. Eng and Mr. Darisme (to the extent that Mr. Eng purportedly transferred part of his purported shares to Mr. Darisme) have consented to substantive consolidation of the Entities. (Eng Decl. ¶ 3; *see* Darisme Decl. ¶ 8.)

## V. NOTICE

"[N]otice and an opportunity to be heard must be given to creditors of the putative consolidated parties—whose claims would be equitably distributed under the consolidation order—and not just to the consolidated parties themselves." *Leslie v. Mihranian (In re Mihranian)*, 937 F.3d 1214, 1217 (9th Cir. 2019). The following efforts have been made to identify creditors of the Entities: Debtor interview; public records search; Rule 2004 document request to Nano; Rule 2004 document request to CCH; Rule 2004 document request to NiTi CA; requested creditor information from Mr. Darisme; and requested creditor information from Mr. Eng. (Klump Decl. ¶ 6.) Trustee obtained a Rule 2004 order requesting documents from NiTi WY (Docket No. 149, entered Aug. 30, 2022); however, a response has not been received to date. (Klump Decl. ¶ 6.) All known and potential creditors of the Entities for which Trustee has addresses will receive notice of this Motion via U.S. Mail and Trustee will also publish notice of the Motion in a newspaper of general circulation in the location of Nano's place of business (Fremont CA) and CCH and Ni-Ti WY's purported place of business (Sheridan WY). Trustee will notice other creditors if /when she becomes aware of their identities.

## VI. REQUEST TO SET CLAIMS BAR DATE AND PROCEDURES

Trustee proposes that within ten (10) days of the order granting this motion becoming

[22] "By documents created by [Debtor] dated December 8, 2017, D. Busieres 'returned' her shares, and stock certificates were issued giving [Debtor] and Mr. Eng, each 350,000 shares of Nano Alloys, Inc., for no apparent consideration paid to anyone for these transactions. Again, Mr. Eng testified that he did not see the stock certificate until his deposition. There was no evidence that he was aware of the transaction in 2017. The Court makes no determination in this proceeding as to <u>when</u> Mr. Eng actually obtained an ownership interest in Nano Alloys, Inc., whether he was entitled to receive an ownership interest, the percentage of the ownership interest to which he was entitled, or whether he has aided or abetted [Debtor] in connection with her conduct towards Mr. Darisme." (Statement of Decision p. 12, ¶ 6(c).)

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 22 of 24

final[23] Trustee will file a motion to set claims bar date for creditors of the Entities to file claims in the Bankruptcy Case within sixty (60) days of the notice to be entitled to a distribution in the Bankruptcy Case under 11 U.S.C. § 502, or be forever barred. Trustee shall then review and, if deemed necessary, object to any claims. Trustee proposes that in addition to mailing the notice of claims bar date to all known creditors for which Trustee has addresses, that she also publish notice of the claims bar deadline in a newspaper of general circulation in the location of the Nano's place of business (Fremont CA) and CCH and Ni-Ti WY's purported place of business (Sheridan WY).

## VII. CONCLUSION

For the reasons set forth herein, Trustee respectfully requests that this Court make and enter an Order:

1. Granting this Motion;

2. Directing that the Entities be substantively consolidated into the above-captioned case;

3. Directing the assets of Debtor and the Entities' be treated as common assets with all avoidance powers preserved;

4. Directing that the claims of creditors of each debtor be paid pro rata from the common fund pursuant to the priority described in the Bankruptcy Code, with the exception that the claim of Mr. Darisme shall be treated pursuant to the anticipated forthcoming Order Approving Compromise with Patrice Darisme;

5. Allowing WFB to withhold $10,000.00 from any turnover of funds to cover the fees and costs incurred as part of the WFB AP against CCH;

6. Within ten (10) days of the order becoming final, Trustee shall file a motion to set

---

[23] Order shall each be considered "final" for purposes hereof if (i) it has not been reversed or modified, the time for appeal therefrom or to seek review, reconsideration or rehearing thereof (including the time to petition for a writ of certiorari but excluding the time to move for relief from a final order or judgment under Rule 60(b) of the Federal Rules of Civil Procedure, made applicable to the Bankruptcy Case by Rule 9024 of the Federal Rules of Bankruptcy Procedure) has been waived or expired, and no appeal, petition for a writ of certiorari or other proceeding for re-argument, review, reconsideration, rehearing, or leave to appeal (including a motion for relief from a final order or judgment under Rule 60(b)) is pending and (ii) no statutory or judicial stay of the enforcement or effect of the Order is in effect and no request for such a stay is pending.

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 23 of 24

claims bar date for creditors of the Entities; and

7. For such further relief as the Court deems necessary and proper.

DATED: December 13, 2022

FENNEMORE WENDEL

By: */s/ Lisa Lenherr*
Mark Bostick
Lisa Lenherr
Attorneys for Gina R. Klump
Chapter 7 Trustee

Case: 21-50901 Doc# 163 Filed: 12/14/22 Entered: 12/14/22 08:40:31 Page 24 of 24