Princesca Ene

1406 Ormsby Dr

Sunnyvale, CA 94087

princescae@gmail.com

408 480 7049

FILED

AUG 14 2023

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No. 21-50901 MEH |
| PRINCESCA N. ENE, | |
| | Chapter 7 |
| Plaintiff. | |
| vs | Adversary Proceeding No. |
| PATRICE W. DARISME AND | COMPLAINT TO DISALLOW CLAIM; TO AVOID AND RECOVER FRAUDULENT TRANSFERS; BREACH OF FIDUCIARY RELIEF; DUTIES, SET ASIDE COMPROMISE AGREEMENT AND FOR DECLARATORY RELIEF |
| GINA R. KLUMP, Trustee | |
| Defendants | |

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 1 of 90

I, Princesca N. Ene ("Plaintiff") of the above-captioned chapter 7 bankruptcy estate alleges as follows:

## JURISDICTION AND VENUE

1.      Plaintiff filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code 2 on July 2, 2021, (the "Petition Date"). The case (the "Bankruptcy Case") was converted to one under Chapter 7 pursuant to this court's order entered on March 28, 2022, as Docket No.102.

2.      The above-captioned Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

4.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (H), (K), and (O), which seeks relief under 11 U.S.C. §§ 502(a), 544, 548, and 550 and Rule 7001(1), (2),(9) of the Federal Rules of Bankruptcy Procedure ("FRBP").

5.      Plaintiff  consents to the entry of a final order by the Bankruptcy Court.

## PARTIES

6.      Princesca  Ene, the debtor, herein referred to as "Plaintiff,"

7.      Gina Klump ("Trustee" or Ms. Klump) Trustee is the duly appointed trustee of the Plaintiff's chapter 7 case. (Docket No. 103, entered March 28, 2022.).On information and belief, the address of trustee is 30 5TH STREET, SUITE 200 PETALUMA, CA 94952-3042

8.      Defendant Patrice Darisme("Defendant" or "Pat Darisme") is Plaintiff's ex-husband and a creditor in the Bankruptcy Case. On information and belief, the address of Defendant is a P.O. Box 64462 Sunnyvale, CA 94088-4462

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 2 of 90

## GENERAL ALLEGATIONS

9.    On February 23, 2021, after a thirteen (13) day trial, the Superior Court of California, County of Santa Clara ("State Court"), in the marital dissolution proceeding pending as Case No. 2015-6-FL14081, entered its Statement of Decision re Property Division, Reimbursement and Breach of Fiduciary Duty, entered Feb. 23, 2021 (the "Statement of Decision") EXHIBIT A.

10.    Ms. Klump's Waterfall Analysis (DOCKET#163-4 EXHIBIT B) reveals that without Pat Darisme's fraudulent claim in excess of $5 million, **Plaintiff's remaining debt is only $11,845.** (Shannon Stein's original claim was rejected and she subsequently withdrew her claim (EXHIBIT C),

11.    On July 2nd, 2021, Plaintiff filed for bankruptcy protection under Chapter 11 to safeguard her retirement accounts and primary residence following her divorce judgment. Defendant Pat Darisme claimed an outstanding debt exceeding $5 million, which Ms. Klump, the trustee, accepted without proper investigation.

12.    Despite Plaintiff's genuine need for protection, the bankruptcy court lifted the stay on Plaintiff's residence property and retirement accounts, enabling their transfer to Pat Darisme.

13.    Prior to the conversion from Chapter 11 to Chapter 7, assets totaling approximately $5.7 million were transferred to Pat Darisme, both pre- and post-petition. The transfers and credits are detailed in paragraphs 43, 44, 46, and 49 of this document. This amount vastly surpasses what Plaintiff owes Pat Darisme .

14. Ms. Klump was appointed to the Chapter 11 case on January 24, 2022.

15.    **To date, no monetary judgment has been granted to Pat Darisme, as stated in the Statement of Decision on Page 35.** Ms. Klump is the primary reason for this.

21-50901 MEH

COMPLAINT

3

16. The Statement of Decision states that Katie Sims (the plaintiff's accountant) is to complete the analysis detailing all assets transferred to Pat Darisme, but Ms. Klump has refused for the bankruptcy estate to hire Katie Sims to complete this work, even after repeated requests from the plaintiff. This is a clear conflict of interest, as plaintiff alleges Ms. Klump orchestrated to keep Pat Darisme's debt artificially inflated.

17. Ms. Klump should be held accountable for her actions. She should be required to reimburse the bankruptcy estate for any losses that it has incurred as a result of her negligence.

18. **Unjustifiable Freeze of Bank Accounts:** In February 2021, Ms. Klump initiated a freeze on all bank accounts affiliated with non-debtor entity Cardinal Cordis Health Incorporated ("CCH"). This unwarranted freeze obstructed CCH from securing legal representation for its involvement in the ongoing adversary proceeding with Wells Fargo (Case 22-05004: Wells Fargo vs, Cardinal Cordis Health). Additionally, Ms Klump's action prevented CCH from mounting a defense to quash Ms Klump's Motion to consolidate the entities into the Plaintiff's estate.

19. **Plaintiff's Attempted Resolution and Ms. Klump's Disregard:** In response to the freeze, Plaintiff filed a motion requesting the release of frozen funds to allow CCH to secure legal representation. Despite Plaintiff's reasonable request, Ms. Klump failed to release the frozen funds, thereby further exacerbating the violation of proper procedures and fairness.

20. Ms. Klump's negligence and refusal to release funds for the entities to hire legal representation caused Case 22-5004 to drag on for 1 year and Wells Fargo to win by default; the substantial financial losses that CCH incurred as a result of Ms. Klump's negligence must

21-50901 MEH

COMPLAINT

4

be reimbursed by Ms. Klump. She is liable for the damages that she caused, and she must be held accountable for her actions.

**21.    Ms. Klump's Justification for Dropping Nano's Lawsuit[1] Against Pat Darisme:** Ms. Klump justified her decision to drop Nano's lawsuit against creditor Pat Darisme by stating that Pat Darisme was going to get a default judgment anyway. However, Ms. Klump neglected to mention that her refusal to release the freeze on Nano's bank accounts made it such that Nano no longer had legal representation.

**22.**    As a result of Ms. Klump's actions, Nano was unable to pursue damages against Pat Darisme in excess of $18 million. This effectively guaranteed that Pat Darisme would win by default, and it allowed him to walk away with all the funds he embezzled from Nano as well.

**23.**    Ms. Klump should be held accountable for her actions. She should be required to reimburse non debtor, Nano for the losses that it incurred as a result of her negligence.

**24.**    On March 10, 2022, Ms Klump filed a Motion to Convert to Chapter 7 (Docket No. 97.)

**25.    Settlement Agreement and Fraudulent Intent:** The events that transpired on December 7th, 2022, marked a critical turning point in the proceedings as Ms. Klump and Pat Darisme entered into a dubious "Settlement Agreement" under fraudulent pretenses. This agreement states in paragraph F that its "Intent. It is the intent of the Parties that this Agreement: 1) *facilitate liquidation of the Entitles*..." Exhibit D. regardless of CCH's financial performance.

**26.**    This settlement agreement appears to be for two primary reasons: first, to artificially maintain an inflated claim on behalf of Pat Darisme, thereby providing Ms. Klump with a pretext to demand higher Statutory fees. Second, this agreement along with Pat Darisme fraudulent "$5 million" Claim justifies the consolidation of the entities to plaintiff's bankruptcy

---

[1] **Verified** Complaint In the Superior Court State of California, County of Santa Clara (" StatB Court" ), against Patrice Darlsme as Case No. 18-CV-321769 (the " Nano Compliant" ).

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 5 of 90

proceeding while potentially disadvantaging non-debtor Cardinal Cordis Health Incorporated (CCH) and its shareholders in the process.

27.    Ms. Klump claimed that the compromise agreement was to reduce Pat Darisme's debt from an excess of $5.4 million (which was a fraudulent statement) to $3 million.

28.    In reality, the plaintiff alleges that the compromise agreement is a way to help Pat Darisme conceal the transfer of assets listed in subsequent paragraphs and to award him an additional $3 million.

29.    Docket 163-4 shows that per her calculations submitted to the courts, Ms. Klump planned on giving Pat Darisme an additional $2.7 million and supporting him in his adversary to collect the additional funds from plaintiff EXHIBIT B

30.    Instead of submitting a fair compromise agreement and to reduce the estate's debt, Ms. Klump conspired with Pat Darisme to increase Pat Darisme's award from $5.4 million to $8.4 million and to eliminate Plaintiff's ability to appeal the original judgment and Nano's ability to sue Pat Darisme for damages.

31.    **Contradictions and Lack of Substantiation:** It is crucial to address the contradictions presented by Ms. Klump's repeated assertions of fraudulent fund transfers from Nano to CCH or any other alleged malfeasance by the plaintiff. In fact, the Court did not make any findings of fact of any illegality and according to the SOD, any alleged claims for fraudulent transfers or other malfeasance by plaintiff, were left for the company to pursue. The Statement of Decision on Page 4, lines 2-9,

32.    **CCH's Solid Standing and Financial Viability:**

    **a.** CCH remains in good standing, as evidenced by EXHIBIT E

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 6 of 90

b. Furthermore, CCH's commendable financial performance is exemplified by its substantial profits of $826,000 generated in the year 2022 alone, as confirmed by Exhibit XXX.

33. These undeniable indicators of CCH's stability and integrity debunk any unsubstantiated claims to the contrary and stand in stark contrast to Ms. Klump's baseless insinuation that CCH serves as a "personal piggy bank" for the plaintiff.

34. **Intricacies of Double Taxation and Unscrupulous Tactics:** Ms. Klump is intent on reversing the transfer of funds from CCH to Nano. This will cost CCH and the estate an additional $3.5 million in taxes, as the estate will be forced to pay taxes on the funds that CCH has already paid taxes on. EXHIBIT B

35. Ms. Klump's decision to reverse the transfer of funds is motivated by her desire to increase the valuation of Nano Alloys. This will benefit Pat Darisme, who fraudulently owns a stake in the company gaining shares by suing Wilson Engfor allegedly stealing 50% of NanoAlloys from the debtor. However, Pat Darisme dropped his lawsuit against Wilson Eng in exchange for Wilson Eng's giving him half of the stolen shares. Accepting stolen goods as payment is considered fraudulent and should be treated as such, Ms. Klump has allowed this fraudulent transfer of the debtor's asset and the estate's shares to stand. (EXHIBIT G)

36. Ms. Klump's actions are a breach of her fiduciary duties as a trustee.

37. Ms. Klump's actions taint the bankruptcy proceedings. They create an atmosphere of questionable ethics and potentially collusive practices. The court should take steps to investigate Ms. Klump's conduct.

38. Ms. Klump's statement in the Compromise Agreement that the Plaintiff still owes Pat Darisme $2,788,419.00 after all credits have been applied **is false**. Ms Klump did not

21-50901 MEH
Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 7 of
COMPLAINT
90

independently audit what was transferred to Pat Darisme, which is her job as trustee, nor allow the bankruptcy estate to hire Katie Sims, plaintiff's accountant hence, the courts has still NOT entered a monetary judgment because the amount owed to Pat Darisme still needs to be calculated (Statement of Decision Pg 34-35).

**39.** In the Compromise Agreement, Ms. Klump inaccurately asserts that Pat Darisme will receive payment as the final creditor. However, this assertion is contradicted by evidence in Ms. Klump's Waterfall Analysis (Docket #163-4, EXHIBIT B), which clearly demonstrates that she has designated Pat Darisme with a priority payout ranking of 3.5. Her analysis reveals that there are other creditors ranked under him with priorities 4 and 5. This inconsistency further raises questions about Ms Klumps credibility.

40. **Pre-petition:** On information and belief, between February 24, 2021, and July 1, 2021, Plaintiff transferred $2,727,227.71[2] (the "Transfers") to Pat Darisme, serving the purpose of fulfilling obligations related to Family Code §1101(h) damages. The assets transferred are itemized as follows:

| | |
|---|---|
| Brokerage Account ETrade #4324: | $911,427.00 |
| Brokerage Account Charles Schwab #4354: | $194,058.00 |
| Bank Accounts (SOD page 32 Ln 18-20): | $782,017.50 |
| Retirement Account: | $825,000.00 |
| Prosper Account: | $14,725.71 |

41. The Statement of Decision reflected a reduction of Pat Darisme's owed amount by $122,337.16, including $9,471.89 (detailed in Statement of Decision ¶ Page 28 Ln12, 21, and 25) and $112,865.27 (detailed in Statement of Decision ¶ Page 24 Ln17-24).

---

[2] EXHIBIT J STATEMENT OF BROKERAGE ACCOUNTS TRANSFERRED TO Pat Darisme PRE-PETITION

COMPLAINT

42. Pre-Petition, and subsequent to providing payment to defendant Pat Darisme for damages related to Family Code §1101(h), the Plaintiff filed an appeal of the State Court judgment award related to the remaining awards and damages; Not Fraudulent Breach of fiduciary duty, Damages per Family Code 1101(g) attorney fees, and sanctions (the "Appeal") in the California Court of Appeal, 6th Appellate District, as Case No. H049168.

43. **Post-petition,** Plaintiff additional assets valued at $1,267,910.00 was transferred Pat Darisme, as follows; the Bankruptcy Court authorized the transfer of Plaintiff's IRA #5634 (Docket #41) valued at $37,641, Lifted stay from Property authorizing Interest in Ormsby Residential Real Property to be transferred to Pat Darisme (Docket #55). Pat Darisme removed Plaintiffs name from 7-unit apartment Property (Plaintiff's interest valued at $254,437.50) and 2004 Toyota Sequoia (Plaintiff's interest valued at $2,527.50)

44. On September 30, 2021, Pat Darisme filed a claim for $4,512,384.86 (Claim No. 3-1), subsequently amending it to $5,400,903.86 (Claim No. 3-2) on October 13, 2021. Concealing Plaintiffs assets already transferred and listed above. EXHIBIT H

45. On September 27, 2021, Pat Darisme initiated a frivolous non-dischargeability complaint, identified as AP Case No. 2105040, despite being fully compensated for damages awarded related to the non-dischargeability breach of Family Code §1101(h) pre-petition

46. The final accounting process is yet to be finalized, certain credits and transfers totaling approximately $1,605,917.53 will also need to be deducted from Pat Darisme's outstanding debt. The outstanding credits are as follows:

    i.   Reimbursement owed from Husband to Wife: $925,016.02 (refer to EXHIBIT I).
    ii.   Wife Reimbursement RFO filed September 2018
    iii.   Outstanding Epstein Credit that Wife is owed: $585,901.51
    iv.   Division of the Canadian corporation (60549): Notably, Mr. Pat Darisme has already completed the transfer of this asset

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 9 of 90

47. **Ms. Klump's Negligence and Violation of Bankruptcy Code:** In breach of her fiduciary duty and bankruptcy code regulations, Ms. Klump neglected to conduct a thorough investigation into the actual debt owed by the estate. Instead, she uncritically accepted Darisme's unsubstantiated claim of "in excess of $5 million."

48. Ms. Klump's negligence directly led to substantial financial losses for Plaintiff.

49. Ms. Klump's statement in the Compromise Agreement that Pat Darisme is owed in excess of $5 million is not supported by evidence. She did not audit what was transferred to Pat Darisme, which is her job as trustee.

50. On the information and belief Pat Darisme has asset transferred credits owing from Husband to Wife in excess of Pat Darisme's claim.

## FIRST CLAIM FOR RELIEF

**(Claim Objection; Declaratory Relief) (11 U.S.C. § 502(a); FRBP 7001(2), (9)**

51. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

Plaintiff hereby asserts the following claim for relief against the creditor Pat Darisme.:

52. Pat Darisme's claims in both Claim No. 3-1 and Claim No. 3-2 are being contested on the basis of fraudulent assertion.

53. Pat Darisme deliberately withheld essential community brokerage and retirement account statements as of December 31, 2020, for a period of over 2.5 years. This calculated action has hindered the ability of accountants listed in the Statement of Decision from accurately calculating a final monetary judgment.

21-50901 MEH
COMPLAINT

Case 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 10 of 90

54. This withholding of critical information directly contravenes the court's order outlined in the Statement of Decision (SOD) on page 34, lines 9-12, which unequivocally directs that "Husband shall be awarded as his sole and separate property all bank accounts, retirement accounts, and investment accounts in his name, or in the name of both Husband and Wife, effective as of December 31, 2020, and is responsible for providing account statements as of that date to Sally White and Katie Sims."

55. The deliberate failure to furnish the mandated account statements, specifically as of December 31, 2020, is a tactical maneuver designed to conceal the true value of assets transferred to Pat Darisme and to undermine the financial integrity of the bankruptcy estate.

56. The court further specifies that any reimbursements owed from Husband to Wife, due to assets transferred to him, are to offset against monies owed, with any remaining balances forming a monetary judgment (Statement of Decision page 35)

57. Plaintiff requests that the court dismiss Pat Darisme's current claim and set aside the Compromise Agreement due to Pat Darisme's deliberate non-compliance with the court's directives.

58. Plaintiff proposes that Pat Darisme only be permitted to refile his claim upon formal entry of a monetary judgment, which will ensure an equitable and transparent claims process

**Declaratory Relief Against Bankruptcy Trustee**

59. The Plaintiff additionally asserts a claim for declaratory relief against the Bankruptcy Trustee, Ms. Klump.

60. The Plaintiff objects to the allowance of Pat Darisme's claim in an amount exceeding $5 million, and seeks a declaration from the court that Pat Darisme's claim, labeled as "excess of $5 million," is fraudulent and should be invalidated.

21-50901 MEH
COMPLAINT

Case 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 11 of 90

61. The basis for this claim lies in Ms. Klump's alleged failure to conduct a thorough investigation into the validity of Pat Darisme's claim, which the Plaintiff contends to be fraudulent.

62. It is further alleged that Ms. Klump's complicity in allowing Pat Darisme's claim to proceed without appropriate rectification constitutes aiding and abetting several false statements, thereby exacerbating the fraudulent assertion.

63. The Plaintiff raises concerns about Ms. Klump's knowledge of assets transferred from the Plaintiff to Pat Darisme, which should have resulted in a reduced claim. The failure to demand such a reduction raises suspicions of asset concealment, potential bankruptcy fraud, and conflicts of interest.

64. The Plaintiff asserts that Ms. Klump's failure to properly investigate and address Pat Darisme's fraudulent claim undermines the principle of fair and impartial administration of the bankruptcy estate.

**The Plaintiff respectfully requests the court to:**

65. Disallow Pat Darisme's claim;

66. Grant declaratory relief, declaring Pat Darisme's claim as fraudulent and setting it aside;

67. Set aside Compromise Agreement

68. Void and dismiss Pat Darisme's claim, permitting him to refile only upon entry of a monetary judgment;

69. Take any other just and equitable actions the court deems appropriate.

70. Pat Darisme is not owed the amount as claim No. 3-1 and amended claim No. 3-2

71. Pat Darisme's Claim No. 3-1 and Claim No. 3-2 are asserted as fraudulent.

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 12 of 90

72. Take any other action that the court deems just and equitable.

## SECOND CLAIM FOR RELIEF

**Breach of Fiduciary Duty by Pat Darisme and Trustee (11 U.S. Code § 704(a)(1),11 U.S. Code § 704(a)(5), 11 U.S. Code § 727(a)(6), 18 U.S. Code § 152, 11 U.S. Code § 706(a))**

73. Plaintiff realleges all preceding paragraphs as though fully set forth herein.:

Plaintiff hereby asserts the following claim for relief against her ex-husband[3], Pat Darisme; Breach of Fiduciary Duty.

74. Pat Darisme failed to properly investigate the validity of his claim in the bankruptcy case.

75. Pat Darisme failed to disclose to the bankruptcy trustee that he had received transferred assets from the Plaintiff, which significantly reduces the amount of his claim.

**Plaintiff bases her claim on the following grounds:**

76. Pat Darisme has a fiduciary duty to Plaintiff because he was her ex-husband and creditor.

77. Pat Darisme owed Plaintiff a duty of loyalty, care, and good faith.

78. Pat Darisme breached his fiduciary duty and acted with malice, oppression and fraud when failing to properly investigate the validity of his claim, failing to disclose that he had transferred assets

---

[3] Fiduciary duties in the context of a prior spousal relationship and creditor status typically end once the bankruptcy case is concluded and all relevant matters, including distribution of assets, claims, and proceedings, are finalized.

COMPLAINT

13

79. Pat Darisme's breach of fiduciary duty caused the Plaintiff damages, including the loss of her bankruptcy estate and unnecessary consolidation and liquidation of Nano, CCH and Ni-TI Tube LLC assets.

**Plaintiff respectfully requests that the court:**

80. Find that Pat Darisme breached his fiduciary duty to Plaintiff.

81. Award Plaintiff damages for Pat Darisme's breach of fiduciary duty.

82. Take any other action that the court deems just and equitable.

Plaintiff, hereby also asserts the following claim for relief against the bankruptcy trustee, Ms. Klump:

83. Ms Klump breached her fiduciary duties and acted with malice, oppression and fraud by failing to thoroughly investigate the validity of Pat Darisme's claim, which is fraudulent.

84. Failed to demand a reduction of Pat Darisme's claim, even though she was aware that he had transferred assets, which should have reduced the amount of his claim.

85. Failing to administer the bankruptcy estate fairly and impartially by allowing Pat Darisme's fraudulent claim to proceed without correction.

86. Refused for the estate to hire Katie Sims, the accountant specified in the Statement of Decision, to complete the analysis detailing all assets transferred to Darisme so a monetary judgment can be rendered.

87. Refused to release the freeze on CCH's bank accounts, preventing CCH from hiring legal counsel in Case 22-5004, allowing Wells Fargo to win judgment by default.

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 14 of 90

88. Refused to release the freeze on Nano's bank accounts, which made it impossible for Nano to retain legal representation, preventing Nano from pursuing its verified complaint for damages against Pat Darisme in excess of $18 million.

**Plaintiff bases her claim on the following grounds**

89. Ms. Klump has a fiduciary duty to Plaintiff as a bankruptcy trustee.

90. Ms. Klump owed Plaintiff a duty of loyalty, care, and good faith.

91. Ms. Klump breached her fiduciary duty and acted with malice, oppression and fraud by failing to thoroughly investigate the validity of Pat Darisme's claim, failed to demand a reduction of Pat Darisme's claim, and failed to administer the bankruptcy estate fairly and impartially.

92. Ms. Klump's breach of fiduciary duty caused Plaintiff damages, including the loss of her bankruptcy estate.

**Plaintiff respectfully requests that the court:**

93. Find that Ms. Klump breached her fiduciary duty to Plaintiff.

94. Award Plaintiff damages for Ms. Klump's breach of fiduciary duty.

95. Take any other action that the court deems just and equitable.

**THIRD CLAIM FOR RELIEF**

**Claim to Avoid and Recover Concealment Fraudulent Transfers (California Civil Code § 3439.04(a)(1) Code § 548(a)(1)(A), 11 U.S. Code § 544(b), 11 U.S. Code § 550) 18 U.S. Code § 152**

96. Plaintiff realleges all preceding paragraphs as though fully set forth herein.:

21-50901 MFH
COMPLAINT
15

Plaintiff, hereby asserts the following claim for relief against Pat Darisme:

97.     Pat Darisme concealed transfer of assets  in order to hinder, delay, or defraud Plaintiff and her creditors

98.     Plaintiff bases her claim on the following grounds:

99.     Pat Darisme had the intent to hinder, delay, or defraud Plaintiff and her creditors.

100.    Pat Darisme concealed the transfer from Plaintiff and her creditors

**Plaintiff respectfully requests that the court:**

101.    Find that Pat Darisme made a fraudulent transfer of assets.

102.    Cancel Pat Darisme's claim in its entirety.

103.    Take any other action that the court deems just and equitable.

Plaintiff,  hereby also asserts the following claim for relief against the bankruptcy trustee, Ms. Klump:

104.    Ms. Klump failed to take steps to expose and document Pat Darisme's concealed fraudulent transfers made by Pat Darisme

**Plaintiff bases her claim on the following grounds:**

105.    Pat Darisme concealed Plaintiff's assets transferred to him pre petition and post petition.

106.    Pat Darisme had the intent to hinder, delay, or defraud Plaintiff and her creditors.

107.    Pat Darisme concealed the transfer from Plaintiff and her creditors.

108.    Ms. Klump was aware of the fraudulent transfer, but failed to take steps to document the Plaintiff's transferred asset and subsequently force Pat Darisme to reduce his claim.

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 16 of 90

21-50901 MEH
COMPLAINT                                                    16

109. Plaintiff respectfully requests that the court:

110. Find that Ms. Klump failed to take steps to document the fraudulent transfers made by Pat Darisme.

111. Order Ms. Klump to take steps to avoid and recover the transferred assets if Pat Darisme refuses to reduce his claim.

112. Take any other action that the court deems just and equitable.

<u>FORTH CLAIM FOR RELIEF</u>

Claim to Set Aside Compromise Agreement (11 U.S. Code § 704(a)(5), 11 U.S. Code § 727(a)(6), 18 U.S. Code § 152

113. Plaintiff realleges all preceding paragraphs as though fully set forth herein.:

Plaintiff, hereby asserts the following claim for relief against her ex-husband and creditor, Pat Darisme:

114. Pat Darisme entered into a compromise agreement with the bankruptcy trustee, Ms. Klump, in bad faith and for the purpose of defrauding her creditors and is not in the best interests of the bankruptcy estate.

**Plaintiff bases her claim on the following grounds:**

115. Pat Darisme knew that his claims No. 3-1 and No. 3-2, which were the basis for the compromise agreement, were false and fraudulent.

116. Pat Darisme knew that Ms. Klump was aware of the fraudulence of his claim.

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 17 of 90

117. Pat Darisme entered into the compromise agreement with Ms. Klump in order to avoid having his fraudulent claim disallowed by the court.

118. Pat Darisme entered into the compromise agreement with Ms. Klump to garner credence for his frivolous AP Case No. 2105040 case

119. Pat Darisme knew that he was owed far less than $ 3,000,000 which the trustee alleges in the compromise agreement. His actions in entering into the compromise agreement were in bad faith and for the purpose of defrauding Plaintiff and her creditors.

120. Pat Darisme knew that he was owed far less than $ $2,788,419.00 which the trustee alleges the Plaintiff still owes Pat Darisme in the compromise agreement. His actions in entering into the compromise agreement were in bad faith and for the purpose of defrauding Plaintiff and her creditors.

**Plaintiff respectfully requests that the court:**

121. Find that Pat Darisme entered into the compromise agreement in bad faith and for the purpose of defrauding the bankruptcy estate, the Plaintiff and her creditors.

122. Set aside the compromise agreement.

123. Take any other action that the court deems just and equitable.

Plaintiff, hereby asserts the following claim for relief against the bankruptcy trustee, Ms. Klump:

124. Ms. Klump approved a compromise agreement with Pat Darisme, her ex-husband and creditor, in bad faith and for the purpose of defrauding bankruptcy estate, the Plaintiff and her creditors.

125. Plaintiff's claim against Ms. Klump is based on the following grounds:

Case 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 18 of 90

126. Ms. Klump knew that Pat Darisme's claim against Plaintiff was fraudulent because Plaintiff had already paid off at least a portion of the debt before filing for bankruptcy.

127. Ms. Klump's actions in approving the compromise agreement were in bad faith and for the purpose of defrauding the bankruptcy estate, the Plaintiff, and her creditors.

**Plaintiff respectfully requests that the court:**

128. Find that Ms. Klump approved the compromise agreement in bad faith and for the purpose of defrauding the bankruptcy estate, the Plaintiff and her creditors.

129. Set aside the compromise agreement.

130. Take any other action that the court deems just and equitable.

### FIFTH CLAIM FOR RELIEF

**Claim to Avoid fraudulent Conversion and False Representation of Material Fact Made with the Intent to Defraud.( 11 U.S. Code § 548(a)(1)(A))**

131. Plaintiff realleges all preceding paragraphs as though fully set forth herein.:

Plaintiff, hereby asserts the following claim for relief against Pat Darisme and the trustee, Ms. Klump:

132. Plaintiff realleges all preceding paragraphs as though fully set forth hereinPat Darisme and Ms. Klump converted Plaintiff's property to their own use by approving a compromise agreement that is in excess of the actual claim and by failing to take steps to recover the property that was transferred to Pat Darisme in excess of debt.

21-50901 MEH
COMPLAINT

19

133. Pat Darisme and Ms. Klump were negligent in their handling of the bankruptcy case, including by approving a compromise agreement that was in excess of his actual claim and by failing to take steps to recover the property that was transferred to Pat Darisme in excess of debt.

134. Pat Darisme made false representations about how much he was still owed in order to induce the courts to approve the compromise agreement.

**Plaintiff bases her claims on the following grounds:**

135. Pat Darisme and Ms. Klump submitted to the courts a compromise agreement that would permit Pat Darisme to collect funds in excess of the court awarded judgment.

136. Pat Darisme and Ms. Klump failed to take steps to recover the property that was transferred to Pat Darisme in excess of the court awarded judgment.

137. Pat Darisme made false representations to the courts about how much he was still owed.

138. Pat Darisme knew that his representations were false when he made them.

139. Pat Darisme made his false representations with the intent to defraud bankruptcy estate, the Plaintiff and her creditors.

Plaintiff respectfully requests that the court:

140. Find that Pat Darisme and Ms. Klump converted her property to their own use.

141. Find that Pat Darisme and Ms. Klump were negligent in their handling of the bankruptcy case.

142. Find that Pat Darisme made false representations of material fact with the intent to defraud.

143. Order Pat Darisme and Ms. Klump to pay Plaintiff damages for her losses.

144. Order Pat Darisme and Ms. Klump to be held jointly and severally liable for Plaintiff's damages.

145. Take any other action that the court deems just and equitable.

Dated: August 11,, 2023

*Is/Princesca N. Ene*

Princesca N. Ene

Plaintiff

COMPLAINT

# EXHIBIT A



FILED

FEB 23 2021

Clerk of the Court
Superior Court of CA County of Santa Clara
BY_____MRueno_____DEPUTY
MBueno

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| IN RE THE MARRIAGE OF<br><br>PATRICE W. DARISME<br>                    Petitioner,<br><br>and<br><br>PRINCESCA N. ENE,<br><br>                    Respondent. | Case No.  2015-6-FL014081<br><br>STATEMENT OF DECISION RE PROPERTY DIVISION, REIMBURSEMENT AND BREACH OF FIDUCIARY DUTY<br><br>Trial Dates: February 11 through December 16, 2020 (various)<br>Date Submitted:  December 16, 2020<br>Proposed Statement of Decision:  January 20, 2021<br>Hearing re Attorneys' Fees:  March 3, 2021<br>Dept.:  10 (Hayashi) |

On February 11, February 13, February 14, February 20, February 21, March 2, March 4, October 26, October 27, October 28, November 18, December 10 and December 16, 2020, the Parties brought on for trial the issues of (1) Division of Property and Reimbursements; (2) Petitioner PATRICE DARISME 's ("Petitioner" or "Husband" or "Mr. Darisme") Request for Findings and Orders based upon Respondent PRINCESCA ENE's ("Respondent" or "Wife" or "Ms. Ene") Breach of Fiduciary Duties under the Family Code; (3) the Parties' respective Requests for Orders re Contempt;[1] and (4)

---

[1] Petitioner's two March 27, 2019 Requests for Order re Contempt; Respondent's May 31, 2019 Request for Order re Contempt.

Case: 21-50901   Doc# 248   Filed: 06/30/23   Entered: 06/30/23 14:08:09   Page 11 of
Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 23 of
90

Husband's Request for Temporary Restraining Order (filed October 20, 2020). Petitioner appeared with and through his counsel Walter Pierce Hammon, Cory Hammon and John D. Pernick; Respondent appeared with and through her counsel Shannon Stein and Pamela Schuur.

The matter was originally scheduled to commence trial on February 10, 2020, at which time the trial court was concluding a civil jury trial in another matter. The jury in that case did not return a verdict on the second phase of that trial until the afternoon of February 14. In the meantime, following hearing on *in limine* motions and opening statements, testimony in this case commenced on February 11, with Petitioner calling Respondent as an adverse witness.[2] Court was in recess for the Lincoln's Birthday holiday on February 12. On the afternoon of February 13, following discussion between Court and counsel about potential collateral consequences that may result from Respondent's testimony, Respondent's counsel requested a break in the proceedings so that she could consult with criminal law counsel, which counsel Dan Barton, appeared in limited scope with and for Ms. Ene on October 27, 2020 only.

On February 14, 20, 21, March 2 and March 4, 2020, the Court heard testimony from the Parties' respective accounting experts Jeffrey Stegner (for Respondent re: business valuation); James Butera (Joint Neutral Accounting Expert); and Sally White (for Petitioner). In addition, the Court addressed the request of Respondent for an early distribution of funds from a community property investment account. At the close of testimony on March 4, 2020, the Parties were to resume testimony on March 17, 2020. On the afternoon of March 13, 2020, the Court received notice that due to the Covid-19 emergency "shelter in place" orders, further trial proceedings would be continued until sometime after May 4, 2020. Due to various extensions in those orders and the limited resources available to the Court because of the State's reduction of trial court funding, trial in this matter could only resume on October 26, 2020.[3]

---

[2] The substance of any witness' testimony will be discussed below in connection with the Court's findings. With the exception of a portion of the testimony of Sally White given on March 4, 2020, a court reporter was present during all witness testimony in this matter.

[3] Between March 13, 2020 and October 26, 2020, the Court held at least three informal telephonic status conferences and remote hearings with counsel to address continued trial dates, Respondent's request for early disbursement of funds from a community account; and requests by witnesses and Parties to appear remotely.

STATEMENT OF DECISION

Case 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 24 of 90

On October 26, 2020, the Parties stipulated to withdraw their respective Requests for Order re Contempt with prejudice. Accordingly, the Court will not make any rulings with respect thereto.

On October 26, 2020, the Court heard testimony of Wilson Eng[4] (appearing remotely via MS Teams) and Nina Thompson, a former employee of Nano Alloys, Inc. On October 27, 2020, Ms. Ene (appearing remotely via MS Teams) resumed testifying and on the advice of her counsel Dan Barton (specially appearing remotely via MS Teams) asserted her Fifth Amendment right not to answer any of the questions that she was asked by Petitioner's counsel. On October 27 and 28, 2020, the Court heard the testimony of Petitioner. In addition, the Court received the deposition testimony of Laura Vaughn, representative of Cardinal Health and an out-of-state resident, in lieu of her live testimony. Thereafter, Ms. White and Katie Simms (Respondent's expert re: property division and reimbursements), who had been meeting and conferring in an attempt to resolve the division of bank accounts and reimbursements were to testify, which testimony was set for November 18, 2020.

On October 28, 2020, counsel for Petitioner brought to the Court's attention the fact that Petitioner had filed a request in the family law division for temporary restraining order and order to show cause to prevent Respondent from withdrawing or using any funds held in the names of or purportedly on behalf of certain entities in which the community had an interest, including Nano Alloys, Inc. The Court granted the temporary restraining order, and advanced hearing on the preliminary injunction from November 19, 2020 in the family law department to November 18, 2020, further

---

[4] It has been stipulated that for purposes of this proceeding Wilson Eng is a shareholder of Nano Alloys, Inc. who currently holds a 50 percent interest in the company. As discussed in the text below, when and how he obtained that interest is disputed. The Court does not find Mr. Eng to be a neutral witness; he is adverse to Petitioner. Both Nano Alloys, Inc. and Mr. Eng are represented by the Law Offices of Nicholas Heimlich and Pamela Schuur (counsel for Respondent in this action) in a related civil action adverse to Petitioner, Nano Alloys, Inc. v Patrice Darisme, and Mr. Darisme's cross-complaint filed therein (18CV321769). The Court notes that in February 2020, Mr. Heimlich appeared on behalf of Mr. Eng with regard to Mr. Eng's appearance as a witness in this case pursuant to subpoena. In March 2020, Mr. Heimlich wrote to the court to state that he is not "corporate counsel" for Nano Alloys, Inc., and therefore although made aware by Ms. Schuur of the Court's instruction that the Parties contact and cooperate with Nano Alloys, Inc.'s corporate counsel with regard to the access of their community property share of funds held by that corporation, he could not cooperate with the Court's instruction and stated that the corporation was not going to make funds available to any of the shareholders. In December 2020, the Court learned that Mr. Heimlich was being paid by the corporation Nano Alloys, Inc., at the direction of Respondent to represent Mr. Eng and the corporation adverse to Petitioner – who is a putative shareholder in the corporation.

3

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 25 of 90

ordered that neither Party should transfer, sell or attempt to transfer or sell their ownership interest in the identified entities, and ordered that hearing be set for November 18, 2020, on the joinder of Nano Alloys, Inc. in the family case.[5] As Wilson Eng and Nano Alloys, Inc. thereafter filed a CCP §170.6 challenge, the issue of joinder was reassigned to the Family Law Division for determination. Accordingly, the Court makes no orders herein with regard to the corporation, but addresses only the rights and liabilities as and between Husband and Wife with regard to the community property interest in the corporation, and Wife's actions that have had or may have an impact on the community property interest in the corporation.

On November 18, 2020, the Court granted Petitioner's motion to strike the testimony of Respondent's accounting expert Jeffrey Stegner to the extent that it included: (1) statements made to him by Respondent of matters as to which she refused to answer questions; (2) assumptions made by him based upon statements or information provided by Respondent as to which she had refused to answer questions; or (3) findings and opinions expressed by him in reliance on statements made by Respondent or assumptions of fact based thereon. The Court continued further testimony to December 10, 2020, and reissued the temporary restraining order.

On December 10, 2020, the Court heard testimony of Katie Simms and further testimony of Sally White. The Court also heard argument in support of Respondent's request to modify the Temporary Restraining Order so that she could pay necessary ongoing expenses to preserve the value of Nano Alloys, Inc. The Court reissued the Temporary Restraining Order, and ordered that the Parties

---

[5] Prior to February 2020, Petitioner had sought joinder of Nano Alloys, Inc. into this family law action. Respondent had sought to stay this trial under after adjudication of the civil action of Nano Alloys, Inc. v. Patrice Darisme and Mr. Darisme's cross-complaint filed therein (18CV321769). The all-purpose Family Law Judge assigned to this case denied both requests for order. On October 28, 2020, the Court stated that based on the evidence it appeared to the Court that prior to separation 100% of the stock of Nano Alloys, Inc. was a community property asset, that Wife had purported to transfer 50% of the stock to Wilson Eng in violation of her fiduciary duties to her spouse; that Wife had acted with malice, oppression and fraud in her exercise of management and control over Nano Alloys, Inc. and its assets, to the detriment of Husband; that after separation she had transferred, withdrawn and converted cash assets of Nano Alloys, Inc.; that as of October 28, 2020, she continued to be the sole officer of the corporation, and had sole control over the bank accounts containing approximately $6 million; and that therefore the temporary restraining order should issue as requested against Wife, and the corporation should be joined so that the Court could effectively enforce its orders.

4

Case 21-50901 Doc# 248 Filed 06/30/23 STATEMENT OF DECISION Entered 06/30/23 14:08:09 Page 14 of 61

return on December 16, 2020 to discuss a briefing schedule for attorneys' fees and whether further modification of the Temporary Restraining Order should be ordered.

On December 16, 2020, the Parties confirmed that the matter was submitted on all issues except attorneys' fees. The Court stated its tentative ruling that Petitioner is entitled to recover attorneys' fees from Respondent under Family Code §1101(g) and under Family Code §271. The Court set a briefing schedule for attorneys' fees and hearing for March 3, 2021. The Court continued further hearing on the preliminary injunction to March 3, 2021, and modified the Temporary Restraining Order to allow Respondent to pay delinquent and ongoing corporate operational expenses for Nano Alloys, Inc., such as corporate filing fees, taxes, data storage fees, and equipment storage fees that fell below a monthly cap, and were concurrently disclosed to Petitioner, as well as to pay a significant arbitration award entered against the corporation in favor of its former counsel who had initiated the civil action (18CV321769) against Petitioner. The Court denied Respondent's request to authorize her to use corporate funds, in which Petitioner had an interest, in order to continue to pursue litigation against Petitioner. The Court authorized the payment of the arbitration award to former counsel solely to avoid incurring interest and costs of collection, and thereby further reduce the value of the community interest in the corporation. This authorization does not alter the Court's finding that Respondent's use of corporate funds to pursue claims against Petitioner for withdrawing corporate funds while not repaying the corporation for her withdrawal of corporate funds, is evidence of oppression (misuse of Respondent's position as an officer of the corporation to disadvantage Petitioner).

Both Parties requested a written Statement of Decision. On January 20, 2021, the Court filed and served its Tentative Decision and Proposed Statement of Decision (the "PSOD"). On February 4, 2021, Petitioner filed and served his Response to the PSOD ("Petitioner's Response") and Respondent filed and served her Objections to Tentative Decision and Statement of Decision ("Respondent's Objections"). This Statement of Decision incorporates the Court's rulings with regard to the Parties' objections, and requests for correction or clarification, as well as additional corrections or clarifications made by the Court.

5

STATEMENT OF DECISION

Petitioner's Response.

Request A: Both Parties identified a 2004 Toyota Sequoia as a community asset in their trial briefs. See also Respondent's Schedule of Assets and Debts. The Court did not address that asset in the PSOD, and will do so herein.

Request B that Petitioner be awarded 100% ownership of the Canadian corporation in this Statement of Decision is granted as described below. On October 26, 2020 (Transcript pages 60:24-63:6) the Parties stipulated that the Parties own as community property an eight unit apartment complex held by them through the Canadian corporation, and stipulated to the value of the real property. The Parties also made clear that their stipulation went only as to the value of the real property not to the corporate interest, and that there are as yet unresolved claims with regard to an accounting for the bank account balance as of date of separation, and the receipt of rents and expenditures made since date of separation the bank accounts. Accordingly, a transfer of ownership of the Canadian corporation to either spouse, without reservation of rights with regard to an accounting for post-separation income and expenses, would not be proper.

Request C to correct the value of the household furniture to a total value of $10,000; Request D seeking clarification of the dates on which Plaintiff's obligation to make Fair Rental Payments; Request E to make clear that transfers of cash or assets (including the buyouts of either Parties' interests in the Family Residence or stock of Nano Alloys) are incident to a divorce and not intended to be taxable; and Request F to correct typographical errors, are granted, except with regard to page 28, line 6, which dollar amount is being modified pursuant to other orders made herein.

Respondent's Objections.

In a statement of decision, the court need not specify the particular evidence considered by the trial court is reaching its decision or make findings on every evidentiary point. *IRMO Williamson* (2014) 226 Cal.App.4th 1303, 1318-19; *Richardson v. Franc* (2015) 233 Cal.App.4th 744, 753 n.2. The main purpose of an objection to a proposed statement of decision is not to reargue the merits. *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 292; *Yield Dynamics, Inc. v. TEA Sys. Corp.* (2007) 154

6

Case 21-50901   Doc# 248   Filed 06/30/23   14:08:09   Page 16 of 91

Case 21-50901   Doc# 255   Filed 08/14/23   Entered 08/14/23 17:09:44   Page 28 of 90

Cal.App.4th 547, 560. For these reasons, except as specified below, the Court overrules all of Respondent's "Objections" as either requests that the Court consider a particular piece of evidence and disregard other findings and evidence, and/or re-arguments of the merits of the case. In particular, the arguments with regard to the valuation date for purposes of the award of damages, whether or not an award of damages for breach of fiduciary duty was duplicative with assigning a value to the remaining community interest in the stock of Nano Alloys, Inc., were presented orally and in writing repeatedly and exhaustively over the past year.

Further, despite Respondent's refusal to answer questions about her transfer of stock to Mr. Eng, Respondent asks the Court to give greater weight to the stock certificates and minutes that she purportedly prepared in 2014 (which could not be corroborated by Wilson Eng) as compared to the sworn testimony of Petitioner. The Court has already rejected these arguments by Petitioner, and finds no greater merit in them now.

The Court finds that Respondent's reliance on *IRMO Schleich* (2017) 8 Cal.App.4th 267, 284 is unavailing and based on a misstatement of the Court's careful explanation of the basis of its calculation of 1101(g) damages for the transfer of 50% of the community property interest of Nano Alloys to Mr. Eng; 1101(h) damages measured by the difference between the value of the community property interest in the other 50% and the current pre-tax value (which specifically avoids duplication of the damages awarded and the value of the corporation as of the date of trial); and the buyout amount (25% of the Court's valuation as of date of trial).

The Court's statements about Mr. Eng, his representation in this case and in the related civil action by the same counsel who are representing Respondent in this case, and the actions of Mr. Eng and his counsel in this case are not *dicta*. The Court finds that Mr. Eng was not a neutral witness in this case and is biased as against Mr. Darisme. Mr. Eng's lack of neutrality and bias were considered by the Court in weighing the credibility of Mr. Eng's testimony and in concluding that it would be unjust and inequitable to divide the stock ownership of Nano Alloys "in kind", and therefore place Mr. Darisme's interest in Nano Alloys at the mercy of Mr. Eng and Ms. Ene.

7

Case: 21-50901   Doc# 248   Filed: 06/30/23   Entered: 06/30/23 14:08:09   Page 17 of 91
Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 29 of 90

The Court does not find that any misstatements of the evidence go to "key" issues or are in anyway material to the Court's findings and orders. Nonetheless, for purposes of clarity:

- the Court sustains Petitioner's objections to the characterization in Footnote 5, that both Parties sought joinder of Nano Alloys to the family law case. Petitioner sought joinder; Respondent sought to have the family law case stayed pending the resolution of the civil action;

- The Court will state in Paragraph 3 that it finds that from 2012, Wife was the principal owner/operator of the business;

- The Court will clarify the timing of the Parties' investments in Paragraph 5(d);

- The Court will clarify the evidence with regard to the Court's findings in Paragraph 8(b)

The Court sustains Respondent's objection to that portion of paragraph 15 ordering that Petitioner is awarded the operating account for the Canadian property, but will award 100% ownership of the stock of the corporation holding the Canadian Property to Petitioner, subject to the obligation to account for all income and expenses of the corporation and to reimburse to Respondent 50% of the post-separation profits and cost of capital expenditures.

The Court sustains Respondent's objection to paragraph 2 of the Orders with regard to the date on which custody and control of the Family Residence will transfer to Petitioner. The Court had set the date of June 30, 2021 in the belief that such date would provide sufficient time for the Parties to resolve or set for hearing the issue of child support, temporary spousal support and support arrears, so that Respondent (the custodial parent) would have the benefit of child support in order to obtain replacement housing. However, given the evident inability of the Parties to resolve issues by agreement, and the limited number of hearing dates caused by Covid-19 and staffing shortages resulting in delays in obtaining hearing dates, the Court will modify the Statement of Decision to provide that the effective date of the transfer of the Family Residence to Petitioner shall be the later of June 30, 2021 or thirty days after the effective date of any order for child support.

The Court sustains Respondent's objection to paragraph 9 of the Orders, as it exceeds the scope of the Findings and Orders necessary to effect a division of the property.

8

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 30 of 90

This Statement of Decision does not address the request for attorneys' fees or the preliminary injunction, both of which are scheduled for hearing on March 3, 2021.

**HAVING HEARD, READ AND CONSIDERED THE TESTIMONY OF THE WITNESSES, THE EVIDENCE AND ARGUMENT (BOTH ORAL AND WRITTEN) AND REVIEWED THE PRIOR ORDERS AS CONTAINED IN THE FILES AND RECORDS OF THE COURT, AND HAVING CONSIDERED AND SUSTAINED CERTAIN REQUESTS AND OBJECTIONS AS STATED ABOVE, AND FINDING GOOD CAUSE THEREFORE, THE COURT FINDS AND ORDERS:**

1. It is not disputed that the Parties married on September 2, 2000, and that there are two children of the marriage: Gabrielle (DOB: 2/25/2002) and Tyler (DOB: 5/9/2005).[6] It is stipulated that the Parties' Date of Separation is January 1, 2015.

*Petitioner's Breach of Fiduciary Duty Claims re Community Property Interest in Nano Alloys dba NiTi Tubes.*

2. In or around November 2004, the Parties formed a business venture, known as NiTi Tubes, LLC, for the purpose of manufacturing and supplying tubing used in the medical device industry. The venture was formed between Wife, who was then employed full time at Memry Corporation and a co-worker from a prior employment, Wilson Eng. As both Wife and Mr. Eng had other employment, the nominal owners and managing partners of the LLC were Husband and Mr. Eng's spouse, Linh Chang (also referred to as "Ling Chang" and "Lin Cheng"). While the exact amount of capital contributed is disputed, it appears that each couple (Parties in this action on the one hand, and Wilson Eng and his spouse, on the other), contributed at least $100,000 as an initial investment. *See* Resp. Exh. A. There is no evidence that Ms. Chang had any participation in the business. Mr. Eng provided facilities and

---

[6] Issues of custody, visitation, child support, temporary and long-term spousal support, and support arrears (if any) were not assigned to this department for trial.

9

Case: 21-50901   Doc# 248   Filed: 06/30/23 14:08:09   Page 19 of

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 31 of 90

operational services in the early years of the business, but it does not appear that he was ever engaged as a full-time management employee of the business.

3. It is not disputed that by 2012, Wife had become the principal owner/operator of the business. It is also not disputed that Husband established bank accounts for the business enterprise, and that Wife used Husband's personal American Express account to pay business expenses.

4. In late 2012, approximately eight years after the venture started, Parties in this action decided to incorporate. It was stipulated by the Parties on February 11, 2020, that on or about January 1, 2013, NiTi Tubes, LLC incorporated as NiTi Tubes, Inc. which corporation changed its name to Nano Alloys, Inc. dba NiTi Tubes. All 700,000 shares of stock were held in Respondent's name, and consistent with having only one shareholder, there was no Board of Directors. *See* Petitioner's Exh. 12.

5. The Court finds that at the time of incorporation, 100% of the stock of Nano Alloys, Inc. dba NiTi Tubes was a community property asset.

   a. On or about June 14, 2014, Respondent sent an e-mail to her mother-in-law M. Beaudray (Exh. 121) admitting that the company has $3,000,000 in the bank that Petitioner/Husband owns 50% of the Company, inferring that they jointly owned 100% of the company. Respondent's denials of this e-mail were not credible.

   b. Even after separation, Respondent asserted that she was the 100% owner of Nano Alloys, Inc. In her testimony on February 11, 2020, Plaintiff admitted that she claimed sole ownership of Nano Alloys, Inc. in the police report she filed on or about September 22, 2015. *See also* Exh. 53. Further, Schedule G of the corporate tax return for tax year 2014 (filed after separation in 2015), Exhibit RR identifies Wife as the 100% shareholder.

   c. Although Wilson Eng claims that he believes that he and his wife were and continue to be 50% owners in Nano Alloys, Inc., no evidence of that ownership interest in the corporation existed until

10

Case: 21-50901   Doc# 248   Filed: 06/20/23   Entered: 06/20/23 14:08:09   Page 20 of
Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 32 of
190

Ms. Ene unilaterally created stock certificates to give him such an interest. Mr. Eng did not participate in the decision to incorporate in late 2012, was not aware of the incorporation or share ownership, and was not employed full-time with the business. In his declaration filed in the Court on January 4, 2019, Mr. Eng declared (at paragraph 4): "*We* formed Nano Alloys in January 2013 to replace Ni-Ti Tubes, LLC." (emphasis added). This is not a true statement. At trial, Mr. Eng admitted that he never saw the stock certificates giving him any interest in the company until his deposition in 2019, and was not aware that the original stock certificates gave Wife 100% ownership interest.

d. Husband testified that he understood that after the initial formation of the LLC and before the incorporation, eight years later, he and Wife contributed all of the additional capital in the business and provided all of the management services that had led to the growth of the company, such that Mr. Eng did not have an ownership interest. He does not have any evidence, however, that Mr. Eng had been "bought out" of the business venture before its incorporation.

6. The Court finds that Respondent/Wife breached her fiduciary duties to Petitioner by transferring or purporting to transfer 50% of the stock of Nano Alloys, Inc. dba NiTi Tubes to Wilson Eng.

a. Family Code §§ 721 and 1100 and the case law thereunder make clear that a spouse who disposes of community property without prior consent or written authorization of the other spouse has breached the fiduciary duties owed by one spouse to the other, which duties persist until the final division of property.

b. It is not disputed that at some time Wife prepared documents for Nano Alloys dated in late 2014 (shortly before the Date of Separation) that purported to "cancel" the stock certificate issuing her 700,000 shares, and issuing her mother, D. Busieres and Mr. Eng, 200,000 shares each and granting herself 400,000 shares (Pet. Exh. 33-34) Petitioner testified that she executed these transactions in or



11

around October 2014, and granted the stock to Ms. Busieres and Mr. Eng "in consideration for their services." This testimony is not credible. There is no evidence that the stock grant was reported as taxable income to either Ms. Busieres or Mr. Eng in 2014. Mr. Eng testified that he never saw that stock certificate until it was shown to him at his deposition. Further, as noted above in 2015 Ms. Ene was still claiming that she is the 100% owner of NiTi Tubes and the 2015 taxes were filed on the basis of her 100% ownership. The Court finds no credible evidence supporting Respondent's argument that the Court's award of damages under Family Code §1101(g) (discussed in paragraph 6 below) should be based as to 200,000 shares on a 2014 date of transfer.

c. By documents created by Wife dated December 8, 2017, D. Busieres "returned" her shares, and stock certificates were issued giving Respondent/Wife and Mr. Eng, each 350,000 shares of Nano Alloys, Inc., for no apparent consideration paid to anyone for these transactions. (Exh. 131). Again, Mr. Eng testified that he did not see the stock certificate until his deposition. There is no evidence that he was aware of the transaction in December 2017. The Court makes no determination in this proceeding as to <u>when</u> Mr. Eng actually obtained an ownership interest in Nano Alloys, Inc., whether he was entitled to receive an ownership interest, the percentage of the ownership interest to which he was entitled, or whether he has aided or abetted Respondent in connection with her conduct towards Petitioner. The Court accepts the stipulation of the Parties that Mr. Eng currently holds 50% of the shares of Nano Alloys, Inc.

d. Husband credibly testified that the transactions resulting in Mr. Eng's ownership of 50 percent of the stock of Nano Alloys, Inc. were without his prior knowledge or consent. There is no evidence that he gave prior written consent. For purposes of this proceeding, it is not disputed that Respondent/Wife effectively transferred one-half of the stock of Nano Alloys, Inc. a community asset, to Wilson Eng. Although Husband argues that this "transfer" was done as part of a fraudulent

12

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 34 of 190

conspiracy, there is not clear and convincing evidence of fraud in connection with the transfers to Mr. Eng.

7.      Accordingly, pursuant to Family Code §1101(g), the Court awards to Petitioner the amount of **$2,402,645.70** (25% of the business value as of December 31, 2017) plus attorneys' fees and court costs in connection with providing the breach of fiduciary duty for the transfer to Wilson Eng of 50% of the ownership of Nano Alloys, Inc.[7]

a.      Family Code §1101(g) provides that the remedies for breach of fiduciary duty by a spouse are "an amount equal to 50 percent of any asset . . . transferred in breach of the fiduciary duty plus attorney's fees and court costs." Here, the "asset transferred" is 50% ownership interest in Nano Alloys, Inc., one half of which would be 25% of the value of the asset.

b.      Family Code §1101(g) further provides that "[t]he value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the disposition of the asset, or the date of the award by the Court." As discussed above, there is no credible evidence of when Ms. Ene actually "granted" 200,000 shares of the stock of Nano Alloys, Inc. to Mr. Eng in 2014. By the documents she created dated December 8, 2017, Respondent/Wife had caused Mr. Eng to be granted 350,000 shares of Nano Alloys, Inc., for no apparent consideration (Exh. 131). Thereafter, she and Mr. Eng have contended in litigation that he is a 50% owner. On October 27, 2020, Ms. Ene refused to answer further questions with regard to the granting of stock to Mr. Eng. Considering all the evidence, the Court finds that the date of disposition is December 2017, and that the value of the asset as of that date. is the value of Nano Alloys measured as a going business as of December 2017, as stated in the opinion and report of James Butera, CPA assuming the business has goodwill value and there is not a

---

[7] On December 16, 2020, the Court set a briefing schedule and hearing on March 3, 2021 for determination of those fees.

13

Case: 21-50901    Doc# 248    Filed: 06/30/23    Entered: 06/30/23 14:08:09    Page 23 of

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 35 of 90

customer liability for returned merchandise, which Mr. Butera finds to be $9,610,583. (See Pet. Exh. 214 and Resp. Exh. PP).

i. Petitioner argues that the Court should adopt the valuation of $10,917,000 based on the report of Sally White. The Court notes that despite the difference in valuation date (12/31/2016 used by Ms. White, v. 12/31/2017 used by Mr. Butera); and the somewhat different manner in which they made various adjustments, both reached very close conclusions with regard to the tangible assets value ($7,709,178 per Ms. White v. $7,898,162). As testified to by Mr. Butera and apparent from Resp. Exh. PP which he prepared, the difference between their two calculations was the result of the multiplier for the capitalization rates which they used in order to calculate the goodwill of the business (5.46 per Ms. White v. 3.88 per Mr. Butera). Given that in 2017 Nano Alloys, Inc. was wholly-owned and managed by Respondent as the key person, and sole director; that corporate and financial transactions were inadequately documented, and that the corporation relied on Petitioner's corporate credit card (rather than establishing a corporate line of credit) and that both Petitioner and Respondent withdrew and used corporate funds for personal expenses, the Court finds that the more conservative multiplier of 3.88 better takes into consideration the risks that might hinder the stability of the company's revenue stream and its potential for future growth in the eyes of a potential purchaser or investor.

ii. Mr. Stegner testified that Nano Alloys, Inc. had $7.6 million in cash as of December 31, 2015 based on review of its tax returns, which had dropped to $7.3 million as of December 31, 2016 per Ms. White. These numbers further support the calculations of tangible assets made by Mr. Butera and Ms. White, as shown above, and without considering the good-will attached to a going business, show that a valuation as of the date of breach of fiduciary duty will be higher than the valuation as of today's date of award.

14

iii.    Respondent contends that although the company had cash of approximately $7,337,000 and total assets exceeding $8,000,000, as of December 31, 2016 (see Exh. TT), those assets were subject to client warranty and claims exceeding $6.1 million. Respondent's contentions are not supported by the evidence; and Respondent has refused to testify with regard to the specifics of the underlying transactions. Mr. Stegner's testimony and opinion as to the valuation of the business of Nano Alloys, Inc. based on Respondent's statements to him that such liability exists has been stricken, because of Respondent's refusal to testify with regard to any facts supporting that contention. The testimony of Nina Thompson made clear that there was more than one set of financial records maintained by Nano Alloys, Inc/NiTi Tubes. The testimony of Sally White made clear that return material authorizations purportedly issued by Nano Alloys were patently falsified. The deposition testimony of Laura Vaughn (Pet. Exh. 268) entirely undermines the purported claims of product returns or customer liabilities. The testimony of Sally White, James Butera, Ms. Thompson and Ms. Vaughn, made clear that there is no factual basis for the purported "liabilities."

iv.    It is not disputed that Respondent ceased operating Nano Alloys, Inc. dba NiTi Tubes in early 2018. All of the accounts receivable have been liquidated, and any remaining product inventory has minimal value. There is relatively little value in any equipment or raw materials that have been stored. The primary remaining assets appear to be approximately $6 million in cash that Respondent transferred from accounts in the name of Nano Alloys, into bank accounts in the names of other fictitious entities ("NiTi Tub" or "Cardinal Cordis Health") under her control (as described below). It appears that Nano Alloys and its shareholders did not pay taxes on that money. Thus, using a value of the asset as of today (the date of award) would clearly not yield "the highest value" as required under §1101(g).

15

Case: 21-50901   Doc# 248   Filed: STATEMENT OF DECISION 06/30/23 14:08:09   Page 25 of
Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 37 of 90

8. The Court finds that Petitioner has met his burden of showing by clear and convincing evidence that Respondent engaged in "malice, oppression and fraud", in order to reduce the value of Nano Alloys, Inc. from its value as an ongoing business ($9,610,583) as established by Mr. Butera to $6,000,000, the reported cash in the bank at the commencement of trial. Pursuant to Family Code §1101(h), Petitioner is hereby awarded damages in the amount of **$1,805,291.50.**, the amount by which the remaining 50% community property interest (after the transfer to Mr. Eng) was damaged as a result of Respondent's course of conduct described below.

a. Through a series of transactions, Respondent transferred over $6 million in cash from the accounts of Nano Alloys, Inc. to accounts in her name, or in the name of entities wholly owned by her, falsely claiming that the funds belonged to a fictitious entity, in order to intentionally reduce the value of Nano Alloys, Inc. and the community property interest therein;

i. Prior to separation, Nano Alloys, Inc. held funds in bank accounts at Bank of America and Chase. As discussed above at the end of December 2015, Nano Alloys purportedly had $7.6 million cash on hand, primarily held in Chase bank accounts (#2380, 2661, 2963, and 0167) and over which Respondent exercised sole control.

ii. On June 30, 2016, Respondent opened JP Morgan Chase account #1692 in her individual name (See Exhs 80, 80a opening balance of $100);

iii. On February 21, 2017, Respondent transferred $3 million from Chase #2661, a bank account in the name of Nano Alloys, dba NiTi Tubes, to JP Morgan Chase account #1692 in her individual name; and transferred $950,000 from account #1692 to JP Morgan Stanley ("JPMS") brokerage account ending 0412 another account in her name (Exh. 88). Thereafter, she executed additional transactions that moved the $3 million which she had removed from Nano Alloys' accounts to JPMS accounts -87223, 87234 and 87229 bearing the name of the

16

Princesca Ene Revocable Trust and bearing Ms. Ene's social security number (Exhs. 89, 90, 91, 92, 95, 96, and 97). In documents that she provided under penalty of perjury in the Family Law action (Exh. 148), she admitted that account 87234 was in her name, but failed to disclose that it held $400,000 in 2017. In her testimony in February 2020, she denied that she executed these transactions. The Court finds those denials not credible in view of the weight of the documentary evidence and the testimony of Nina Thompson.

iv.     In March 2017, Respondent transferred an additional $1,350,000 from Nano Alloys account #1692 to JPMS account 0412 (Exh. 94),

v.     On or about September 1, 2017, Petitioner's counsel served subpoena's for the production of bank records on Bank of America and JP Morgan Chase, notice of which would have been received by Respondent's counsel at or about the same time (Exh. 117). Promptly thereafter, on or about September 6, 2017, Respondent/Wife opened JPMS accounts in the name of Nano Alloys, dba NiTi Tubes (JPMS ## 831-17409, -17410, and 17411) with zero balances, and by September 19, 2017, Respondent had transferred over $3,160,000 back from the JPMS accounts (#87229, 87233, and 87234) that she had opened in the name of her personal trust into accounts in the name of the corporation that are entirely in her control (JPMS ## 831017409, 17410 and 17411). (Exh. 108, 109, 110, 111 112 and 113), and also avoided immediate discovery of the removal of $3 million from the corporation. After this flurry of transactions, on September 22, 2017, Respondent's then-attorneys moved to quash the subpoenas to BofA and JP Chase, obviously seeking to delay or avoid discovery of this attempted removal of $3 million from the corporation. Wilson Eng (the 50% co-owner of the business) testified that he had no knowledge of any of these transactions, had no knowledge that the company had over $7 million in cash, and authorized none of these transactions.



17

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 39 of 190

vi.       On December 1, 2017, Respondent formed an entity, Cardinal Cordis Health, LLC, purportedly a venture authorized by Cardinal Health, Inc. through its agent Cynthia Chan[8], and Respondent, of which she claims to be an 80% controlling owner (Exh. 129).  On December 11, 2017 Respondent opened a Bank of America account (#2264) in the name of NiTi Tub, a Wyoming LLC (Exh. 132, 178 and 192), for which Respondent is the sole signatory, the address for which is her residence address, and into which she deposited funds which appear to have originated from Nano Alloys, Inc.  Thereafter, between December 6, 2017 and March 31, 2018, Respondent transferred into the Cardinal Cordis Health account over $6 million from Nano Alloys accounts (including the over $3 million that she had moved from corporate accounts into her personal trust accounts, and then back into the JPMS accounts she created in September 2017 after the subpoenas were served.  (Exhs. 130 [$2,231,000 in December 2017; $3,764,000 on February 28, 2018] and 136, 155, 156, 165, 168, 169).

vii.       On or about March 8, 2018, Respondent opened another bank account at Chase Bank in the name of Cardinal Cordis Health (Exhs. 161, 161(a)), identifying herself as the sole owner and President (Exh. 165).  On March 9, 2018, Respondent transferred over $3 million from the Cardinal Cordis Health Account at Wells Fargo Bank (described above) to the Cardinal Cordis Health Account at Chase Bank that she had opened the day before (Exhs. 168-169).

viii.       Early in the trial, Respondent contended that the $6 million in funds were transferred by agreement between Nano Alloys and its customer Cordis Corporation, to establish a reserve fund from which customer liability claims could be satisfied (See, e.g. Day 2 of the

---

[8] On the afternoon of February 13, 2020, when confronted with a Nano Alloys American Express charge made by Cynthia Chan (Exh. 135), Ms. Ene testified that there was a Cynthia Chan employed by Nano Alloys from 2011 until about 2013, and that the company had used a credit card with her name on it even after she left the company; Ms. Ene stated that the Cynthia Chan who appears on corporate documents for Cardinal Cordis Health, was actually the Quality Assurance Director for Cordis who had married and moved to Mexico in 2016 or 2017. The Court does not find Ms. Ene's testimony to be credible.

18

transcript, page 232 and Exh. 212). In October 2020, Respondent refused to answer any questions about Cynthia Chan or any transactions that resulted in the transfer of $6 million from Nano Alloys bank accounts into bank accounts in the name of Cardinal Cordis Health or NiTi Tub. The Court finds these transactions to be fraudulent. As made clear from the deposition testimony of Laura Vaughn (Exh. 268) authorized agent of Cardinal Health, the entity that controls Cordis Corporation -- there is no record of a Cynthia Chan being employed by Cardinal Health, Inc. or Cordis Corporation,[9] there was no agreement with Respondent to create Cardinal Cordis Health, or to open bank accounts in the name of such entity. Husband testified that Cynthia Chan was a pseudonym used by Respondent herself during the operation of Nano Alloys, Inc., in order to create the impression that Nano Alloys had a larger infrastructure than it in fact had. There is no evidence that Cordis Corporation or Cardinal Health have asserted against Nano Alloys, Inc. or NiTi Tubes any product liability claims.

ix. Respondent's contention that the funds either: 1) do not belong to Nano Alloys; or 2) are subject to unliquidated unasserted liabilities for product returns or product liability claims are not supported by any credible evidence.

x. In March 2018, in opposition to Petitioner's prior request to freeze Nano Alloys, Inc.'s bank accounts, Respondent filed a declaration attaching a memorandum purportedly written by Nina Thompson and bearing the date of March 2018, which Respondent then claimed was actually written in March 2017 and legitimized the March 2017 transfer of funds. (Exh. 167). Nina Thompson testified that she had already left the company before March 2017, and

---

[9] Respondent contends that the subsequent acquisition by Johnson & Johnson of this business line makes Ms. Vaughn's testimony irrelevant. Having reviewed Ms. Vaughn's deposition and considered the evidence as a whole, the Court overrules the objection. Further the fact that Petitioner did not rule out whether Johnson & Johnson in 2019 shows outstanding claims on its books, separate from the records of the subsidiary entity with which Nano Alloys, Inc. in fact did business in 2017 is immaterial to the Court's evaluation of Respondent's conduct.

19

that any memoranda purportedly authored by her in March 2017 or at any time thereafter are false.

b. Respondent now does not dispute that the funds held in any bank accounts in the name of Cardinal Cordis Health, NiTi Tubes, or NiTi Tub, are the property of Nano Alloys, Inc. The Court finds, however, that viewing the evidence as a whole, the creation of bank accounts in the name of Cardinal Cordis Health, and the removal of the funds from Nano Alloys, Inc. into those accounts was fraudulent and done intentionally to attempt to conceal the true value of the community interest in that corporation. The removal of these funds coincided with Respondent's unilateral decision to shut-down the business operations, thereby destroying the goodwill that had been built up in the business. The last product shipped in the first quarter of 2018.

c. The Court finds clear and convincing evidence that Respondent misused her position of authority to access and use funds of Nano Alloys, Inc. for her own personal benefit, thereby reducing the community property interest in the corporation.

i. On or about December 12, 2013, Ms. Ene purchased a 2013 Tesla Model S, paying $97,813 cash from corporate funds of Nano Alloys (Exh. 277). Both Parties have attempted to claim that the Tesla is a community asset. The Court finds that it is a corporate asset, and that the community has a potential liability back to the corporation for its purchase. The Court assigns this liability to Ms. Ene as her sole and separate obligation.

ii. On or about December 22, 2013, Ms. Ene transferred $98,000 from Nano Alloys, Inc dba NiTi Tubes to Bank of America Account 6739 in the name of herself and her mother D. Bussieres (Schedules 24 and 25 to Exh. 229). From that account, she thereafter transferred funds from and to BofA Account 8002, also held in the name of herself and her mother. This $98,000 payment purports to be in addition to $7,318.00 in expense reimbursements purportedly paid to

Case: 21-50901   Doc#: 248   Filed: 06/30/23   Entered: 06/30/23 14:08:09   Page 30 of

Case: 21-50901   Doc#: 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 42 of 90

Ms. Bussieres at various times between April and December 2013. (Exh. AAA). The reimbursements include payment for employee meals, cleaning (e.g. "Simple Green"), office and floor supplies, and other items which were more likely purchased by Ms. Ene than an independent consultant. During the course of trial, Ms. Ene produced a NiTi Tubes "Find Report" dated 12/22/13 (Exh. AAA) which purports to support the contention that the $98,000 was paid for "professional services" rendered by Ms. Bussieres between 2009 and 2013. No invoices or Form1099's to Ms. Bussieres were produced. Ms. Bussieres did not testify at trial. Respondent refused to answer questions about the payments to her mother. The Court does not find credible the claim that Nano Alloys' payment of $98,000 into a joint account of Ms. Ene and Ms. Bussieres was for professional services to the corporation;

iii. In December 2017, Respondent opened BofA account 2264 for NiTi Tub, a Wyoming LLC and contended it was an account belonging to NiTi Tubes (Exh. 132, 178, 192) and in August 2018 withdrew cash from that account.

iv. In December 2019, February 2020, March 2020, April 2020, and May 2020, Respondent transferred funds totaling of or about $504,000 from Nano Alloys accounts to the NiTi Tub, LLC account which Respondent had established with Bank of America (See Exhs. 132, 248, 249, 250, 251, 252, 253, 254, 255 and 256) which account is under Respondent's control. At or about the same time, Respondent transferred funds to her personal bank accounts, and bank accounts held jointly by Respondent and her Mother, paid her attorneys and paid personal credit card bills (see Exh. 248, 253, 254, 255, and 256).

v. In 2017, Ms. Ene increased her salary from Nano Alloys, from $65,000/year paid in 2016 to $108,000, which action is inconsistent with any theory that the business was failing in 2017, and the fact that it ceased operations at the end of 2017.



STATEMENT OF DECISION

Case: 21-50901   Doc#: 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 43 of 90

vi.   It is not disputed that after separation, Ms. Ene continued to use Mr. Darisme's personal Amex credit card to charge Nano Alloys business expenses ($24,778.70 in April 2015 and $27,316.57 in June 2015). It is further not disputed, that in or about April 2015, the Parties agreed, and it was ordered that the Parties would each receive $100,000 from the Fisher Investment Account" as an advance on community property distributions. (Exh. XX). In testimony given on March 4, 2020, it was conceded that after separation Petitioner accessed the Nano Alloys bank accounts and transferred $286,481 to himself to pay off the outstanding balance on his Amex credit card created by Ms. Ene's use of that account for Nano Alloys, and to distribute $100,000 to himself and $100,000 to Ms. Ene. (Exh. Q and R). Nonetheless in September 2015, Ms. Ene used her position of management and control of Nano Alloys, to file a police report accusing Mr. Darisme of stealing over $200,000 in Nano Alloys funds, and thereafter directed the use of over $120,000 of corporate funds to pursue claims against Petitioner for his removal of funds from the Nano Alloys, Inc. bank accounts while not making any effort to account for the greater cash amounts that she had removed.

vii.   After having removed its cash assets, Respondent provided knowingly false information to the accounting professionals and in early 2018 purportedly ceased operations of Nano Alloys, Inc., thereby destroying any business goodwill and reducing the value of the community property interest in the corporation from $4,805,291.50 to $3,000,000 or less.

***Division of Assets, Liabilities and Reimbursements***

9.   The Court finds for purposes of the family law action, that the community owns at least 50% of the shares of Nano Alloys, Inc. and thus Petitioner is entitled to own at least 25% of the shares of Nano Alloys, Inc. Respondent's request that the Court divide this asset "in kind" would be unjust, unreasonable and inequitable under the circumstances of this case, as it would place Petitioner in the

22

Case 21-50901   Doc#248   Filed 06/30/23 JUDGMENT   Entered 06/30/23 14:08:09   Page 32 of 91

position of a minority shareholder in a corporation whose assets are under the sole control of Respondent, with the majority of the stock held by Respondent and Wilson Eng, a party who has shown himself adverse to the interests of Petitioner. Accordingly, the Court orders that Respondent be awarded the entirety of the community property interest in Nano Alloys, Inc., NiTi Tubes, NiTi Tub, LLC and Cardinal Cordis Health, subject to the requirement that she pay to Petitioner the sum of **$863,519** and that she defend, indemnify and hold harmless Petitioner from and against all claims asserted or unasserted, which have or may be asserted against him based on any alleged ownership of an interest in Nano Alloys, Inc or NiTi Tubes or any predecessor entity, or any claims based on the removal of any funds from the accounts of Nano Alloys, Inc., any claims against Ms. Ene for her conduct, or transactions, including any negligence, and including any removal by Petitioner of any amount of money from Nano Alloys, Inc. bank accounts, including the amount of $286,481, which amount is deemed by the Court to be an advance distribution to Petitioner of a portion of his community property interest in Nano Alloys, Inc. and NiTi Tubes.

10. Petitioner's request for an alternate date of valuation for of his share of Nano Alloys, Inc. was previously denied by the Court. *See* 11/12/2019 Findings and Order After Hearing. Family Code §2552(b) allows for an exception to use of a valuation date closest to trial to "remedy inequities" that might otherwise result from a trial date valuation. Petitioner argues that a trial date valuation would result in Petitioner's 25% interest in Nano Alloys, Inc. being undervalued. Given the findings in paragraph 8 above which result in providing Petitioner with full remedies for the decrease of value in the entire community property interest in Nano Alloys (i.e. 50% of the company's value as of December 31, 2017 offset by the cash remaining on hand as of the date of trial), the Court finds that for purposes of division the community property interest in Nano Alloys, Inc. should be valued as of the date of trial, and is $2.25 million ($6 million cash held in various bank accounts, reduced by 30% to account for the

23

Case: 21-50901    Doc#: 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 45 of 90

estimated Federal and State tax and other outstanding liabilities to third parties, and divided by 2). Petitioner's share thereof is $1,125,000, which is reduced by the $286,481 that he removed in 2015 from Nano Alloys, Inc. bank accounts.

11. The Court orders that Respondent reimburse Petitioner **$100,000** for the portion of the $286,481 that he withdrew from Nano Alloys, Inc. and deposited to Respondent's account as described above and in Exhibit XX.

12. It is stipulated that the Parties purchased during marriage residential real property located on Ormsby Drive in Sunnyvale (the "Family Residence") that has a current value of $2,250,000, which is encumbered by a loan in the principal amount of $303,391, leaving equity of $1,946,609. Each Party's interest would be valued at **$973,304.50**.

13. Pursuant to the April 30, 2015 Stipulation and Order (Exh. XX), from and after May 1, 2015, Wife had sole control and use of the Family Residence, which she and the children have occupied ever since. It is not disputed that from May 1, 2015, she paid the mortgage, property tax and insurance, as well as the costs for the gardener and pool service (Exh. CCC). The Court orders that Respondent be credited with one-half of the mortgage, property tax, insurance payments and major repairs that she made to preserve the community interest in the Family Residence in the amount of $112,865.27 (*Epstein* reimbursement[10]) The Court will not order reimbursement for occupancy expenses such as utilities, gardening services, or swimming pool maintenance.

14. The Parties have stipulated to the Fair Rental Value of the Family Residence based on the appraisal report of Michael Frangadakis: $5,400/month for 5/1/2015 through 12/31/2017; $5,500 for 1/1/2018 through 12/31/2019; and $5,800/month for 1/1/2020 through 11/30/2020 (Exh. 275; Exh.

---

[10] *IRMO Epstein* (1979) 24 Cal.3d 81 (spouse entitled to be reimbursed for post-separation payments of community debts that are made from separate property).

24

Case 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 46 of 90

CCC). Petitioner asks that Respondent be charged with that amount pursuant to *IRMO Watts*.[11] Respondent urges that the Court deny any *Watts* reimbursement under the facts of this case, as Respondent had primary care of the children since separation, sole responsibility for financial and physical maintenance of the Family Residence, and received no support from Petitioner at any time since May 1, 2015. The Court considers those facts, and also considers that Respondent simultaneously had sole access to the revenues of Nano Alloys, Inc. and that her mortgage, property tax and insurance appear to be about one-half of the Fair Rental Value of the Property. Both Parents share the responsibility for providing shelter for their children while they are minors. Accordingly, the Court orders that Respondent reimburse Petitioner for 30% of the Fair Rental Value of the Family Residence from 5/1/2015 through 12/31/2019 and 40% of the Fair Rental Value for the Family Residence from 1/1/2020 through 11/30/2020, which is calculated as **$116,960**. This Order is not intended to be determinative of any issues related to any claim for support or *Trainotti* credits that may be asserted in connection therewith.

15. Canadian Property. The Parties stipulated that they own as community property an 8-unit apartment complex located in Quebec Canada. Title to the apartment building is held by a Canadian corporation, 6059431 Canada Inc., the stock of which is owned in equal shares by Husband and Wife. It appears that the Canadian corporation retains a third-party property manager who is responsible for leasing activity, any capital expenditures, and who maintains a Canadian bank account into which rents are deposited and from which expenses are paid. Presumably a portion of the bank account may consist of tenant deposits, which are potentially subject to return to the tenants upon vacating the property, or reserves for the payment of taxes.

---

[11] *IRMO Watts* (1985) 171 Cal.App.3d 366 (An order that one spouse reimburse the community for one-half of the fair rental value of his/her sole occupancy of community-owned real property is based on the equitable powers of the Court).

Case 21-50901   Doc#255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 47 of 90

Petitioner contends that the real property and the Canadian bank account are the only assets of the Canadian corporation, and that all income received from the real property has been used solely to pay expenses associated therewith, and that there have been no post-separation capital improvements. Respondent contends that since separation, Petitioner has not been provided with an accounting of all income and expenses of the Canadian corporation, including any payments made to Petitioner from that corporation, and that the property manager has not cooperated with regard to the provision of leasing records and bank statements. At the commencement of trial, the Parties stipulated that they would obtain an appraisal of the real property, including an evaluation of the leases and occupancy. There were significant delays in obtaining that appraisal, due in part to the "shelter at home" orders due to Covid.

On October 27, 2020, the Parties stipulated that based on appraisal, the community property interest is valued as of the date of trial at $508,875 and that both Parties shall be assigned one-half of that amount. It was also stated that amount represented the value of the real property only and did not resolve the accounting for post-separation income, expenses or distributions, or the division of the Canadian bank account (which at one point reportedly had a balance of $10,000 (U.S. or Canadian is unknown), which accounting was not completed by the Parties' respective accounting professionals as of the date this matter was submitted. The Court will order that one-half of the real property value ($254,437.50) is credited to each Party. The Court will further reserve jurisdiction to modify the Judgment to credit Respondent with one-half of the value of adjusted value of any cash assets of the corporation taking into account any bank account balances, distributions, reserves, advances or distributions being held in that corporation. Effective upon the entry of such modified judgment, Petitioner shall be granted 100% of the right, title and interest in the Canadian corporation, 6059431 Canada Inc. and shall thereafter hold harmless, indemnify and defend Respondent from any subsequent

26

STATEMENT OF DECISION

Case: 21-50901   Doc# 248   Filed: 06/30/23   Entered: 06/30/23 14:08:09   Page 36 of

claim, cause of action or liability, asserted or unasserted, including any claim based on negligence, arising or accruing after that date from ownership, operation or management of the Canadian property.

16. Husband's Requests for Reimbursements for Post-Separation Payments. As summarized in Exh. 274 (page 2, schedules 1 and 2) and the testimony of Sally White and Respondent on December 10, 2020, the Court finds that after separation Husband paid $36,417.69 in community property expenses from separate property bank accounts, consisting of carrying costs and maintenance for the Family Residence (which he was not occupying) from Date of Separation through April 30, 2015, and tax liabilities as well as interest and penalties which appear to the Court to be the fault (at least in significant part) of Respondent's unilateral decision to file taxes separately and lack of cooperation in the filing of 2013 and 2014 tax returns, or timely transmitting documents from governmental agencies that were mailed to the Family Residence. Husband is entitled to a credit for one-half of those amounts, $18,208.85.

17. Joint Accounts of Wife and her Mother are not Community Property of this Marriage. It appears that there are two bank accounts, Bank of America #6739 and 8002, opened during marriage in the name of Wife and her Mother, D. Bussieres (Exh. 274), the balances in which total approximately $108,000. As discussed above in paragraph 8.c.ii, the Court has found that in December 2013, Respondent transferred at least $98,000 in funds from Nano Alloys to those accounts (Exh. 229, schedules 24 and 25). There is no evidence provided to the Court that Wife is the owner of any funds contained in these accounts. Wife's counsel argues that the Court must treat these funds as property of Wife's mother, and exclude them from any orders made in this proceeding. The Court does not have credible evidence that the payment was made for professional services provided by Ms. Bussieres to Nano Alloys, Inc. Nonetheless, Husband's request to divide those accounts as community property of the Parties is denied. Any claim for the conversion of those funds from Nano Alloys, Inc. or NiTi Tubes belongs to the

27

Case 21-50901    Doc#255    Filed 08/14/23    Entered: 08/14/23 17:09:44    Page 49 of 90

corporation. The damages caused to Petitioner's community property interest in the corporation through this conduct has already been addressed in the remedies awarded under Family Code section 1101(h) above.

18. As summarized in Exh. ZZ, page 2, the Court finds that after separation Wife paid $6,132.06 for a community tax liability and to pay off pre-separation credit card balances. However, $2,931 of that amount was paid from the account that Wife holds jointly with her Mother (BofA #6739), and consistent with paragraph 17 above, any right to reimbursement from the community belongs to Ms. Bussieres, as she is being treated for purposes of this matter as the owner of those funds. The Court therefore finds that Wife's right to reimbursement is limited to the amount paid from her personal account #7077, in the amount of $3,201, and orders that she be reimbursed one-half of that amount, **$1,600.50** by Husband.

19. The Court finds that after separation on or about June 9, 2016, Husband deposited to his separate bank account (-0444) $5,000, which was a deposit paid to Tesla before marriage, and refunded after marriage (Exh. 274, page 3, line 232). One half of that amount is $2,500. In addition, the Court finds that after separation, Husband deposited into his separate bank account -checks that were written to him by third-parties for what appears to be community claims, e.g. refunds or insurance claim payments (Exh. YY) totaling $2,708.77. (Exh. YY). The Court does not include post-separation checks for refund/rebate for post-separation emergency road service in late 2015 or thereafter. Husband is ordered to reimburse Wife one-half of these amounts: **$3,854.39**.

20. It is not disputed that as the date of separation the American Express Card in Mr. Darisme's name had a cash rewards balance of $8,034. (Exh. ZZ) Wife shall be credited with one half of that amount, **$4,017**.

21. <u>Division of Bank Accounts</u>. As summarized in Exh. 274, and confirmed by the expert accountants for the respective Parties Sally White and Katie Simms during their testimony on December



28

Case 21-50901 Doc#2848 Filed 06/20/23 STATEMENT OF INTEREST 06/20/23 14:08:09 Page 32 of 91

10, 2020, the Parties have stipulated to the division of checking, savings and brokerage accounts which have a total value of $1,606,463, of which $531,844 is community property. Dividing the community portion equally, and taking into consideration agreed upon separate property amounts in the accounts, agreed-upon reimbursements and post-separation transfers from one spouse to the other, $825,143 is to be awarded to Husband as his sole and separate property, and $781,320 is awarded to Wife as her sole and separate property.

In addition to the amounts stated in Exh. 274, Respondent's expert identified that as of the Date of Separation there was a balance remaining in BofA Account #9770 of $1,395 which is a community property asset. This amount was transferred to BofA Account -0745, from which Husband paid community expenses for which he is being reimbursed. Thus, Husband's award should be reduced by $697.50 and Wife's award increased by a like amount. Husband is credited with **$824,445.50** (of which **$265,922** is a division of community property); Wife is credited with **$782,017.50** (of which $265,922 is a division of community property).

22. <u>Division of Retirement Accounts</u>. On March 6, 2020, the Parties stipulated to a division of their retirement accounts (3/6/2020 Stipulation and Order re Division of Retirement Accounts, hereinafter "3/6/2020 Order")). Pursuant to that stipulation as of February 2020, the Parties held a total of $1,193,638 in various retirement accounts, of which $920,331 is community property. $750,095 of the community property funds are held in retirement accounts in Husband's name, one-half of which $375,047.50 would be subject to transfer to Wife's retirement account under a QDRO. In addition, Wife holds an eTrade account x5634 valued at $20,187, of which $2,493 is community, and the balance of $17,695 is separate. Wife's Medtronic 401(k)/ESOP plan holds $69,716 all of which is community property and her Memry/SAES plan holds $98,027, all of which is community property. Wife would be entitled to receive a QDRO distribution of $375,047.50 (1/2 of the community property share of the

Case: 21-50901 Doc#248 Filed: 06/30/23 Entered: 06/30/23 14:08:09 Page 39 of
Case: 21-50901 Doc#255 Filed: 08/14/23 Entered: 08/14/23 17:09:44 Page 51 of
90

retirement accounts held in Husband's name). Based on the 3/6/2020 Order, it appears that Husband would be entitled to $715,777.50 and Wife would be entitled to a QDRO distribution of $477,860.50 (adjusted for earnings and losses).

23. Cars. The Court finds that the Tesla automobile is not community property. It was acquired by Wife using Nano Alloys, Inc. funds, and may be subject to claims of ownership by the corporation. It is ordered that Wife defend, indemnify and hold harmless Husband against any and all claims arising from her purchase of the Tesla automobile or its use, including any claims for reimbursement by the corporation.

It is not disputed that Husband has had in his possession a 2004 Toyota Sequoia SR5 Sport Utility vehicle that is community property. The Court will take judicial notice of the current Kelly Blue Book valuation for that vehicle (mid-point of the private party range) which is $5,055 (assuming good condition and 160,000 miles (i.e. 10,000 miles/year). The 2004 Toyota Sequoia is awarded to Husband and one half of its current value, $2,527.5 is credited to Respondent

24. There is in the Family Residence household furnishings and fixtures. The Court heard evidence that the estimated value thereof ranges from $5,000 to $15,000. If the Parties cannot come to an agreement with regard to the division of the household furnishings and fixtures, the Court will order that each of the children (minor or adult) shall be allowed to retain any clothing, toys, computers, telephones, desks, bedding and bedroom furniture used primary by that child as her/his personal property. The Parties shall then go to binding arbitration with Family Court Services as to the division of all other community property furnishings and fixtures.

25. The Table below summarizes the liabilities owed by Respondent/Wife to Petitioner/Husband, and the credits to each Party from the division of the Parties assets.



30

| Description | Amount Owed to Husband from Wife | Amount Owed to Wife from Husband |
|---|---|---|
| **Issues re Nano Alloys** | | |
| Damages under 1101(g) (¶¶ 5-7) | $2,402,645.70 | |
| Damages under 1101(h) (¶8) | $1,805, 291.50 | |
| Buy-out of Husband's Interest in Nano Alloys, Inc.; Wife keeps interest in Nano Alloys and defends, indemnifies and holds harmless Husband (¶¶9-10) | $863,519. | |
| Reimbursement to Husband for $100,000 of the $286,481 removed by Husband from Nano Alloys in September 2015, and deposited in Wife's account. (¶11) | $100,000 | |
| **Sub-total – Amounts Due to Husband from Wife re Nano Alloys:** | $5,171,456.20 | |

| **Property Division and Reimbursements re Family Residence** | **Amount Credited to Husband** | **Amount Credited to Wife** |
|---|---|---|
| Interest in Ormsby Residential Real Property (stipulated value $2,250,000 – loan of $303,391 = community interest of $1,946,609) per 10/27/2020) (¶12) | $973,304.50 | $973,304.50 |
| Reimbursement to Wife (5/1/2015 to 11/30/2020) Resp. Exh CCC; Exh. 275 (*Epstein*) (¶13) | | $112,865.27 |
| Reimbursement to Husband for Fair Rental Value (5/1/2015 to 11/30/2020) adjusted by 20% per minor child Exh. 275; Resp Exh CCC (*Watts*) (¶14) | $116,960. | |

31

Case: 21-50901   Doc#: 248   Filed: 06/30/23   Entered: 06/30/23 14:08:09   Page 41 of 91

Case: 21-50901   Doc#: 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 53 of 90

| Other Property Division and Related Reimbursements | | |
|---|---|---|
| Interests in Canadian Property (per 10/27/2020 stip, equity is $678,500 Canadian, or $508,875 USD) (¶15) | $254.437.50 | $254,437.50 |
| Ordered Reimbursement to Husband for ½ post-separation payment of community expenses (Exh. 274) (¶16) | $18,208.85 | |
| Ordered Reimbursement to Wife for ½ post-separation payment of expenses (Exh. ZZ) (¶18) | | $1,600.50 |
| Ordered Reimbursement to Wife for one-half of of Tesla refund of ($5,000) and post-separation community checks deposited to Husband's account (¶19) | | $3,854.39 |
| Ordered Reimbursement to Wife for one-half of AmEx cash rewards balance (¶20) | | $4,017. |
| Adjusted Stipulated Division of Bank Accounts (Exh. 274;, Exh. ZZ) (includes separate property shares of each spouse) (¶21) | $824,445.50 | $782,017.50 |
| Division of Retirement Accounts Buy-out of Wife's share of community property interest of all retirement accounts in Husband's name (3/6/2020 Stipulation and Order) (¶22) to be adjusted based on earnings/losses since Feb. 2020 | $715,777.50 | $477,860.50 |
| 2004 Toyota Sequoia awarded to Husband, credit to Wife (¶23) | | $2,527.50 |

32

| Sub-total of Property division and reimbursements | $2,903,133.85 | $2,612,484.66 |
| --- | --- | --- |

As discussed above, the foregoing numbers are subject to adjustment based on the increase/decrease in the value of the non-real property assets of the Canadian corporation and the value of the retirement accounts. However, it is clear that the amount owed by Wife to Husband as it relates to Nano Alloys, Inc. of $5,171,456.20 (taking into account the damages awarded breach of her fiduciary duties and the buy-out of his interest in the corporation), significantly exceeds the amounts credited to her for division of the other community assets.

Based on the foregoing, IT IS HEREBY ORDERED THAT JUDGMENT ON RESERVED ISSUES OF BREACH OF FIDUCIARY DUTY AND DIVISION OF PROPERTY BE ENTERED, which provides:

1. Wife shall buy-out Husband's 25% interest in Nano Alloys, Inc. for the sum of $863,519, which amount shall be an offset against the division of community property assets as between the Parties. Wife shall defend, indemnify and hold harmless Husband against all claims and cause of action that have arisen, asserted or unasserted, against him based on ownership of Nano Alloys, transactions by either spouse purportedly on behalf of that company or related to that company, removal by either Party of any funds from Nano Alloys, including without limitation Husband's removal of any funds from the bank accounts of Nano Alloys, Inc. in the amount of or about $286,481.

2. Husband shall be awarded as his sole and separate property the Family Residence on Ormsby Drive and all furniture and fixtures contained therein. Title and possession shall be transferred to Husband on the *later* of June 30, 2021 or thirty-days following the effective date of an order for child support, and from December 1, 2020 until such date of transfer, Wife shall be



33

Case 21-50901 Doc#248 Filed 06/30/23 Entered 06/30/23 14:08:09 Page 43 of
Case: 21-50901 Doc#: 255 Filed: 08/14/23 Entered: 08/14/23 17:09:44 Page 55 of
90

responsible for paying the mortgage, property tax and insurance, maintaining the property in good condition and paying to Husband the amount of $1,933 per month (the difference between the current fair rental value and the current mortgage plus impounds per Exh. CCC).

3. Effective as of the date of the modified Judgment which includes the accounting for all non-real property assets of the Canadian corporation, Husband shall be awarded as his sole and separate property all right, title and interest in the Canadian corporation, 6059431 Canada, Inc., including the Canadian property and the operating bank accounts associated therewith.

4. Husband shall be awarded as his sole and separate property all bank accounts, retirement accounts and investment accounts in his name, or in the name of both Husband and Wife, effective as of December 31, 2020, and is responsible for providing account statements as of that date to Sally White and Katie Sims, so that the professionals can calculate the exact amount of the credits that Wife will be given for the award of her community property interest in those accounts. The Parties are ordered to meet and confer to determine if ownership of the retirement accounts in Wife's name can be transferred to Husband under the terms of the applicable plans, and if so, how they should be valued, or if it will be necessary to prepare QDRO orders, in which case the maximum portion of those plans shall be assigned to Husband in order to satisfy Wife's liabilities as ordered hereby.

5. All reimbursements owing from Husband to Wife for Epstein amounts (paragraph 13), division of the Canadian corporation and Canadian real property (paragraph 15), and division of other assets or accounts (paragraphs 18, 19, 20, 21, and 22) are hereby ordered to be offset against the monies otherwise owing to Wife this Judgment.

6. The transfers of assets between the Parties as ordered hereby are intended to be incident to the divorce and not a taxable event pursuant to IRC section 1041.



34

Case 21-50901   Doc#248   Filed: 06/30/23   Entered: 06/30/23 14:08:09   Page 44 of 81

7. Issues of attorneys' fees and costs are reserved, and set for hearing on March 3, 2021.

8. After application of the foregoing credits and offsets, all remaining amounts owed shall be entered as a monetary Judgment owing from Wife to Husband, with all unpaid amounts bearing interest at the rate of 10% per annum starting April 1, 2021. The Court reserves jurisdiction to amend the Judgment to add an award of attorneys' fees.

9. Counsel for Petitioner shall prepare the Judgment consistent with the foregoing.

IT IS SO ORDERED.

Dated: February 19, 2021

_____
Roberta S. Hayashi
Judge of the Superior Court

Case: 21-50901   Doc# 248   Filed: STATEMENT OF DECISION: 06/30/23 14:08:09   Page 45 of
Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 57 of
90

# EXHIBIT B

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 58 of 90

**Princesca Ene**
**Waterfall Analysis**
*Projection, actual results will vary

Total Estimated Funds Available     $ 7,000,000.00

| # Claim | Claimant Name | Ene/Entity | Date | Class | Priority | % Payout | Estimated Claim Amount | Estimated Proposed Payment | Funds Remaining | Notes / Comments: |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fennemore Wendel | Ene | Various | Admin | 1 | 100% | 270,000.00 | 270,000.00 | 6,730,000.00 | Estimate through anticipated end of case |
| | Bachecki, Crom & Co., LLP | Ene | Various | Admin | 1 | 100% | 100,000.00 | 100,000.00 | 6,630,000.00 | Estimate through anticipated end of case |
| | Chapter 7 Trustee | Ene | Various | Admin | 1 | 100% | 233,250.00 | 233,250.00 | 6,396,750.00 | Statutory Fee based upon anticipated $7 Million recovery |
| | CA Employment Development Dept | Entity | 8/2/2021 | Priority | 2 | 100% | 86.17 | 86.17 | 6,396,663.83 | State Tax Lien Document No. U210071561015; Filing No.25052867 |
| | Alameda County | Entity | Various | Priority | 2 | 100% | 802.84 | 802.84 | 6,395,860.99 | Tax Liens, filing #2020032632; 2019021016; 2018024195; 2017030705; 2021044830 |
| | IRS - Entity Taxes | Entity | TBD | Priority | 2 | 100% | 2,000,000.00 | 2,000,000.00 | 4,395,860.99 | Estimate |
| | FTB - Entity Taxes | Entity | TBD | Priority | 2 | 100% | 600,000.00 | 600,000.00 | 3,795,860.99 | Estimate |
| | IRS - Ene Taxes | Ene | TBD | Priority | 2 | 100% | 350,000.00 | 350,000.00 | 3,445,860.99 | Estimate |
| | FTB - Ene Taxes | Ene | TBD | Priority | 2 | 100% | 100,000.00 | 100,000.00 | 3,445,860.99 | Estimate |
| 4-1 | Braun Hagey & Borden, LLC | Entity | 6/14/2021 | GU | 3 | 100% | 303,112.84 | 303,112.84 | 3,042,748.15 | Arbitration award and judgment Case No. CPF-21-517342; (Superior Court, County of SF). |
| | Labor Commission of the State of CA | Entity | 6/24/2019 | GU | 3 | 100% | 5,436.61 | 5,436.61 | 3,037,311.54 | Andy Nguyen v. Nano Alloys, Alameda County Superior Court; Case No. HG16822825 |
| | Michelle Truong | Entity | 11/6/2019 | GU | 3 | 100% | 3,534.56 | 3,534.56 | 3,033,776.98 | Michelle Troung v. Nano Alloy, Alameda County Superior; Court Case No. RG20049831 |
| | Andy Nguyen | Entity | 7/1/2016 | GU | 3 | 100% | 5,436.61 | 5,436.61 | 3,028,340.37 | Andy Nguyen v. Nano Alloys Alameda County Superior Court Case #HG16822825 |
| | S&M Moving Systems | Entity | TBD | GU | 3 | 100% | 116,200.00 | 116,200.00 | 2,912,140.37 | Estimate |
| | Data Safe | Entity | TBD | GU | 3 | 100% | 20,000.00 | 20,000.00 | 2,892,140.37 | Estimate |
| | WFB AP Attorneys' Fees | Entity | TBD | GU | 3 | 100% | 10,000.00 | 10,000.00 | 2,882,140.37 | Estimate |
| 1-1 | Magnolia Group, LLP | Ene | 2020-21 | GU | 3 | 100% | 11,345.00 | 11,345.00 | 2,870,795.37 | CPA Fees |
| 5-1 | US Trustee | Ene | 2021-22 | GU | 3 | 100% | 500.00 | 500.00 | 2,870,295.37 | US Trustee quarterly fees |
| 6-1 | Shannon Stein | Ene | 2018-21 | GU | 3 | 100% | 173,464.60 | 173,464.60 | 2,696,830.77 | Family law atty fees |
| 3-2 | Patrice Darisme | Ene | 2021 | Partially Sub | 3.5 | 90% | 3,000,000.00 | 2,696,830.77 | - | Damages and award due to husband limited to $3 Million claim per settlement |
| | IRS Penalties, etc. - Entity | Entity | TBD | Subordinated | 4 | 0% | 800,000.00 | - | - | Estimate |
| | FTB Penalties, etc. - Entity | Entity | TBD | Subordinated | 4 | 0% | 200,000.00 | - | - | Estimate |
| | IRS Penalties, etc. - Ene | Ene | TBD | Subordinated | 4 | 0% | 100,000.00 | - | - | Estimate |
| | FTB Penalties, etc. - Ene | Ene | TBD | Subordinated | 4 | 0% | 50,000.00 | - | - | Estimate |
| | Nano Alloys, Inc. v. Patrice Darisme | Entity | 2/14/2018 | GU | 5 | N/A | - | - | - | $0 Waived per agreement |
| | Medical device liability | Entity | N/A | GU | 5 | N/A | - | - | - | Estimate |
| 2-1 | Shannon Stein | Ene | DUP | N/A | 5 | N/A | - | - | - | Believed to be a duplicate, see claim 6-1 |
| | | | | | | | 8,453,169.23 | 7,000,000.00 | - | |

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 59 of 90

# EXHIBIT C

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 60 of 90

Pamela M. Schuur, Attorney at Law
28026 Dobbel Avenue
Hayward, California 94542
Telephone: 408.483.6810
Email: pamela.schuur@comcast.net

Attorney for Creditor Shannon Stein

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 21-50901-MEH |
| PRINCESCA N. ENE, | Chapter 7 |
| Debtor. | **WITHDRAWAL OF PROOF OF CLAIM** |

Claimant Shannon Stein hereby withdraws her Proof of Claim No. 6 filed on April 26, 2022.

DATED: June 1, 2023      LAW OFFICE OF PAMELA M. SCHUUR

By: _____
Pa
Attorney for Shannon Stein, Creditor

Case: 21-50901 Doc# 255 Filed: 08/14/23 Entered: 08/14/23 17:09:44 Page 61 of 90

# EXHIBIT D

# SETTLEMENT AGREEMENT
## *In re Ene, Debtor*
## Case No. 21-50901

This SETTLEMENT AGREEMENT ("Agreement") is made and entered into by and between[1] Gina Klump ("Trustee") of the Chapter 7 bankruptcy estate of Princesca N. Ene ("Debtor"), and Patrice Darisme ("Darisme"), as follows:

## RECITALS

A. <u>Dissolution Litigation and Appeal</u>. In 2015, Darisme commenced *In re the Marriage of Patrice Darisme and Princesca Ene*, in the Superior Court State of California, County of Santa Clara ("State Court"), as Case No. 2015-6-FL014081 (the "Martial Dissolution Action"). On February 23, 2021, the State Court entered its Statement of Decision re Property Division, Reimbursement and Breach of Fiduciary Duty (the "Statement of Decision"). On September 13, 2021, the State Court entered its Amended Judgment After Trial (the "Amended Judgment"). Pre-Petition, Debtor filed the appeal: *Darisme v. Ene*, Court of Appeal of the State of California Sixth Appellate District, Case No. H049168 (appealing the breach of fiduciary duty, attorney fees, and sanctions orders included in the Amended Judgement) (the "Appeal").

B. <u>Nano Litigation.</u> On January 12, 2018, Nano (defined below) filed a Verified Complaint in the Superior Court State of California, County of Santa Clara ("State Court"), against Patrice Darisme as Case No. 18-CV-321769 (the "Nano Complaint"). On February 14, 2018, Darisme filed a Cross-Complaint for Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty, against Nano, Wilson Eng, and Princesca Ene, in the State Court (Case No. 18-CV-321769) (the "Cross-Complaint").

C. <u>Bankruptcy.</u> On July 2, 2021, Debtor filed her chapter 11 Voluntary Petition in the United States Bankruptcy Court, Northern District of California (the "Bankruptcy Court"), as Case No. 21-50901 ("Bankruptcy Case"). A Motion to Appoint Trustee was filed by creditor Patrice Darisme on November 10, 2021 (Docket No. 65), and the Order Appointing Chapter 11 Trustee (Gina Klump) was entered on January 24, 2022. (Docket No. 81.) On March 10, 2022, Trustee filed a Motion to Convert to Chapter 7 and Supporting Statement of Investigation and Report seeking conversion of the Bankruptcy Case to Chapter 7. (Docket No. 97.) The Order Converting Case to Chapter 7 was entered on March 28, 2022 (Docket No. 102), and the Appointment of Trustee naming Gina Klump as the Chapter 7 Trustee was filed on March 28, 2022. (Docket No. 103.)

D. <u>Debtor's Interest in Entities.</u> Debtor has an interest in the following-entities: Nano Alloys, Inc., dba Ni-Ti Tubes, a California corporation ("Nano"); Cardinal Cordis Health, a Wyoming corporation ("CCH"); and Ni-Ti Tube, LLC, a Wyoming limited liability company aka NiTi Tub LLC ("NI-TI WY") (collectively, the "Entities").

E. <u>Darisme Claim.</u> On October 13, 2021, Darisme filed an amended claim in the amount of $5,400,903.86 (Claim No. 3-2) (the "Darisme Claim").

F. <u>Intent.</u> It is the intent of the Parties that this Agreement: 1) facilitate liquidation of the Entities for the benefit of all creditors via substantive consolidation of the non-Debtor Entities; 2) resolve and dispose of the Nano Complaint, Cross-Complaint, and Appeal; and 3) provide resolution and allowance of the Darisme Claim. The Parties wish to resolve their disputes without further cost, risk, or delay, and agree to settle on the terms set forth below.

---

[1] The signing parties shall each individually be a "Party" and collectively be the "Parties."

28475173.1/521488.0002

## AGREEMENT

1.      **Incorporation of Recitals.** The foregoing recitals are incorporated herein as though set forth in full.

2.      **Substantive Consolidation.** Darsime consents to Trustee's motion to substantively consolidate the non-Debtor Entities and agrees to execute any declarations or other documents to further Trustee's efforts to consolidate the Entities in the Bankruptcy Case.

3.      **Claims.**

    3.1     <u>Claim Allowance.</u> In full and final satisfaction of all his claims against the Entities and the estate, the Darisme Claim shall be allowed against the estate only in the amount of three million dollars ($3,000,000.00), without prejudice to his claims as may be determined against the Debtor.

    3.2     <u>Claim Subordination.</u> Darisme agrees to subordinate the Darisme Claim to allow payment first to those obligations paid pursuant to 11 U.S.C. §§ 726(a)(1) and (2).

4.      **Dismissal of Pending Litigation.** Within fourteen (14) days of the Effective Date (defined ¶ 6), the following pending actions shall be dismissed by stipulation, with prejudice, and with respective parties to each bear their own attorneys' fees and costs: Nano Complaint, Cross-Complaint, and the pending Appeal, inclusive of the breach of fiduciary duty, attorney fees and sanctions orders. Trustee will execute any declarations or other documents necessary to assist Darisme in seeking dismissal of any further appeals by Debtor as to any issues which are the subject of the currently pending Appeal or relate to property of the bankruptcy estate.

5.      **Debtor Discharge.** Trustee will fulfill her statutory duty under 11 U.S.C. § 704(a)(6), provided the claims are viable, non-frivolous, and advisable.[2]

6.      **Bankruptcy Court Approval.** This Agreement is expressly conditioned upon the Bankruptcy Court's entry of final orders approving this Agreement (the "Order"). The Order shall be considered "final" for purposes hereof if (i) it has not been reversed or modified, the time for appeal therefrom or to seek review, reconsideration or rehearing thereof (including the time to petition for a writ of certiorari but excluding the time to move for relief from a final order or judgment under Rule 60(b) of the Federal Rules of Civil Procedure, made applicable to the Bankruptcy Case by Rule 9024 of the Federal Rules of Bankruptcy Procedure) has been waived or expired, and no appeal, petition for a writ of certiorari or other proceeding for re-argument, review, reconsideration, rehearing, or leave to appeal (including a motion for relief from a final order or judgment under Rule 60(b)) is pending and (ii) no statutory or judicial stay of the enforcement or effect of the Order is in effect and no request for such a stay is pending. The first full day following the occurrence of the foregoing shall be the deemed the effective date ("Effective Date").

---

[2] Section 4(G) the U.S. Department of Justice, Executive Office for United States Trustees' Handbook for Chapter 7 Trustees provides: "[t]he trustee has a duty under section 704(a)(6) to object to the debtor's discharge if advisable . . . To determine if it is advisable to oppose the debtor's discharge, the trustee must consider the cost of the litigation, the amount of estate funds available, the benefit to creditors of a denial of the discharge, and the likelihood of success." See, *https://www.justice.gov/ust/page/file/762521/download* .

28475173.1/521488.0002

7. **No Admission of Liability.** This Agreement was negotiated, in part, to avoid the time, effort, and cost of litigation. This Agreement was never intended and shall never constitute nor be construed as an admission of any liability, concession, or wrongdoing, in any form, by any Party.

8. **Consultation with Counsel.** The Parties have consulted with their respective legal counsel before entering into this Agreement and have read, understood, and voluntarily agreed to execute this Agreement with full knowledge that upon final approval it shall become a binding and enforceable contract.

9. **Entire Agreement.** This Agreement contains the entire agreement between the Parties with respect to the matters referred to in this Agreement and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, and there are no representations or other agreements between the Parties in connection with the subject matter hereof except as specifically set forth herein. No delay or omission on the part of either party in exercising any right hereunder will operate as a waiver of such right or any other right. A waiver on one occasion will not be construed as a bar to or a waiver of any right on any further occasion.

10. **Warranties.** Each of the Parties warrants and represents that he or she:

   10.1  has not heretofore assigned, subrogated, or transferred or purported to assign, subrogate, or transfer, to any person, firm, partnership, corporation or entity whatsoever any action(s) or cause(s) of action at law or in equity, suits, debts, demands, claims, contracts, covenants, liens, liabilities, losses, costs, accounts, expenses (including, without limitation attorneys' fees), or damages released in this Agreement;

   10.2  has full power and authority to execute and perform its obligations under this Agreement in all respects; and

   10.3  has not relied upon the advice of any representative, agent, or attorney of any of the other Parties, as to the legal or other consequences which attach from the assent to the terms of this Agreement.

11. **No Other Representations of Warranties.** The Parties acknowledge that no representations or warranties of any kind have been made by anyone to induce the signing of this Agreement other than as set forth in this Agreement.

12. **Bankruptcy Court Jurisdiction and Governing Law.** The Parties agree that the Bankruptcy Court presiding over the Case shall have exclusive jurisdiction to resolve any dispute that may arise under the Agreement and that the Agreement shall be governed by California law.

13. **Counterparts.** This Agreement may be executed in one or more counterparts; a copy of an executed original shall be deemed an original for all purposes; a signed copy transmitted by email shall deemed an executed original for all purposes.

14. **Severability.** In the event any immaterial provision of this Agreement is held to be void, voidable, or unenforceable, the remaining provisions of this Agreement will remain in full force and effect.

28475173.1/521488.0002

15. **Authority.** The Parties each represent and warrant to each of the Parties that they are authorized to execute this Agreement and intend to be fully and legally bound by its terms.

16. **Binding Effect.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and their respective heirs, executors, administrators, legal representatives, successors and assigns, including any successor trustee in the Bankruptcy Case.

THE FOREGOING IS AGREED:

GINA KLUMP

Chapter 7 Trustee, Princesca N. Eze
DATE: December ___, 2022

Patrice Darisme
DATE: December 7, 2022

38475173.1/521448.0002

# EXHIBIT E

# STATE OF WYOMING
## Office of the Secretary of State

I, CHUCK GRAY, Secretary of State of the State of Wyoming, do hereby certify that according to the records of this office,

### Cardinal Cordis Health

is a

### Profit Corporation

formed or qualified under the laws of Wyoming did on **December 1, 2017**, comply with all applicable requirements of this office. Its period of duration is Perpetual. This entity has been assigned entity identification number **2017-000778587**.

This entity is in existence and in good standing in this office and has filed all annual reports and paid all annual license taxes to date, or is not yet required to file such annual reports; and has not filed Articles of Dissolution.

I have affixed hereto the Great Seal of the State of Wyoming and duly generated, executed, authenticated, issued, delivered and communicated this official certificate at Cheyenne, Wyoming on this 6th day of July, 2023 at 4:15 PM. This certificate is assigned ID Number 062726015.





_____
Secretary of State

Notice: A certificate issued electronically from the Wyoming Secretary of State's web site is immediately valid and effective. The validity of a certificate may be established by viewing the Certificate Confirmation screen of the Secretary of State's website https://wyobiz.wyo.gov and following the instructions displayed under Validate Certificate.

# EXHIBIT F

671121

| | Final K-1 | [X] Amended K-1 | OMB No. 1545-0123 |

## Schedule K-1
## (Form 1120-S)
Department of the Treasury
Internal Revenue Service

**2022**

For calendar year 2022, or tax year

beginning _____ ending _____

## Shareholder's Share of Income, Deductions, Credits, etc.
**See separate instructions.**

### Part I — Information About the Corporation

**A** Corporation's employer identification number
82-3589717

**B** Corporation's name, address, city, state, and ZIP code

CARDINAL CORDIS HEALTH
30 N GOULD ST
6818
Sheridan, WY 82801

**C** IRS Center where corporation filed return
OGDEN, UT 84201

**D** Corporation's total number of shares

Beginning of tax year ........ 100.000000
End of tax year .......... 100.000000

### Part II — Information About the Shareholder

**E** Shareholder's identifying number
█████2557

**F** Shareholder's name, address, city, state, and ZIP code

**G** Current year allocation percentage ... 100.0000 %

**H** Shareholder's number of shares

Beginning of tax year ........ 100.000000
End of tax year .......... 100.000000

**I** Loans from shareholder

Beginning of tax year ........ $ _____
End of tax year .......... $ _____

For IRS Use Only

### Part III — Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Item | | # | Item |
|---|------|------|---|------|
| 1* | Ordinary business income (loss) −35,277. | | 13 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | | |
| 4 | Interest Income 1,247. | | | |
| 5a | Ordinary dividends 49,834. | | | |
| 5b | Qualified dividends 34,830. | | 14 | Schedule K-3 is attached if checked ........ [ ] |
| 6 | Royalties | | 15 F* | Alternative minimum tax (AMT) items STMT |
| 7 | Net short-term capital gain (loss) −64,337. | | | |
| 8a | Net long-term capital gain (loss) 866,236. | | | |
| 8b | Collectibles (28%) gain (loss) | | | |
| 8c | Unrecaptured section 1250 gain | | | |
| 9 | Net section 1231 gain (loss) | | 16 A | Items affecting shareholder basis 18,982. |
| 10 | Other income (loss) | | F | 901. |
| | | | 17 A* | Other information STMT |
| | | | V* | STMT |
| 11 | Section 179 deduction | | | |
| 12 | Other deductions | | | |
| 18 | [X] More than one activity for at-risk purposes* | | | |
| 19 | [ ] More than one activity for passive activity purposes* | | | |
| | * See attached statement for additional information. | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.** www.irs.gov/Form1120S Schedule K-1 (Form 1120-S) 2022

UYA

# EXHIBIT G

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| In re<br><br>PRINCESCA N. ENE,<br><br><br>              Debtor. | Case No. 21-50901-MEH<br><br>Chapter 7<br><br>**NOTICE OF HEARING ON MOTION FOR ORDER APPROVING COMPROMISE WITH PATRICE DARISME**<br><br>Date:     January 19, 2023<br>Time:    1:30 p.m.<br>Place:   In Person or Via Zoom<br>           Courtroom 11<br>           280 South First Street<br>           San Jose, CA<br>Judge:  Hon. M. Elaine Hammond |

**TO:   THE DEBTOR, ALL CREDITORS OF THE ESTATE, THE UNITED STATES TRUSTEE AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Gina R. Klump ("**Trustee**"), the chapter 7 trustee for the bankruptcy estate of Princesca N. Ene ("**Debtor**"), has filed a motion under Bankruptcy Rule 9019 ("**Motion**") for an order approving her compromise with Patrice Darisme ("**Darisme**") based on the terms and merits discussed below.

### The Proposed Compromise

Under the proposed compromise, in full and final satisfaction of all of Patrice Darisme's claims against the Entities[1] and the estate[2] (collectively, the "**Darisme Claim**"), the Darisme Claim shall be allowed against the estate only in the amount of three million dollars ($3,000,000.00), without prejudice to his claims as may be determined against the Debtor.[3]

Darisme will consent to and support Trustee's motion[4] to substantively consolidate the Entities into the above-captioned case and to facilitate that effort, will consensually subordinate the Darisme Claim to allow payment first to those obligations paid pursuant to 11 U.S.C. §§ 726(a)(1) and (2).

In addition, the settlement provides that within fourteen (14) days of the Effective Date (defined in the Settlement Agreement), the following pending actions (each defined below) shall be dismissed by

---

[1] Nano Alloys, Inc., dba Ni-Ti Tubes, a California corporation ("**Nano**"); Cardinal Cordis Health, a Wyoming corporation ("**CCH**"); and Ni-Ti Tube, LLC, a Wyoming limited liability company aka NiTi Tub LLC ("**Ni-Ti WY**") (collectively, the "**Entities**").

[2] On October 13, 2021, Darisme filed an amended claim in the amount of $5,400,903.86 (Claim No. 3-2).

[3] On September 27, 2021, Darisme filed a non-dischargeability complaint, which is pending as AP Case No. 21-05040.

[4] This will be filed as a separate motion.

Case: 21-50901   Doc# 255   Filed: 08/14/23   Entered: 08/14/23 17:09:44   Page 72 of 90

stipulation, with prejudice, and with respective parties to each bear their own attorneys' fees and costs: **Nano Complaint, Cross-Complaint,** and the **Appeal**.

Finally, the settlement reiterates Trustee's obligation to fulfill her statutory duty under 11 U.S.C. § 704(a)(6), to pursue viable, non-frivolous, and advisable denial of discharge claims.

### Factual Background and Merits of the Compromise

On July 2, 2021, Debtor filed her chapter 11 Voluntary Petition in the United States Bankruptcy Court, Northern District of California (the "**Bankruptcy Court**"), as Case No. 21-50901 ("**Bankruptcy Case**"). A Motion to Appoint Trustee was filed by creditor Patrice Darisme on November 10, 2021 (Docket No. 65), and the Order Appointing Chapter 11 Trustee (Gina Klump) was entered on January 24, 2022. (Docket No. 81.) On March 10, 2022, Trustee filed a Motion to Convert to Chapter 7 and Supporting Statement of Investigation and Report seeking conversion of the Bankruptcy Case to Chapter 7. (Docket No. 97.) The Order Converting Case to Chapter 7 was entered on March 28, 2022 (Docket No. 102), and the Appointment of Trustee naming Gina Klump as the Chapter 7 Trustee was filed on March 28, 2022. (Docket No. 103.)

Debtor's primary assets consist of her interests in various defunct Entities which, as of early 2022, held approximately $7 million. Debtor's primary creditor is Patrice Darisme, her ex- spouse, who asserts the Darisme Claim in excess of $5 million—a sum awarded in large part due to findings by the State Court in the marital dissolution proceeding[5] that Debtor's attempts to dissipate community marital assets was undertaken with "malice, oppression and fraud" and related findings that the transfer of funds between various non-Debtor Entities was fraudulent. Trustee has determined that consolidation of the Debtor's bankruptcy case with the Entities is in the best interests of creditors and the estate because it is necessary to recover funds and pay creditors in a fair and equitable way. Therefore, through separate coordinated motion, Trustee seeks to substantively consolidate the Entities into this bankruptcy case pursuant to this Court's equitable powers (11 U.S.C. § 105(a)) and Ninth Circuit authority (*see, e.g., In re Bonham*, 229 F.3d 750 (9th Cir. 2000)) that permit substantive consolidation of non-debtor entities.

Darisme asserts an interest in Nano that he purportedly obtained through a settlement with Wilson Eng, who claims to own 50% of Nano.[6] Trustee contends that any interest in Nano purportedly owned by Mr. Eng is avoidable under California Civil Code §§ 3439.4(a)(1), (2) *et seq.*, 11 U.S.C. § 544, and recoverable under § 550(a)(1). Trustee asserts that any interest purportedly held by Darisme is recoverable under 11 U.S.C. § 550(a)(2). Darisme and Mr. Eng dispute Trustee's contentions and contend that the transfer is not avoidable or recoverable.

This compromise seeks to resolve numerous interwoven issues between the parties, described as follows:

1.      Pre-Petition, Debtor filed an appeal[7] of the Amended Judgment, appealing the breach of fiduciary duty, attorney fees, and sanctions orders (the "**Appeal**"). The Appeal is property of the estate. 11 U.S.C. § 541(a)(1). Trustee has reviewed the Appeal and believes that the portion of the claim that valued ½ of Mr. Eng's purported share (identified as PD1 in the Darisme Claim) used a valuation of Nano as a going concern ($9,610,582.80) without taking taxes into consideration. Trustee's accountant estimates

---

[5] In 2015, Darisme commenced *In re the Marriage of Patrice Darisme and Princesca Ene*, in the Superior Court State of California, County of Santa Clara ("**State Court**"), as Case No. 2015-6-FL014081 (the "**Martial Dissolution Action**"). On February 23, 2021, the State Court entered its Statement of Decision re Property Division, Reimbursement and Breach of Fiduciary Duty (the "**Statement of Decision**"). On September 13, 2021, the State Court entered its Amended Judgment After Trial (the "**Amended Judgment**").

[6] Wilson Eng also asserts, and the Trustee disputes, an interest in Nano. Mr. Eng has consented to the substantive consolidation of the Entities.

[7] *Darisme v. Ene*, Court of Appeal of the State of California Sixth Appellate District, Case No. H049168.

Nano's tax liability to have been $3.6M, reducing its value to $6,010,582.80. Therefore, the PD1 line item in the Claim would be **$1,502,645.70** not $2,402,645.70. This reduces the claim to **$4,500,903.76**. In addition to other potential issues on appeal, a significant question arises when Trustee considers the effect of a successful avoidance of Mr. Eng's interests and to what extent that would undermine the amounts awarded in the judgment; after all, if Trustee can recover the shares as fraudulent transfers then the $2.4M awarded as damages arising from the transfer of community property in 2017 would be nullified and likely replaced with a valuation of **$788,519** (25% of the value at date of separation), further reducing the claim to **$3,786,777.06**. Mr. Darisme disputes Trustee's analysis and asserts his claim should be allowed in the amount filed.

2.  Pre-Petition, on January 12, 2018, Nano filed a Verified Complaint in the Superior Court State of California, County of Santa Clara ("**State Court**"), against Patrice Darisme as Case No. 18-CV-321769 (the "**Nano Complaint**"). On February 14, 2018, Darisme filed a Cross-Complaint for Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty, against Nano, Wilson Eng, and Princesca Ene, in the State Court (Case No. 18-CV-321769) (the "**Cross-Complaint**"). Trustee has reviewed the Nano Complaint and believes claims raised were addressed and resolved as part of the Marital Dissolution Action. Trustee has reviewed the Cross-Complaint and Trustee finds its claims to be meritless. However, Nano is not actively disputing the Cross-Complaint and as a result, Darisme is seeking entry of a default judgment against Nano. After substantive consolidation of Nano, entry of a default judgment may require Trustee to incur legal expenses to set aside the default and resolve the Cross-Complaint on the merits. Darisme contends his Cross-Complaint is meritorious.

3.  In addition to the Darisme Claim in the amount of $5,400,903.86, the Amended Judgment allocates the balance of the marital estate between the Darisme and Debtor, providing that Darisme was to receive property approximately valued at $2,903,133.85, and upon transfer, Debtor would be entitled to a credit against the balance owed to Darisme in the approximate amount of $2,612,484.66. Numerous thorny family law issues and factual disputes remain with regard to the credits and the timing for the entitlement of those credits; however, even if Debtor were entitled to the maximum credit against the filed Darisme Claim, she would still owe Darisme $2,788,419.00.

The traditional factors bankruptcy courts in the Ninth Circuit apply on a motion to approve a compromise are: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views. *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377 at 1381 (9th Cir. 1986).

With regard to the first factor, in this case, although the Trustee believes i) she would prevail in a reduction in the amount of the Darisme Claim if she litigated the Appeal; ii) she could successfully defeat the claims asserted in the Cross-Complaint; and iii) the issues related to the credits owed to Debtor could be litigated to an appropriate outcome, the value of the resulting reductions would likely not justify the cost and delay of litigation, especially in light of the fact that it is unlikely there will be sufficient funds in the estate to pay the Darisme Claim in-full. Indeed, Trustee's projections anticipate that after substantive consolidation with the Entities and payment of administrative claims and general unsecured claims, there will be $2,696,830.77 remaining to pay the Darisme Claim.

The second factor, concerning collectability, does not apply because any contemplated outcome of the foregoing issues would result in a reduction of the Darisme Claim, not a balance owed to the estate.

The third factor weighs in favor of the compromise, because numerous issues that are being compromised will otherwise require litigation in State Court and some involve detailed accounting and family law issues, which would require Trustee to retain special counsel. The added expense, complexity of issues, inconvenience and delay would drain funds available for distribution to creditors—an outcome that is unnecessary in light of the fact it is anticipated that the settlement will allow all creditors to be paid in-full, other than the Darisme Claim and subordinated tax penalties.

Finally, with regard to the fourth factor, the paramount interest of creditors is that the above-outlined issues be resolved efficiently, expeditiously, and with a maximum net recovery to the estate and creditors. These interests are served by the settlement which facilitates liquidation of the Entities through Darisme's consent to the substantive consolidation motion and the compromise and subordination of his claim, and results in the dismissal of the Appeal, the Nano Complaint, and the Cross-Complaint—all of which may have otherwise caused increased expense and delay, for an outcome that would likely not be better than what is proposed in the settlement.

Based on the foregoing, Trustee believes that this settlement is reasonable, fair, equitable, and in the best interests of creditors and the estate.

**PLEASE TAKE FURTHER NOTICE** that all matters before Judge Hammond will be conducted in person, in the courtroom, unless otherwise ordered by the court; (1) counsel, parties, and other interested parties may attend the hearing in person or by Zoom, (2) additional information is available on Judge Hammond's Procedures page on the court's website, and (3) information on attending the hearing by Zoom will be provided on Judge Hammond's calendar, posted no later than seven (7) days prior to the hearing date.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Bankruptcy Local Rule 9014-1(c)(1), any objections to the Motion must be served on the undersigned and filed with the Clerk of the United States Bankruptcy Court, Northern District of California, San Jose Division, 280 South First Street, San Jose, CA 95113-3099 no later than fourteen (14) days before the date of the hearing; i.e. January 5, 2023. Any objection must be accompanied by any supporting declarations or memoranda that the objecting party wishes to present in support of its position. If no timely objections are filed, the Court may grant the relief requested in the Motion without further notice or opportunity to be heard.

A copy of the Motion and supporting declaration are on file with the court and may be obtained by request to the undersigned.

Dated: December 14, 2022

                 */s/ Lisa Lenherr*
Mark S. Bostick (Bar No. 111241)
Lisa Lenherr (Bar No. 258091)
FENNEMORE WENDEL
1111 Broadway, 24th Floor
Oakland, CA 94607-4036
Tel: (510) 834-6600
Email: mbostick@fennemorelaw.com
Email: llenherr@fennemorelaw.com
Attorneys for Gina R. Klump, Trustee

Case: 21-50901  Doc# 165  Filed: 12/14/22  Entered: 12/14/22 11:41:44  Page 7 of 7
Case: 21-50901  Doc# 255  Filed: 08/14/23  Entered: 08/14/23 17:09:44  Page 75 of
90

Case: 21-50901 Doc# 255 Filed: 08/14/23 Entered: 08/14/23 17:09:44 Page 76 of 90

Bankruptcy Court Case# 21-50901
DEBTOR: Princesca Ene [Wife/Debtor/Respondent]
CREDITOR: Patrice Darisme [Husband/Creditor/Petitioner]
State of California CASE # 2015-6-FL-014081
Final Judgment Entered: May 3 2021
Amended Judgment Entered: Sept 13 2021

## DAMAGES & AWARD DUE TO HUSBAND

| | Reference - Amended Judgment Section | | Due to Husband |
|---|---|---|---|
| 1 | Exh 3 - [P. 10 L. 8,9] &. [P. 12, L. 1] | Family Code §1101(g) Damages [Breach of Fiduciary Duty] | $ 2,402,645.70 |
| 2 | Exh 3 - [P. 10 L. 19] & [P. 15 L. 22,23] | Attorney Fees | $ 176,141.41 |
| 3 | Exh 3 - [P. 10 L. 28] &. [P. 12 L. 4] | Family Code §1101(h) Damages [Breach of Fiduciary Duty with "malice, oppression and fraud"] | $ 1,805,291.50 |
| 4 | Exh 3 - [P. 11 L. 11] & [P. 16 L. 1-3] | Family Code §271 Sanctions | $ 107,043.25 |
| | | Total Damages and Award Due to Husband | $ 4,491,121.86 |
| 5 | Exh 3 - [P. 15 L 9-12] | Interest Charges @ 10% per year starting April 1 2021 - TBD - ongoing | TBD |
| 6 | Exh 3 - [P 12, L 13] | Wife pays Husband Residence Fair Rental Value from 12/1/2020 until Transfer $1,933 per month - ongoing - calculated as of Oct 1 2021 | $ 21,263.00 |
| | | **TOTAL CLAIM [PLUS INTEREST FROM DATE OF JUDGMENT AT 10% PER ANNUM]** | **$ 4,512,384.86** |

Case: 21-50901 Doc# 255 Filed: 08/14/23 Entered: 08/14/23 17:09:44 Page 77 of 90

**Bankruptcy Court Case# 21-50901**
**DEBTOR: Princesca Ene [Wife/Debtor/Respondent]**
**CREDITOR: Patrice Darisme [Husband/Creditor/Petitioner]**
**State of California CASE # 2015-6-FL-014081**
**Final Judgment Entered: May 3 2021**
**Amended Judgment Entered: Sept 13 2021**

| DAMAGES & AWARD DUE TO HUSBAND | | | |
|---|---|---|---|
| Reference - Amended Judgment Section | | | Due to Husband |
| Exhibit 3 - [P. 10 L. 8,9] &. [P. 12, L. 1] | Family Code §1101(g) Damages [Breach of Fiduciary Duty] | $ | 2,402,645.70 |
| Exhibit 3 - [P. 10 L. 19] & [P. 15 L. 22,23] | Attorney Fees | $ | 176,141.41 |
| Exhibit 3 - [P. 10 L. 28] &. [P. 12 L. 4] | Family Code §1101(h) Damages [Breach of Fiduciary Duty with "malice, oppression and fraud"] | $ | 1,805,291.50 |
| Exhibit 3 - [P. 11 L. 11] & [P. 16 L. 1-3] | Family Code §271 Sanctions | $ | 107,043.25 |
| | Total Damages and Award Due to Husband | $ | 4,491,121.86 |
| Exhibit 3 - [P. 11 L. 17-18] | Wife Buys out Husband's 25% Ownership of Nano Alloys | $ | 788,519.00 |
| Exhibit 3 - [P. 11 L. 27] | Wife shall Pay Husband $100,000 | $ | 100,000.00 |
| Exhibit 3 - [P. 15 L 9-12] | Interest Charges @ 10% per year starting April 1 2021 - TBD - ongoing | | TBD |
| Exhibit 3 - [P 12, L 13] | Wife pays Husband Residence Fair Rental Value from 12/1/2020 until Transfer $1,933 per month - ongoing - calculated as of Oct 1 2021 | $ | 21,263.00 |
| TOTAL CLAIM [PLUS INTEREST FROM DATE OF JUDGMENT AT 10% PER ANNUM] | | $ | 5,400,903.86 |

# EXHIBIT I

# Magnolia Group  LLP

CERTIFIED PUBLIC ACCOUNTANTS

January 30, 2019

**SENT VIA EMAIL AND U.S. MAIL**

Shannon Stein, Esq.
Law Offices of Shannon Stein
435 South Murphy Avenue
Sunnyvale, CA 94086

Re:     Marriage of Ene and Darisme
        Withdrawals by Patrice Darisme

Dear Ms. Stein:

We have been engaged by Princesca Ene to review bank records related to funds withdrawn by Patrice Darisme since separation from various accounts of the parties. This letter and the attached schedules constitute our initial report on this issue. This report is based on the information received and reviewed to date, and includes certain accounts as requested. If additional information is provided, it may change the conclusions in this report.

Attached are Schedules 1-4 which summarize the activity in the following accounts for the period from January 2015 to December 2018 (except Fisher accounts through Sept 2018):

| Account | Reference | Withdrawals Jan 2015-Dec 2018 |
|---|---|---|
| Etrade x4324 | Schedule 1 | $ 46,623.03 |
| Fisher Investments - Managed x0447 | Schedule 2 | $ 303,263.55 |
| Fisher Investments - Client Supervised x0447 | Schedule 3 | $ 245,000.00 |
| Charles Schwab x4354 | Schedule 4 | $ 330,129.44 |
| Total | | $ **925,016.02** |

Please note that these accounts were accessible by Mr. Darisme since the date of separation, the noted withdrawals were not traced to deposits in other community accounts and the withdrawals are unknown to Princesca Ene. Accordingly, we have assumed that Mr. Darisme initiated those withdrawals and transfers and have included them in this report.

Please contact me if you have any questions.

Sincerely,

Katie Sims, CPA

29 Hawthorne Ave., Los Altos, CA 94022

Main 650.559.8980   Fax 650.559.8989

www.magnoliacpas.com

Case: 21-50901 Doc# 255 Filed: 08/14/23 Entered: 08/14/23 17:09:44 Page 80 of 90

Magnolia Group LLP
Schedule 1

Marriage of Ene and Darisme
Bank Statement Summary - Patrice Darisme & Princesca Ene, JTWROS
E*Trade #4324
January 2014 - December 2018

## CASH / MONEY HOLDINGS

| Month | Investment Income | Deposits | Stock Sale Proceeds | Other Credits | Withdrawal | Funds to Purchase Securities | Other Debits | Balance |
|---|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | | 86,340.57 |
| 1 | 305.98 | | | | | | | 86,646.55 |
| 2 | 653.34 | | | | | (6,098.44) | | 81,201.45 |
| 3 | 287.49 | | | | | (3,773.57) | | 77,715.37 |
| 4 | 280.78 | | | | | | | 77,996.15 |
| 5 | 679.94 | | | | | | | 78,676.09 |
| 6 | 302.82 | | | | | | | 78,978.91 |
| 7 | 477.59 | | | | | | | 79,456.50 |
| 8 | 887.32 | | | | | | | 80,343.82 |
| 9 | 312.04 | | | | | | | 80,655.86 |
| 10 | 312.42 | | 1,194.98 | | | (5,135.49) | | 77,027.77 |
| 11 | 699.95 | | | | | | | 77,727.72 |
| 12 | 539.00 | | | | | | | 78,266.72 |
| Year totals | 5,738.67 | - | 1,194.98 | - | - | (15,007.50) | - | 78,266.72 |
| 2015 | | | | | | | | |
| 1 | 351.58 | | | | | (19,159.99) | | 59,458.31 |
| 2 | 699.81 | | | | | | | 60,158.12 |
| 3 | 356.10 | | | | | (13,259.99) | | 47,254.23 |
| 4 | 316.49 | | | | | | | 47,570.72 |
| 5 | 759.19 | | | | | | | 48,329.91 |
| 6 | 724.51 | | | | | | | 49,054.42 |
| 7 | 336.23 | | | | | (46,586.99) | | 2,803.66 |
| 8 | 772.82 | | 2,754.95 | | (3,623.03) | | | 2,708.40 |
| 9 | 366.31 | | | | | | | 3,074.71 |
| 10 | 325.17 | | | | | | | 3,399.88 |
| 11 | 772.85 | | | | | | | 4,172.73 |
| 12 | 637.82 | | | | | | | 4,810.55 |
| Year totals | 6,418.88 | - | 2,754.95 | - | (3,623.03) | (79,006.97) | - | 4,810.55 |

## SECURITIES

| Month | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance |
|---|---|---|---|---|---|---|
| 2014 | | | | | | 354,145.57 |
| 1 | - | | - | | (19,649.73) | 334,495.84 |
| 2 | 6,098.44 | | - | | 15,525.87 | 356,120.15 |
| 3 | 3,773.57 | | - | | 2,700.87 | 362,594.59 |
| 4 | - | | - | | 4,059.63 | 366,654.22 |
| 5 | - | | - | | 9,491.59 | 376,145.81 |
| 6 | - | | - | | 9,508.54 | 385,654.35 |
| 7 | - | | - | | 3,375.09 | 389,029.44 |
| 8 | - | | - | | 22,931.52 | 411,960.96 |
| 9 | - | | - | | (7,876.92) | 404,084.04 |
| 10 | 5,135.49 | | (1,194.98) | | 16,036.65 | 424,061.20 |
| 11 | - | | - | | 22,499.28 | 446,560.48 |
| 12 | - | | - | | (12,606.56) | 433,953.92 |
| Year totals | 15,007.50 | - | (1,194.98) | - | 65,995.83 | 433,953.92 |
| 2015 | | | | | | |
| 1 | 19,159.99 | | - | | (6,971.76) | 446,142.15 |
| 2 | - | | - | | 30,112.15 | 476,254.30 |
| 3 | 13,259.99 | | - | | (9,493.39) | 480,020.90 |
| 4 | - | | - | | 2,262.49 | 482,283.39 |
| 5 | - | | - | | 10,210.30 | 492,493.69 |
| 6 | - | | - | | (9,627.26) | 482,866.43 |
| 7 | 46,586.99 | | - | | 11,708.05 | 541,161.47 |
| 8 | - | | (2,754.95) | | (37,761.07) | 500,645.45 |
| 9 | - | | - | | (15,424.84) | 485,220.61 |
| 10 | - | | - | | 37,081.17 | 522,301.78 |
| 11 | - | | - | | 6,549.20 | 528,850.98 |
| 12 | - | | - | | (20,273.24) | 508,577.74 |
| Year totals | 79,006.97 | - | (2,754.95) | - | (1,628.20) | 508,577.74 |

## TOTAL

| Total |
|---|
| 440,486.14 |
| 421,142.39 |
| 437,321.60 |
| 440,309.96 |
| 444,650.37 |
| 454,821.90 |
| 464,633.26 |
| 468,485.94 |
| 492,304.78 |
| 484,739.90 |
| 501,088.97 |
| 524,288.20 |
| 512,220.64 |
| 512,220.64 |
| 505,600.46 |
| 536,412.42 |
| 527,275.13 |
| 529,854.11 |
| 540,823.60 |
| 531,920.85 |
| 543,965.13 |
| 503,353.85 |
| 488,295.32 |
| 525,701.66 |
| 533,023.71 |
| 513,388.29 |
| 513,388.29 |

Bank Square - Ene updated 1.29.19.xls

Magnolia Group LLP
Schedule 1

Marriage of Ene and Darisme
Bank Statement Summary - Patrice Darisme & Princesca Ene, JTWROS
E*Trade #4324
January 2014 - December 2018

**CASH / MONEY HOLDINGS**

| Month | Investment Income | Deposits | Stock Sale Proceeds | Other Credits | Withdrawal | Funds to Purchase Securities | Other Debits | Balance |
|---|---|---|---|---|---|---|---|---|
| 2016 | | | | | | | | |
| 1 | 360.78 | | | | | | | 5,171.33 |
| 2 | 772.85 | | | | | | | 5,944.18 |
| 3 | 511.96 | | | | | | | 6,456.14 |
| 4 | 343.40 | | | | | | | 6,799.54 |
| 5 | 832.36 | | | | | | | 7,631.90 |
| 6 | 772.28 | | | | | | | 8,404.18 |
| 7 | 349.19 | | | | | | | 8,753.37 |
| 8 | 832.38 | | | | | | | 9,585.75 |
| 9 | 7,226.78 | | 5,739.88 | | | | | 22,552.41 |
| 10 | 294.59 | | | | | | | 22,847.00 |
| 11 | 832.51 | | | | | | | 23,679.51 |
| 12 | 752.86 | | | | | | | 24,432.37 |
| Year totals | 13,881.94 | - | 5,739.88 | - | - | - | - | 24,432.37 |
| | | | | | | | | |
| 2017 | | | | | | | | |
| 1 | 343.99 | | | | | | | 24,776.36 |
| 2 | 832.52 | | | | | | | 25,608.88 |
| 3 | 498.52 | | | | | (1,994.99) | | 24,112.41 |
| 4 | 293.82 | | | | | | | 24,406.23 |
| 5 | 4,803.91 | | | | | | | 29,210.14 |
| 6 | 850.27 | | 11,648.89 | | | | | 41,709.30 |
| 7 | 324.02 | | 14,092.72 | | | | | 56,126.04 |
| 8 | 968.71 | | | | (14,000.00) | | | 43,094.75 |
| 9 | 319.75 | | | | (20,000.00) | (9,116.95) | | 14,297.55 |
| 10 | 340.05 | | | | | | | 14,637.60 |
| 11 | 968.31 | | | | (9,000.00) | | | 6,605.91 |
| 12 | 643.04 | | | | | (3,911.95) | | 3,337.00 |
| Year totals | 11,186.91 | - | 25,741.61 | - | (43,000.00) | (15,023.89) | - | 3,337.00 |

**SECURITIES**

| Month | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance |
|---|---|---|---|---|---|---|
| 2016 | | | | | | |
| 1 | - | | - | | (39,819.42) | 468,758.32 |
| 2 | - | | - | | (5,283.29) | 463,475.03 |
| 3 | - | | - | | 40,288.41 | 503,763.44 |
| 4 | - | | - | | (7,076.29) | 496,687.15 |
| 5 | - | | - | | 13,906.82 | 510,593.97 |
| 6 | - | | - | | (9,134.06) | 501,459.91 |
| 7 | - | | - | | 32,439.95 | 533,899.86 |
| 8 | - | | - | | 3,687.45 | 537,587.31 |
| 9 | - | | (5,739.88) | | 2,733.74 | 534,581.17 |
| 10 | - | | - | | (12,781.82) | 521,799.35 |
| 11 | - | | - | | 10,458.03 | 532,257.38 |
| 12 | - | | - | | 8,670.50 | 540,927.88 |
| Year totals | - | - | (5,739.88) | - | 38,090.02 | 540,927.88 |
| | | | | | | |
| 2017 | | | | | | |
| 1 | - | | - | | 27,367.78 | 568,295.66 |
| 2 | - | | - | | 35,712.56 | 604,008.22 |
| 3 | 1,994.99 | | - | | 8,978.91 | 614,982.12 |
| 4 | - | | - | | 12,332.33 | 627,314.45 |
| 5 | - | | - | | 17,675.75 | 644,990.20 |
| 6 | - | | (11,648.89) | | (8,881.83) | 624,459.48 |
| 7 | - | | (14,092.72) | | 16,794.72 | 627,161.48 |
| 8 | - | | - | | 29,510.94 | 656,672.42 |
| 9 | 9,116.95 | | - | | (6,572.34) | 659,217.03 |
| 10 | - | | - | | 41,177.12 | 700,394.15 |
| 11 | - | | - | | 23,659.58 | 724,053.73 |
| 12 | 3,911.95 | | - | | 1,395.48 | 729,361.16 |
| Year totals | 15,023.89 | - | (25,741.61) | - | 199,151.00 | 729,361.16 |

**TOTAL**

| Total |
|---|
| |
| 473,929.65 |
| 469,419.21 |
| 510,219.58 |
| 503,486.69 |
| 518,225.87 |
| 509,864.09 |
| 542,653.23 |
| 547,173.06 |
| 557,133.58 |
| 544,646.35 |
| 555,936.89 |
| 565,360.25 |
| 565,360.25 |
| |
| |
| 593,072.02 |
| 629,617.10 |
| 639,094.53 |
| 651,720.68 |
| 674,200.34 |
| 666,168.78 |
| 683,287.52 |
| 699,767.17 |
| 673,514.58 |
| 715,031.75 |
| 730,659.64 |
| 732,698.16 |
| 732,698.16 |

Bank Square - Ene updated 1.29.19.xls

Magnolia Group LLP
Schedule 1

Marriage of Ene and Darisme
Bank Statement Summary - Patrice Darisme & Princesca Ene, JTWROS
E*Trade #4324
January 2014 - December 2018

**CASH / MONEY HOLDINGS**

| Month | Investment Income | Deposits | Stock Sale Proceeds | Other Credits | Withdrawal | Funds to Purchase Securities | Other Debits | Balance |
|-------|-------------------|----------|---------------------|---------------|------------|------------------------------|--------------|---------|
| 2018 | | | | | | | | |
| 1 | 357.30 | | | | | | 43.89 | 3,738.19 |
| 2 | 905.73 | | | | | | | 4,643.92 |
| 3 | 403.30 | | | | | | (5.98) | 5,041.24 |
| 4 | 354.40 | | | | | | | 5,395.64 |
| 5 | 1,024.75 | | | | | | | 6,420.39 |
| 6 | 815.80 | | | | | | (12.00) | 7,224.19 |
| 7 | 348.43 | | | | (300,000.00) | | (684.31) | (293,111.69) |
| 8 | | 300,000.00 | | | | | (1,739.05) | 5,149.26 |
| 9 | 285.16 | | | | | | (454.22) | 4,980.20 |
| 10 | 365.66 | | | | | | (365.47) | 4,980.39 |
| 11 | 1,045.00 | | | | | | (1,006.28) | 5,019.11 |
| 12 | 1,270.27 | | | | | | (1,269.98) | 5,019.40 |
| Year totals | 7,175.80 | 300,000.00 | - | - | (300,000.00) | - | (5,493.40) | 5,019.40 |

Total Unknown Withdrawals 2015-2018     (46,623.03)

**SECURITIES**

| Month | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance |
|-------|-------------------|---------------------|-----------------|----------------------------|-----------------|---------|
| 2018 | | | | | | |
| 1 | - | | - | | 51,105.50 | 780,466.66 |
| 2 | - | | - | | 1,360.03 | 781,826.69 |
| 3 | - | | - | | (43,623.02) | 738,203.67 |
| 4 | - | | - | | 10,628.16 | 748,831.83 |
| 5 | - | | - | | 42,878.58 | 791,710.41 |
| 6 | - | | - | | 2,489.11 | 794,199.52 |
| 7 | - | | - | | 21,894.46 | 816,093.98 |
| 8 | - | | - | | 88,040.91 | 904,134.89 |
| 9 | - | | - | | (4,840.59) | 899,294.30 |
| 10 | - | | - | | (70,893.08) | 828,401.22 |
| 11 | - | | - | | (29,162.79) | 799,238.43 |
| 12 | - | | - | | (72,172.50) | 727,065.93 |
| Year totals | - | - | - | - | (2,295.23) | 727,065.93 |

**TOTAL**

| Total |
|-------|
| 784,204.85 |
| 786,470.61 |
| 743,244.91 |
| 754,227.47 |
| 798,130.80 |
| 801,423.71 |
| 522,982.29 |
| 909,284.15 |
| 904,274.50 |
| 833,381.61 |
| 804,257.54 |
| 732,085.33 |
| 732,085.33 |

Bank Square - Ene updated 1.29.19.xls

Magnolia Group LLP
Schedule 2

Marriage of Ene and Darisme
Bank Statement Summary  - Patrice Darisme
Fisher #0447 - MANAGED PORTFOLIO
January 2014 - September 2018

**Cash / Money Holdings - Managed Portfolio**

| Month | Investment Income | Stock Sale Proceeds | Withdrawal (Note 1) | Transfer Out | Funds to Purchase Securities | Other Debits | Balance |
|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | |
| 12 | 566.76 | | | | | | 4,012.90 |
| **2015** | | | | | | | |
| 12 | 503.63 | | | | | (2,724.49) | 1,792.04 |
| **2016** | | | | | | | |
| 10 - 12 | | | | | | 143.69 | 1,935.73 |
| **2017** | | | | | | | |
| 1 - 3 | | | | | | 2,262.62 | 4,198.35 |
| 4 - 6 | | | | | | 3,638.63 | 7,836.98 |
| 12 | 584.90 | | | | | (6,538.31) | 1,883.57 |
| **2018** | | | | | | | |
| 1 - 3 | 4,070.02 | 301,379.98 | (303,263.55) | | | | 4,070.02 |
| 4 - 6 | 1,718.51 | | | | | | 5,788.53 |
| 6 - 9 | | | | | | (3,724.44) | 2,064.09 |

Total Unknown Withdrawals          (303,263.55)

**Securities - Managed Portfolio**

| Month | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance | Total |
|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | |
| 12 | - | | - | | | 600,622.71 | 604,635.61 |
| **2015** | | | | | | | |
| 12 | - | | - | | 3,514.53 | 604,137.24 | 605,929.28 |
| **2016** | | | | | | | |
| 10 - 12 | - | | - | | 24,476.10 | 628,613.34 | 630,549.07 |
| **2017** | | | | | | | |
| 1 - 3 | - | | - | | 42,689.39 | 671,302.73 | 675,501.08 |
| 4 - 6 | - | | - | | 32,148.81 | 703,451.54 | 711,288.52 |
| 12 | - | | - | | 71,621.08 | 775,072.62 | 776,956.19 |
| **43562** | | | | | | | |
| 1 - 3 | - | | (301,379.98) | | (11,995.00) | 461,697.64 | 465,767.66 |
| 4 - 6 | - | | - | | 2,840.07 | 464,537.71 | 470,326.24 |
| 9-Jun | - | | - | | 34,312.17 | 498,849.88 | 500,913.97 |

Notes:
1. Withdrawal in Q1 2018 was calculated by subtracting the net investment return of -$7,924.98 from the account balance at 12/31/17 of $776,959.19 and comparing with remaining balance at 3/31/18 of $465,767.66.  Net investment return was (1.02%) or -$7,924.98 for Q1 2018 per the Fisher Investments quarterly report.

Bank Square - Ene updated 1.29.19.xls

Fisher #0447 Managed
Page 1 of 1

Magnolia Group LLP
Schedule 3

Marriage of Ene and Darisme
Bank Statement Summary - Patrice Darisme
Fisher #0447 - CLIENT SUPERVISED PORTFOLIO
December 2014 - September 2018

**Cash - Client Supervised Portfolio**

| Month | Deposit | Stock Sale Proceeds | Nimble Out | Change in Value | Balance |
|---|---|---|---|---|---|
| 2014 | | | | | |
| 12 | | | | | 4,337.55 |
| 2015 | | | | | |
| 12 | 14,969.91 | | | | 19,307.46 |
| 2016 | | | | | |
| 10 - 12 | Statement missing | | | | 19,307.46 |
| 2017 | | | | | |
| 1 - 3 | 18,705.27 | | | | 38,012.73 |
| 4 - 6 | | 253,487.50 | | | 291,500.23 |
| 12 | | | | | 291,500.23 |
| 2018 | | | | | |
| 1 - 3 | | | | (100,000.00) | 191,500.23 |
| 4 - 6 | | | | (95,000.00) | 96,500.23 |
| 9 | | | | (50,000.00) | 46,500.23 |
| Total Unknown Withdrawals 2015 - Sept 2018 | | | | (245,000.00) | |

**Securities - Client Supervised Portfolio**

| Month | Securities Bought | Nimble Securities Received | Nimble Securities Sold | Securities Transferred Out | Change in Value | Balance | Total |
|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | |
| 12 | | | | | | 148,225.00 | 152,562.55 |
| 2015 | | | | | | | |
| 12 | | 13,294.00 | | | (98,637.00) | 62,882.00 | 82,189.46 |
| 2016 | | | | | | | |
| 10 - 12 | | | | | | 62,882.00 | 82,189.46 |
| 2017 | | | | | | | |
| 1 - 3 | | 78,037.50 | | | 22,555.50 | 163,475.00 | 201,487.73 |
| 4 - 6 | | | (253,487.50) | | 90,012.50 | - | 291,500.23 |
| 12 | | | | | | - | 291,500.23 |
| 43562 | | | | | | | |
| 1 - 3 | | | | | | - | 191,500.23 |
| 4 - 6 | | | | - | | - | 96,500.23 |
| 12 | | | | | | - | 46,500.23 |

Fisher #0447 Client
Page 1 of 1

Magnolia Group LLP
Schedule 4

Marriage of Ene and Darisme
Bank Statement Summary  - Patrice Darisme
Charles Schwab #4354
January 2014 - December 2018

**CASH / MONEY HOLDINGS**

| Month | Investment Income | Stock Sale Proceeds | Withdrawal | Transfer Out | Funds to Purchase Securities | Other Debits | Balance |
|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | 3,009.58 |
| 1 | 650.24 | 37,322.74 | | | (37,111.12) | (1,837.83) | 2,033.61 |
| 2 | 506.60 | | | | | (1.34) | 2,538.87 |
| 3 | 1,159.78 | | | | | | 3,698.65 |
| 4 | 1,470.99 | | | | | (1,853.51) | 3,316.13 |
| 5 | 992.57 | | | | | (35.66) | 4,273.04 |
| 6 | 1,703.40 | 43,538.26 | (1,075.47) | | (45,929.61) | (6.70) | 2,502.92 |
| 7 | 713.11 | 1,003.25 | | | | (2,085.80) | 2,133.48 |
| 8 | 321.80 | | | | | (1.34) | 2,453.94 |
| 9 | 1,110.72 | 3,199.53 | (3,195.25) | | | | 3,568.94 |
| 10 | 714.82 | | | | | | 4,283.76 |
| 11 | 323.95 | 3,535.12 | | | | (9.95) | 8,132.88 |
| 12 | 1,343.74 | 1,066.22 | (1,048.86) | | | (1,710.29) | 7,783.69 |
| Year totals | 11,011.72 | 89,665.12 | (5,319.58) | - | (83,040.73) | (7,542.42) | 7,783.69 |
| | | | | | | | |
| 2015 | | | | | | | |
| 1 | 683.16 | | | | | (1,889.49) | 6,577.36 |
| 2 | 1,618.82 | | | | | (21.47) | 8,174.71 |
| 3 | 1,285.86 | 5,984.13 | (5,885.08) | | | | 9,559.62 |
| 4 | 1,375.29 | | | | | (1,927.09) | 9,007.82 |
| 5 | 1,300.65 | 18.34 | | | | (35.66) | 10,291.15 |
| 6 | 1,697.74 | 20,011.54 | (4,306.23) | | (15,627.46) | (17.81) | 12,048.93 |
| 7 | 844.00 | 34,987.54 | | | (33,825.21) | (1,932.88) | 12,122.38 |
| 8 | 318.59 | 17,616.22 | | | (19,320.82) | | 10,736.37 |
| 9 | 1,333.50 | 22,141.26 | (6,259.56) | | (10,654.63) | (1.32) | 17,295.62 |
| 10 | 798.89 | | | | | (1,783.02) | 16,311.49 |
| 11 | 493.48 | | | | | (6.93) | 16,798.04 |
| 12 | 1,259.03 | 6,485.01 | | (3,933.65) | | (12.56) | 20,595.87 |
| Year totals | 13,009.01 | 107,244.04 | (16,450.87) | (3,933.65) | (79,428.12) | (7,628.23) | 20,595.87 |

**SECURITIES**

| Month | Description of Securities Received | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance |
|---|---|---|---|---|---|---|---|
| 2014 | | | | | | | 584,735.42 |
| 1 | | 37,111.12 | | (37,322.74) | | (26,576.36) | 557,947.44 |
| 2 | | - | | - | | 26,905.19 | 584,852.63 |
| 3 | | - | | - | | 2,734.76 | 587,587.39 |
| 4 | | - | | - | | 4,693.58 | 592,280.97 |
| 5 | | - | | | | 6,430.53 | 598,711.50 |
| 6 | Nimble | 45,929.61 | 127,609.92 | (43,538.26) | | 37,293.30 | 766,006.07 |
| 7 | | - | | (1,003.25) | | (41,530.86) | 723,471.96 |
| 8 | | - | | - | | 24,816.26 | 748,288.22 |
| 9 | Nimble | - | 8,565.34 | (3,199.53) | | (16,714.26) | 736,939.77 |
| 10 | | - | | - | | 10,431.50 | 747,371.27 |
| 11 | | - | | (3,535.12) | | 11,495.95 | 755,332.10 |
| 12 | Nimble | - | 2,692.00 | (1,066.22) | | (7,561.36) | 749,396.52 |
| Year totals | | 83,040.73 | 138,867.26 | (89,665.12) | - | 32,418.23 | 749,396.52 |
| | | | | | | | |
| 2015 | | | | | | | |
| 1 | | - | | - | | (47,120.77) | 702,275.75 |
| 2 | | - | | - | | 56,477.07 | 758,752.82 |
| 3 | Nimble | - | 14,049.95 | (5,984.13) | | (30,117.60) | 736,701.04 |
| 4 | | - | | - | | 29,432.09 | 766,133.13 |
| 5 | | - | | (18.34) | | 15,539.61 | 781,654.40 |
| 6 | Nimble | 15,627.46 | 12,496.00 | (20,011.54) | | (7,815.80) | 781,950.52 |
| 7 | | 33,825.21 | | (34,987.54) | | 18,971.40 | 799,759.59 |
| 8 | | 19,320.82 | | (17,616.22) | | (55,524.56) | 745,939.63 |
| 9 | Nimble | 10,654.63 | 17,023.45 | (22,141.26) | | (33,415.54) | 718,060.91 |
| 10 | | - | | - | | 45,186.61 | 763,247.52 |
| 11 | | - | | - | | (79,766.67) | 683,480.85 |
| 12 | Nimble | - | 10,120.75 | (6,485.01) | | (20,280.36) | 666,836.23 |
| Year totals | | 79,428.12 | 53,690.15 | (107,244.04) | - | (108,434.52) | 666,836.23 |

**TOTAL**

| | Total |
|---|---|
| | 587,745.00 |
| | 559,981.05 |
| | 587,391.50 |
| | 591,286.04 |
| | 595,597.10 |
| | 602,984.54 |
| | 768,508.99 |
| | 725,605.44 |
| | 750,742.16 |
| | 740,508.71 |
| | 751,655.03 |
| | 763,464.98 |
| | 757,180.21 |
| | 757,180.21 |
| | |
| | |
| | 708,853.11 |
| | 766,927.53 |
| | 746,260.66 |
| | 775,140.95 |
| | 791,945.55 |
| | 793,999.45 |
| | 811,881.97 |
| | 756,676.00 |
| | 735,356.53 |
| | 779,559.01 |
| | 700,278.89 |
| | 687,432.10 |
| | 687,432.10 |

Bank Square - Ene updated 1.29.19.xls

Magnolia Group LLP
Schedule 4

Marriage of Ene and Darisme
Bank Statement Summary - Patrice Darisme
Charles Schwab #4354
January 2014 - December 2018

**CASH / MONEY HOLDINGS**

| Month | Investment Income | Stock Sale Proceeds | Withdrawal | Transfer Out | Funds to Purchase Securities | Other Debits | Balance |
|---|---|---|---|---|---|---|---|
| 2016 | | | | | | | |
| 1 | 630.03 | 1,593.66 | | | | (1,894.56) | 20,925.00 |
| 2 | 349.64 | 14,476.00 | | | (14,426.60) | | 21,324.04 |
| 3 | 1,316.68 | 2,169.37 | | (2,051.80) | | | 22,758.29 |
| 4 | 1,667.95 | 1,039.36 | | | | (1,848.42) | 23,617.18 |
| 5 | 2,118.46 | 5,963.36 | | | (5,904.56) | (38.00) | 25,756.44 |
| 6 | 1,585.00 | 400.67 | | (400.23) | (2,563.68) | (11.25) | 24,766.95 |
| 7 | 741.40 | 57,404.36 | | | (57,786.03) | (1,862.36) | 23,264.32 |
| 8 | 503.86 | 7,965.53 | | | (8,107.47) | (1.14) | 23,625.10 |
| 9 | 1,360.29 | 25,913.90 | | (13,232.90) | | (1.31) | 37,665.08 |
| 10 | 641.00 | 1,092.09 | | | | (1,905.71) | 37,492.46 |
| 11 | 330.18 | | | | | | 37,822.64 |
| 12 | 1,487.87 | 1,891.97 | | (1,871.16) | | (17.36) | 39,313.96 |
| Year totals | 12,732.36 | 119,910.27 | - | (17,556.09) | (88,788.34) | (7,580.11) | 39,313.96 |
| 2017 | | | | | | | |
| 1 | 846.29 | 5,310.13 | | | (4,340.94) | (1,982.16) | 39,147.28 |
| 2 | 497.32 | | | | | (1.14) | 39,643.46 |
| 3 | 1,250.12 | 27,255.61 | | (27,188.83) | | | 40,960.36 |
| 4 | 1,257.17 | 336,234.55 | | | (71,595.20) | (2,117.81) | 304,739.07 |
| 5 | 2,245.60 | 14,598.94 | | | (20,869.40) | (92.44) | 300,621.77 |
| 6 | 2,098.46 | 39,699.67 | | | (44,171.96) | (24.50) | 298,223.44 |
| 7 | 1,004.22 | 7,176.89 | | | (7,172.90) | (2,253.41) | 296,978.24 |
| 8 | 1,504.79 | | | | | (30.11) | 298,452.92 |
| 9 | 1,364.55 | | | | | (3.35) | 299,814.12 |
| 10 | 702.03 | 26,987.56 | | | (26,534.84) | (2,355.61) | 298,613.26 |
| 11 | 658.78 | 5.18 | | | (2,504.61) | (0.17) | 296,772.44 |
| 12 | 1,480.58 | 14,590.25 | | (20,000.00) | | (44.37) | 292,798.90 |
| Year totals | 14,909.91 | 471,858.78 | - | (47,188.83) | (177,189.85) | (8,905.07) | 292,798.90 |

**SECURITIES**

| Month | Description of Securities Received | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance |
|---|---|---|---|---|---|---|---|
| 2016 | | | | | | | |
| 1 | | - | | (1,593.66) | | (59,408.10) | 605,834.47 |
| 2 | | 14,426.60 | | (14,476.00) | | (9,024.29) | 596,760.78 |
| 3 | Nimble | - | 4,700.79 | (2,169.37) | | 42,433.51 | 641,725.71 |
| 4 | | - | | (1,039.36) | | 4,885.13 | 645,571.48 |
| 5 | | 5,904.56 | | (5,963.36) | | 18,573.33 | 664,086.01 |
| 6 | Nimble | 2,563.68 | 1,056.52 | (400.67) | | (17,670.94) | 649,634.60 |
| 7 | | 57,786.03 | | (57,404.36) | | 23,092.70 | 673,108.97 |
| 8 | | 8,107.47 | | (7,965.53) | | 6,156.46 | 679,407.37 |
| 9 | Nimble | - | 33,463.88 | (25,913.90) | | 6,323.85 | 693,281.20 |
| 10 | | - | | (1,092.09) | | (24,197.29) | 667,991.82 |
| 11 | | - | | - | | 14,188.64 | 682,180.46 |
| 12 | Nimble | - | 4,641.04 | (1,891.97) | | 23,128.90 | 708,058.43 |
| Year totals | | 88,788.34 | 43,862.23 | (119,910.27) | - | 28,481.90 | 708,058.43 |
| 2017 | | | | | | | |
| 1 | | 4,340.94 | | (5,310.13) | | 19,803.94 | 726,893.18 |
| 2 | | - | | | | 30,422.74 | 757,315.92 |
| 3 | Nimble | - | 62,882.16 | (27,255.61) | | 41,811.09 | 834,753.56 |
| 4 | Nimble | 71,595.20 | 89,940.49 | (336,234.55) | | 14,376.16 | 674,430.86 |
| 5 | | 20,869.40 | | (14,598.94) | | 17,962.03 | 698,663.35 |
| 6 | | 44,171.96 | | (39,699.67) | | 1,078.82 | 704,214.46 |
| 7 | | 7,172.90 | | (7,176.89) | | 16,949.95 | 721,160.42 |
| 8 | | - | | - | | 6,928.32 | 728,088.74 |
| 9 | | - | | - | | 17,425.26 | 745,514.00 |
| 10 | | 26,534.84 | | (26,987.56) | | 21,828.95 | 766,890.23 |
| 11 | | 2,504.61 | | (5.18) | | 13,253.60 | 782,643.26 |
| 12 | | - | | (14,590.25) | | 6,715.64 | 774,768.65 |
| Year totals | | 177,189.85 | 152,822.65 | (471,858.78) | - | 208,556.50 | 774,768.65 |

**TOTAL**

| Total |
|---|
| 626,759.47 |
| 618,084.82 |
| 664,484.00 |
| 669,188.66 |
| 689,842.45 |
| 674,401.55 |
| 696,373.29 |
| 703,032.47 |
| 730,946.28 |
| 705,484.28 |
| 720,003.10 |
| 747,372.39 |
| 747,372.39 |
| 766,040.46 |
| 796,959.38 |
| 875,713.92 |
| 979,169.93 |
| 999,285.12 |
| 1,002,437.90 |
| 1,018,138.66 |
| 1,026,541.66 |
| 1,045,328.12 |
| 1,065,503.49 |
| 1,079,415.70 |
| 1,067,567.55 |
| 1,067,567.55 |

Bank Square - Ene updated 1.29.19.xls

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 87 of 90

PRELIMINARY BASED ON INFO RECEIVED TO DATE

Marriage of Ene and Darisme
Bank Statement Summary  - Patrice Darisme
Charles Schwab #4354
January 2014 - December 2018

## CASH / MONEY HOLDINGS

| Month | Investment Income | Stock Sale Proceeds | Withdrawal | Transfer Out | Funds to Purchase Securities | Other Debits | Balance |
|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | |
| 1 | 666.62 | 1,249.00 | | (50,000.00) | | (2,430.20) | 242,284.32 |
| 2 | 1,134.30 | | | (50,000.00) | | (12.03) | 193,406.59 |
| 3 | 1,271.21 | 9,728.19 | | | (9,998.47) | (5.76) | 194,401.76 |
| 4 | 1,277.62 | | | (50,000.00) | | (2,716.62) | 142,962.76 |
| 5 | 1,306.27 | 25,738.00 | | | (26,063.17) | (59.63) | 143,884.23 |
| 6 | 1,787.78 | 10,066.68 | | (45,000.00) | (9,043.99) | (64.50) | 101,630.20 |
| 7 | 557.43 | 31,640.63 | | (50,000.00) | (28,016.28) | (1,777.94) | 54,034.04 |
| 8 | 697.63 | 9,925.54 | | | (16,833.00) | (10.44) | 47,813.77 |
| 9 | 1,075.42 | 25,287.16 | | | (25,776.66) | (2.98) | 48,396.71 |
| 10 | 359.75 | | | | | (1,566.72) | 47,189.74 |
| 11 | 368.26 | 1.10 | | | | (0.11) | 47,558.99 |
| 12 | 865.48 | | | | | (22.21) | 48,402.26 |
| Year totals | 11,367.77 | 113,636.30 | - | (245,000.00) | (115,731.57) | (8,669.14) | 48,402.26 |
| Total Unknown Withdrawals 2015-2018 | | | (16,450.87) | (313,678.57) | | | |

## SECURITIES

| Month | Description of Securities Received | Securities Bought | Securities Received | Securities Sold | Securities Transferred Out | Change in Value | Balance |
|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | |
| 1 | | - | | (1,249.00) | | 55,728.36 | 829,248.01 |
| 2 | | - | | - | | (43,320.10) | 785,927.91 |
| 3 | | 9,998.47 | | (9,728.19) | (297,128.00) | (26,708.93) | 462,361.26 |
| 4 | | - | | - | | 3,452.51 | 465,813.77 |
| 5 | | 26,063.17 | | (25,738.00) | | 536.88 | 466,675.82 |
| 6 | | 9,043.99 | | (10,066.68) | | (1,421.24) | 464,231.89 |
| 7 | | 28,016.28 | | (31,640.63) | | 19,692.09 | 480,299.63 |
| 8 | | 16,833.00 | | (9,925.54) | | 8,241.79 | 495,448.88 |
| 9 | | 25,776.66 | | (25,287.16) | | 2,579.21 | 498,517.59 |
| 10 | | - | | - | | (41,241.73) | 457,275.86 |
| 11 | | - | | (1.10) | | 3,546.94 | 460,821.70 |
| 12 | | - | | - | | (43,463.22) | 417,358.48 |
| Year totals | | 115,731.57 | - | (113,636.30) | (297,128.00) | (62,377.44) | 417,358.48 |

## TOTAL

| | Total |
|---|---|
| | 1,071,532.33 |
| | 979,334.50 |
| | 656,763.02 |
| | 608,776.53 |
| | 610,560.05 |
| | 565,862.09 |
| | 534,333.67 |
| | 543,262.65 |
| | 546,914.30 |
| | 504,465.60 |
| | 508,380.69 |
| | 465,760.74 |
| | 465,760.74 |

# EXHIBIT J



**E✱TRADE** Securities
Investment Account

February 1, 2021 - February 28, 2021
Account Number: 6703-4324
Account Type: JOINT

E*TRADE Securities LLC
P.O. Box 484
Jersey City, NJ 07303-0484
1-800-ETRADE-1 (1-800-387-2331)
etrade.com Member FINRA/SIPC

## Customer Update:

**All your tax info in one place**
Forms 1099 for 2020, FAQs, key deadlines, cost basis info, and more–find them all in our Tax Center at *etrade.com/tax.*

### IMPORTANT INFORMATION

April 15 is Tax Day, but it's also the last day to make a 2020 contribution to your IRA.

PATRICE W DARISME &
PRINCESCA N ENE JTWROS
PO BOX 64462
SUNNYVALE CA 94088-4462

### Account At A Glance

$1,852,210.82

$1,741,788.38

As of 01/31/21      As of 02/28/21

| Net Change: | $-110,422.44 |
| --- | --- |

▲ DETACH HERE

PATRICE W DARISME &
PRINCESCA N ENE JTWROS
PO BOX 64462
SUNNYVALE CA 94088-4462

Make checks payable to E*TRADE Securities LLC

Mail deposits to:

DETACH HERE ▲

**Use This Deposit Slip**      **Acct: 6703-4324**

**Please do not send cash**

| | Dollars | Cents |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL DEPOSIT** | | |

E*TRADE SECURITIES LLC
P.O. Box 484
Jersey City, NJ 07303-0484

Case: 21-50901    Doc# 255    Filed: 08/14/23    Entered: 08/14/23 17:09:44    Page 89 of 90

**charles SCHWAB**

Schwab One® Account of
**PATRICE W DARISME**

Account Number ████-4354

Statement Period
December 1-31, 2020

## Account Value as of 12/31/2020: $ 388,021.77

## Change in Account Value

| | This Period | Year to Date |
|---|---|---|
| Starting Value | $ 370,210.58 | $ 605,870.18 |
| Credits | 473.70 | 6,733.59 |
| Debits | (19.79) | (7,222.58) |
| Transfer of Securities (In/Out) | 0.00 | (303,356.78) |
| Income Reinvested | 0.00 | 0.00 |
| Change in Value of Investments | 17,357.28 | 86,007.36 |
| Ending Value on 12/31/2020 | $ 388,021.77 | $ 388,021.77 |
| Accrued Income [c] | 95.05 | |
| Ending Value with Accrued Income [b] | $ 388,116.82 | |
| Total Change in Account Value | $ 17,811.19 | $ (217,848.41) |
| Total Change with Accrued Income [d] | $ 17,906.24 | |

Account Value [in Thousands]

570
475
380
285
190
95
0

3/20  6/20  9/20  12/20

## Asset Composition

| | Market Value | % of Account Assets |
|---|---|---|
| Bank Sweep [x,z] | $ 48,521.27 | 13% |
| Equities | 337,031.44 | 87% |
| Other Assets | 2,469.06 | <1% |
| Total Assets Long | $ 388,021.77 | |
| Net Loan Balance | 0.00 | |
| Total Account Value | $ 388,021.77 | 100% |

Overview



13% Bank Sweep [X,Z]
87% Equities

**FISHER INVESTMENTS™**

**PRIVATE CLIENT GROUP**

Your Independent Investment Advisor is not affiliated with or an agent of Schwab and Schwab does not supervise or endorse your Advisor.